



**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 24, 2022**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DARREN SCOTT MATLOFF, | § | CASE NO. 19-44253-MXM-7 |
| | § | |
| DEBTOR. | § | CHAPTER 7 |
| | § | |

---

| | | |
|---|---|---|
| | § | |
| TRIUMPHANT GOLD LIMITED, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | ADVERSARY NO. 19-04127-MXM |
| | § | |
| DARREN SCOTT MATLOFF, | § | |
| | § | |
| DEFENDANT. | § | |

### <u>MEMORANDUM OPINION</u>
*[Relates to Adv. ECF No. 4]*

The Court conducted a trial on the Complaint[1] filed by Triumphant Gold Limited ("*TGL*") against Darren Scott Matloff ("*Mr. Matloff*").  By the Complaint, TGL is seeking a judgment that (i) TGL's alleged claim of $8,140,842.02 against Mr. Matloff is nondischargeable based on *four* independent theories under 11 U.S.C. § 523(a)(2), (4), and (6); (ii) Mr. Matloff's discharge (of alleged debt exceeding $67 million) is denied based on *seven* independent theories under 11 U.S.C. § 727(a)(2), (3), (4), (5), and (7); and (iii) certain of Mr. Matloff's asserted exemptions be denied.

The Court has reviewed and considered the pleadings and briefings filed in this adversary proceeding, the testimony of witnesses, the exhibits admitted into evidence, and the arguments of counsel.  This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law[2] as required by Federal Rule of Civil Procedure 52, made applicable in this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052.

As detailed below, the Court finds and concludes that TGL failed to satisfy its burden to establish that Mr. Matloff's debt to TGL should be declared nondischargeable under § 523 or that Mr. Matloff should be denied a discharge under § 727.  Therefore, each of the claims and causes of action contained in Counts One, Two, Three, Four, and Five of the Complaint are denied.  Finally, as detailed below, the objection to exemptions contained in Count Six of the Complaint are also denied.

---

[1] *Adversary Complaint* (the "*Complaint*") Adv. ECF No. 4.

[2] Any findings of fact that should be more appropriately be characterized as a conclusion of law should be regarded as such, and *vice versa*.

# I.    JURISDICTION AND VENUE

The Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the standing order of reference in this district. This Adversary Proceeding constitutes core proceedings over which the Court has statutory and constitutional authority to enter final orders and judgments pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (I), (J), and (O). Even if this Court would not otherwise have the authority to enter a final judgment, the Court finds that the parties have consented to the Court's issuance of a final judgment in this proceeding. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

# II.    BACKGROUND FACT[3]

## A.    Mr. Matloff's Education and Work Experience Prior to 2008

Mr. Matloff did not graduate from high school, nor did he attend college. Further, Mr. Matloff has not had any formal education or training in accounting or finance outside of what he has learned through his work experience.

In 2003, Mr. Matloff founded "a very small company, a family business" initially operating as an original equipment manufacturer for various brands specializing in consumer electronics.[4] His small family business began growing thirty to forty percent year over year.[5] In or around 2007, Mr. Matloff decided to create his own branded products, and, in 2008, his

---

[3] Citations to TGL Exhibits will be "TGL Ex. [Ex. number]" and Matloff Exhibits will be "Mat. Ex. [Exhibit number]". Citations to witnesses' testimony will be to the applicable Adv. ECF Number, with pinpoint citations as "[page number]:[line number(s)]."

[4] Adv. ECF No. 154 at 104:9–10.

[5] Adv. ECF No. 154 at 104:10–13.

business began developing, designing, and creating its own leisure-use, remote-controlled helicopters and drones under the trademarked "Propel" brand name.[6]

## B.    Mr. Matloff Forms Rooftop Group USA and Enters into a "Collaborative Relationship" with Asian Express

In or about 2008, Mr. Matloff formed Rooftop Group USA, Inc., a California Corporation ("**Rooftop Group USA**"), primarily to develop and distribute the Propel-brand remote-controlled helicopters and drones.[7]   At or about that same time, Rooftop Group USA entered into a "collaborative relationship"[8] with Asian Express Holdings, LTD, a Hong Kong company ("**Asian Express**").   Asian Express was owned by Ms. Jia-wen (Phoebe) Chen ("**Ms. Chen**"), but Mr. Matloff was the CEO of Asian Express.[9]

Under the collaborative relationship with Asian Express, Rooftop Group USA was the United States based selling arm for the Propel-branded products.  Big-box retailers in the United States would issue purchase orders directly with Rooftop Group USA, who would then place product orders with Asian Express.[10]   Asian Express would then manage the manufacturing of the products, usually through manufacturers located in China.   After manufacturing, Rooftop Group USA would provide for the distribution of the product to the customer retailers and collect the sale proceeds for the sold product.  Rooftop Group USA would then remit payment to Asian

---

[6] TGL Ex. 58.

[7] Adv. ECF No. 154 at 95:8–21.

[8] Adv. ECF No. 154 at 95:14–16.  Although Mr. Matloff testified that there was a contractual agreement between Rooftop Group USA and Asian Express during that time period, no agreement was offered into evidence.

[9] Adv. ECF No. 154 at 30:11–12.

[10] Adv. ECF No. 154 at 30:13–16; 95:14–21; and 115:17–21; *see also* Adv. ECF No. 156 at 60:19–23.

Express for the manufacturing costs Asian Express incurred in fulfilling Rooftop Group USA's purchase orders.[11]

## C.      Growth of Rooftop Group USA between 2008 and 2014

Between 2008 and 2014, Rooftop Group USA and Asian Express were the only two entities involved in the manufacturing and sale of Rooftop Group USA's Propel-branded products.  During that time, however, Rooftop Group USA experienced substantial growth. By 2014, Rooftop Group USA generated gross sales exceeding $27 million.[12]  Following a 2015 restructuring of the business, which formed various Rooftop entities detailed *infra*, the restructured Rooftop enterprise continued to experience substantial growth, with gross sales exceeding $43 million in 2015,[13] $81 million in 2016,[14] and $149 million in 2017.[15]

Between 2008 and 2014, Rooftop Group USA hired key operational and management personal and retained outside professionals to oversee various aspects of the business.

### 1.      Ms. Susan Ocampo

Ms. Ocampo, Mr. Matloff's sister, began working with Mr. Matloff in 2008—when she formed and incorporated Rooftop Group USA.[16]  Except for a few months in the fall of 2013,[17] Ms. Ocampo remained with the business until 2019.[18]  From and after 2008, Ms. Ocampo served in several capacities for the business including "account executive, a business manager,

---

[11] Adv. ECF No. 154 at 29:25 thru 30:16; *see also* Adv. ECF No. 156 at 214:7–22.

[12] TGL Ex. 67 at 5.

[13] TGL Ex. 67 at 5.

[14] TGL Ex. 67 at 7.

[15] TGL Ex. 67 at 7; Mat. Ex. 64.

[16] Adv. ECF No. 155 at 9:20–24.

[17] Adv. ECF No. 155 at 10:6–9.

[18] Adv. ECF No. 155 at 11:11–18.

bookkeeper, CFO, personal assistant, [handling] litigation legal matters, customer service, [and working] on projects[and] media, just to name a few."[19]  Ms. Ocampo's primary responsibility, however, was in the bookkeeping and accounting department where she was responsible for the day-to-day maintenance of accounts receivable, accounts payable, general ledger, and QuickBooks.[20]  Ms. Ocampo testified as a fact witness during the trial, and her testimony will be referenced throughout this Memorandum Opinion.  The Court found Ms. Ocampo to be a very credible witness.

### 2.  *Mr. Adam McEnaney*

Mr. McEnaney was never an employee of Rooftop Group USA or Rooftop Services. Rather, Mr. McEnaney (and his company, Q4 Brands)[21] began working with Rooftop Group USA as a 1099 independent contractor from 2008 until the Rooftop entities ceased operations in 2019.[22] Mr. McEnaney primarily worked with Rooftop Group USA's retail customers to generate sales for Rooftop Group USA.[23]  As compensation for his work, Mr. McEnany and Q4 Brands received commissions for net sales he generated for Rooftop Group USA.[24]

Although Mr. McEnaney did not testify live during the trial, both TGL and Mr. Matloff offered into evidence a designated deposition transcript of his prior deposition testimony, which will be referenced throughout this Memorandum Opinion.  In addition, because TGL raised certain disputes concerning Mr. McEnaney and Q4 Brands, a more detailed discussion

---

[19] Adv. ECF No. 155 at 9:20 thru 10:5.

[20] Adv. ECF No. 155 at 10:9–12.

[21] Adv. ECF No. 154 at 89:15 thru 90:3.

[22] Adv. ECF No. 171-1 at 9:8–11 and 81:1–17; Adv. ECF No. 154 at 209:24 thru 210:13.

[23] Adv. ECF No. 171-1 at 10:4–17; Adv. ECF No. 155 at 68:9–23.

[24] Adv. ECF No. 154 at 210:9–19; Mat. Ex. 76.

specifically devoted to Mr. McEnaney and Q4 Brands is included, *infra*, in this Memorandum Opinion.

### 3.      Mr. Sunny Tuli

Mr. Tuli joined Rooftop Group USA in 2010 as its COO, and he remained with the business until mid-2018.  During his time with the business, Mr. Tuli led the brand and product development team focusing on research and development, engineering, production management, and overseeing all manufacturing operations.  Mr. Tuli did not testify during the trial.

### 4.      Ms. Anita York

Ms. York joined Rooftop Group USA in 2010.  Ms. York managed the company's Toronto, Canada, office where she was the Finance Director responsible for overseeing the company's day-to-day operations and retailer vendor relationships.[25]  She was also responsible for managing the company's purchase orders and accounts receivable.[26]  Ms. York has worked in a variety of bookkeeping and accounting roles for over twenty-five years, including managing vendor relationships and accounts receivable.  During her eight years with Rooftop Group USA and Rooftop Services, Ms. York testified that "there has never been a bounced check or a suspension of an account due to nonpayment issues or nonreconciliation of account."[27]  Ms. York testified as a fact witness during the trial, and her testimony will be referenced throughout this Memorandum Opinion.  The Court found Ms. York to be a very credible witness.

---

[25] Adv. ECF No. 155 at 12:16–20.

[26] Adv. ECF No. 155 at 45:13–24 and 48:7–12.

[27] Adv. ECF No. 155 at 85:8–20.

### 5.      *Mr. Edward L. Schafman and Ms. Erin Newbrand*

Beginning in 2012, Rooftop Group USA engaged Edward L. Schafman, P.C., and specifically, Mr. Schafman and Ms. Newbrand—both of whom are CPAs[28]—to provide traditional accounting and day-to-day bookkeeping services for the business.[29]  Mr. Schafman and Ms. Newbrand continued to provide outside accounting services to Rooftop Group USA and Rooftop Services through 2019.  Although neither Mr. Schafman or Ms. Newbrand testified live during the trial, both TGL and Mr. Matloff offered into evidence designated deposition transcripts of their deposition testimony, which will be referenced throughout this Memorandum Opinion.

### 6.      *Mr. Andrew Dixon*

In or around 2012, Rooftop Group USA engaged Mr. Dixon, a CPA with Arete Advisors, LLP,[30] to provide tax services for the business.[31]  Mr. Dixon and his firm prepared tax returns for Rooftop Group USA and then other Rooftop entities as they were created through 2019.  Although Mr. Dixon did not testify live during the trial, both TGL and Mr. Matloff offered into evidence a designated deposition transcript of his deposition testimony, which will be referenced throughout this Memorandum Opinion.

### 7.      *Mr. Steve Nelson*

Mr. Nelson joined Rooftop Group USA as an advisor in 2014 and then as a director and General Counsel for Rooftop Singapore in 2015 until he resigned in 2018.[32]  Mr. Nelson earned a BA degree from the University of Pennsylvania in 1980 and a JD degree from Columbia

---

[28] Adv. ECF No. 171-2 at 128:9–11

[29] Adv. ECF No. 155 at 10:8–15; 12:10–15; and 46:23 thru 48:4.

[30] Adv. ECF No. 171 at 6:23.

[31] Adv. ECF No. 155 at 10:8–15; 12:10–15; and 46:23 thru 48:4.

[32] Adv. ECF No. 158 at 5:25 thru 6:5.

University in 1986.  After law school, Mr. Nelson joined the Baker McKenzie law firm where he ultimately became a partner and served as the head of the firm's China practice until 2005.  Mr. Nelson then joined the King & Wood law firm, where he was the head of the tax group and co-head of the corporate group until 2010.  Mr. Nelson then joined the DLA Piper law firm, where he worked until joining Rooftop Group USA in 2014.[33]  Mr. Nelson testified as a fact witness during the trial and his testimony will be referenced throughout this Memorandum Opinion.  The Court found Mr. Nelson to be a very credible witness.

### 8.      *Mr. Thian Chew*

Mr. Chew joined Rooftop Group USA in 2014 as its CFO.  Mr. Chew was tasked with building out a full finance team and systems to facilitate corporate governance, and with paving the way for the business to be more suitable for institutional level lenders and investors.[34]  Mr. Chew earned his MBA from the University of Pennsylvania—The Wharton School, and he has over twenty-five years of experience in investing, finance, and transforming business operations. Mr. Chew's previous experience includes Vice President and Executive Director positions in the principal investing group of the Hong Kong office of Goldman Sachs, Director in KPMG Consulting's business transformation practice, and Senior Manager in KPMG's audit and assurance divisions.  Mr. Chew remained with Rooftop Group USA and then Rooftop Singapore as its CFO until he resigned on April 30, 2018.[35]

Mr. Chew did not testify during the trial, but his role with the Rooftop entities and TGL is extremely relevant and significant to the issues raised in the Complaint.  Therefore, a more

---

[33] Adv. ECF No. 158 at 6:6–16.

[34] TGL Ex. 58.

[35] Mat. Ex. 144.

detailed discussion specifically devoted to Mr. Chew is included, *infra*, in this Memorandum Opinion.

**D.** **The 2015 Restructuring of the Rooftop Business and the formation of Rooftop Singapore**

During 2013 and 2014, the management team of Rooftop Group USA determined that the business should undergo a formal corporate restructuring. According to the credible testimony of Mr. Nelson, the corporate restructuring for Rooftop Group USA was necessary to create "a more rational corporate structure that would put all the business in – the group under a single corporate entity based in Singapore with a lower effective tax rate than in the U.S., and as a unified corporate structure, make the group more amenable to accepting an entity investment."[36]

To begin the formal corporate restructuring, Rooftop Group International Pte. Ltd., a Singapore Company, was formed in 2014 as a PLLC under the laws of the Republic of Singapore ("***Rooftop Singapore***").[37] Rooftop Singapore's parent company was Gandiva Investments Limited, a limited liability company incorporated in the British Virgin Islands ("***Gandiva***"). Gandiva is owned by the Matloff Family Trust.[38] Mr. Matloff is a potential beneficiary of the Matloff Family Trust.[39]

The following is the organizational structure of the Matloff Family Trust:[40]

---

[36] Adv. ECF No. 158 at 9:13–18.

[37] TGL Ex. 7 at 8.

[38] Mat Ex. 27.

[39] Mat. Ex. 8 at 8; Mat. Ex. 9 at 10; TGL Ex. 146 at 4.

[40] TGL Ex. 3.



The formal business restructuring of the Rooftop business became effective January 1, 2015, and its organizational chart is reflected below.[41]  Note, however, that although Rooftop Group USA is noted on the organizational chart, it is not part of the Rooftop Singapore corporate family, but rather, it continued to be owned by Mr. Matloff.[42]  After the 2015 restructuring, however, Rooftop Group USA continued to operate, as reflected on the organizational chart, as an agent of the newly formed Rooftop Group Services (US) ("**_Rooftop Services_**").

---

[41] Mat Ex. 83.  The agency relationships are addressed in more detail in this Memorandum Opinion.  Rooftop Singapore, Rooftop Services, and Rooftop Group USA eventually filed bankruptcy in 2019.

[42] Mat. Ex. 8 at 8; Mat. Ex. 9 at 10; TGL Ex. 146 at 4.



The restructuring was implemented, in part, through the creation of several new entities and the execution of several agreements, including two agency relationships. Rooftop Singapore became the new parent company for several subsidiary companies. The subsidiary companies, including Rooftop Services, were formed for the purpose of segmenting the anticipated growth in business activities in North America, Europe, and Asia.[43]

The historical business activities that had been performed by Rooftop Group USA prior to 2015 were taken over by Rooftop Singapore. Asian Express then acquired Rooftop Group USA's assets that were linked to (i) the customer product sales representation and services related to the sale of the Propel-brand remote control helicopters and drones, and (ii) Yeon Fashion,[44]

---

[43] Adv. ECF No. 158 at 9:4 thru 11:6.

[44] TGL raised several issues in its Complaint and during the trial concerning the affiliation of Ms. Yeon and Yeon Fashion with Mr. Matloff and Rooftop Group USA. The issues regarding Ms. Yeon and Yeon Fashion are more fully detailed, *infra*, in Section II. Q.

which had been operating as a division within Rooftop Group USA.[45]   The two preceding transactions, and an overview of the resulting 2015 restructuring of the business and their assets, are summarized in an Audit Memo[46] that was prepared by Mr. Chew.

## E.    The Agency Agreements

As part of the 2015 restructuring of the Rooftop business organization, the following two agency relationships—highlighted on the above organizational chart—were formed:

- *Agency Agreement* dated as of January 1, 2015, between Asian Express, as agent, and Rooftop Singapore (the "***Asian Express Agency Agreement***");[47] and

- *Agency Agreement* dated as of January 1, 2015, between Rooftop Group USA, as agent, and Rooftop Services (the "***Rooftop Group USA Agency Agreement***").[48]

The Asian Express Agency Agreement and the Rooftop Group USA Agency Agreement (together, the "***Agency Agreements***") were formed for the primary purpose of facilitating and transitioning the business from the two legacy entities (Asian Express and Rooftop Group USA) to Rooftop Singapore and Rooftop Services, respectively.[49]

### 1.    *The Asian Express Agency Agreement*

Under the Asian Express Agency Agreement, Rooftop Singapore engaged Asian Express to act as Rooftop Singapore's agent to carry out the business for the benefit of Rooftop Singapore.[50]   Historically, Asian Express had performed the manufacturing, distribution, and sales of Rooftop Group USA's Propel-branded business.

---

[45] Mat. Ex. 84 at 2; Adv. ECF No. 158 at 17:7 thru 18:23.

[46] (the "***Audit Memo***") Mat. Ex. 84; *see also* Adv. ECF No. 154 at 110:3 thru 111:15.

[47] TGL Ex. 4.

[48] TGL Ex. 5.

[49] Adv. ECF No. 154 at 110:10 thru 111:15; Adv. ECF No. 158 at 10:22 thru 11:6.

[50] TGL Ex. 4 at 1.

Asian Express's responsibilities under the Asian Express Agency Agreement included taking the following actions on behalf of Rooftop Singapore: (i) continuing to engage third-party manufacturers; (ii) continuing to sell products to existing and newly developed customers; (iii) continuing to develop and design product; (iv) continuing to manage the product sourcing, design and production, supervision, and engineering activities of ICL Technologies (Shenzhen) Ltd; (v) continuing to recruit, hire, train, and supervise new employees; (vi) continuing to carry out Rooftop Singapore's logistics activities; (vi) continuing to maintain efficient operating costs; and (viii) assisting Rooftop Singapore to transition the legacy business from Asian Express to Rooftop Singapore.[51]

Consistent with past practice, Rooftop Group USA was effectively one of Asian Express's customers.[52] The agreement also provided that "a transition period shall be required to" transfer employees, notify customers and suppliers, and to carry out other business transition activities.[53]

### 2.    *The Rooftop Group USA Agency Agreement*

Under the Rooftop Group USA Agency Agreement, Rooftop Services engaged Rooftop Group USA to act as its agent to carry out the business for the benefit of Rooftop Services.[54] Historically, Rooftop Group USA had performed the sales representative activities in North America.

Rooftop Group USA's responsibilities under the Rooftop Group USA Agency Agreement included taking the following actions on behalf of Rooftop Services: (i) continuing to represent

---

[51] TGL Ex. 4 at 2–3.

[52] Adv. ECF No. 158 at 14:20–22.

[53] TGL Ex. 4 at 1.

[54] TGL Ex. 5 at 1.

14

and sell products to existing and newly developed customers; (ii) continuing to recruit, hire, train, and supervise new employees; (iii) continuing to carry out Rooftop Services logistics activities; (iv) continuing to maintain efficient operating costs; and (v) assisting Rooftop Services in transitioning the business from Rooftop Group USA to Rooftop Services.[55]

The agreement also provides that "a transition period shall be required" to transfer employees, notify customers and suppliers, and to carry out other business transition activities.[56]

### F.     The Disney License and the Warner Bros. License

In 2015, Asian Express was awarded a Consumer Products License Agreement from The Walt Disney Company Limited, as licensor, for the manufacture of a new line of *Star Wars*®-themed drones (the "***Disney License***").[57]  Not long after, in 2016, Asian Express was also awarded a Product License Agreement from Warner Bros. Consumer Products Inc., as licensor, for the manufacture of a new line of *Batman*®-themed drones (the "***Warner Bros. License***").[58]

The management teams of Rooftop Singapore and Asian Express anticipated that the *Star Wars*® and *Batman*® themed drones would be ready for distribution in time for the 2016 holiday season.  Because Asian Express had commenced work on the new Disney and Warner Bros. product lines prior to finalization of the licensing agreements, the Disney License term began as of January 1, 2016, and the Warner Bros. License term began as of August 1, 2015.[59]

---

[55] TGL Ex. 5 at 2–3.

[56] TGL Ex. 5 at 1.

[57] Mat. Ex. 28; Adv. ECF No. 154 at 116:11–19.

[58] Mat. Ex. 29.

[59] Mat. Ex. 28 at 1; Mat. Ex. 29 at 5; Adv. ECF 154 at 116:11 thru 118:10.

Anticipating a ramp-up in operating and manufacturing costs associated with the *Star Wars*® and *Batman*® themed drones, Rooftop Singapore sought additional liquidity through third-party financing sources.[60]

## G.     The 2016 Loan Agreement with TGL

During the process of seeking potential financing sources, Mr. Matloff was introduced to Mr. Danny Yee ("***Mr. Yee***").[61]  Mr. Yee is employed with Aktis Capital Advisory, which is an advisor to Aktis Capital Master Fund, a Cayman Island fund ("***Aktis Capital***").  Aktis Capital is the parent of TGL.  TGL is a special purpose vehicle used by Aktis Capital for finance situations, such as TGL's financing of Rooftop Singapore.[62]  Mr. Yee testified as a fact witness during the trial and his testimony will be referenced throughout this Memorandum Opinion.

On July 25, 2016, TGL entered into a Loan Agreement with Rooftop Singapore, Mr. Matloff, Asian Express, and Gandiva (the "***2016 Loan Agreement***").[63]  The 2016 Loan Agreement provided, in relevant part, (i) for a loan facility to Rooftop Singapore in the amount of $10 million that could be increased—at the sole discretion of TGL—to $20 million; (ii) an interest rate of 1.25% per month (15% annually); (iii) a maturity date of June 28, 2017; and (iv) Rooftop Singapore was required to maintain its employment of Mr. Chew as the CFO of Rooftop Singapore.[64]

---

[60] Adv. ECF No. 154 at 118:25 thru 119:15.

[61] Adv. ECF No. 156 at 54:6–24.

[62] Adv. ECF No. 156 at 53:6–22.

[63] TGL Ex. 13; Adv. ECF No. 156 at 78:8–14.

[64] TGL Ex. 13 at 13, ¶ 5.12.

As part of the loan transaction, TGL required Mr. Matloff to personally guaranty Rooftop Singapore's obligations under the 2016 Loan Agreement. Therefore, on July 25, 2016, Mr. Matloff executed a *Personal Guaranty.*[65]

Mr. Yee testified that he led the TGL team that negotiated the 2016 Loan Agreement.[66] Prior to entering into the 2016 Loan Agreement, TGL conducted extensive due diligence, including obtaining management accounts of the Rooftop entities' sales, profitability, and assets.[67] TGL also obtained Rooftop Singapore's 2015 audited consolidated financial statements and independent auditor's report.[68] TGL was also provided a copy of Mr. Chew's Audit Memo and copies of the Agency Agreements.[69]

Mr. Yee testified further that his "points of contact" for information and due diligence from Rooftop was "[o]f course, the CFO, Mr. Thian Chew with a lot of the financial information; Mr. Steve Nelson who gave [TGL] information in terms of the company's organization or new organization; and, of course, Mr. Matloff in regards to the – the business in total especially in North American sales."[70] In addition, Mr. Yee acknowledged that Mr. Matloff had informed him that the Rooftop entities were in the process of or had just completed the 2015 corporate restructuring that, in part, created Rooftop Singapore.[71]

---

[65] TGL Ex. 15.

[66] Adv. ECF No. 156 at 53:24 thru 54:3.

[67] Adv. ECF No. 156 at 57:3–12.

[68] TGL Ex. 7; Adv. ECF No. 156 at 57:13 thru 58:15.

[69] TGL Exs. 4 and 5; Adv. ECF No. 156 at 66:21 thru 67:3.

[70] Adv. ECF No. 156 at 152:19 thru 153:3.

[71] Adv. ECF No. 156 at 62:4–14.

Mr. Yee testified that after TGL had completed its due diligence, TGL then entered into the 2016 Loan Agreement.[72] At no time during his testimony did Mr. Yee testify or contend that, prior to entering into the 2016 Loan Agreement, Mr. Matloff—or anyone on behalf of Rooftop Singapore, Asian Express, or Gandiva—made any false pretenses, false representations or provided TGL with a statement in writing concerning the financial condition of any of these parties that was materially false.

### 1.  TGL Requires that the Agency Agreements be Amended

Because TGL believed that the Agency Agreements "weren't strong enough,"[73] TGL required that the Agency Agreements be amended.[74]  Therefore, on October 31, 2016, both Agency Agreements were amended.[75]  The amendments required by TGL were intended, in part, to (i) more clearly state that the activities of the agents were for the benefit of the Rooftop entities; (ii) perfect TGL's claim over the underlying collateral of the credit facility, namely, the sale proceeds of the Propel-branded drones;[76] and (iii) require that the agents who collected proceeds of accounts receivable pay the proceeds into specific bank accounts over which TGL would have control and were charged to TGL (the "***Charged Accounts***").[77]  The Amended Agency Agreements also inserted, among others, the following two provisions:

- [A]ll customer payments received by the Agent … will be paid over to the Company … as soon as reasonably practicable, provided that the Agent may … retain from the customer payments such amount

---

[72] TGL Ex. 13; Adv. ECF No. 156 at 78:4–14.

[73] Adv. ECF No. 156 at 70:18–21.

[74] Adv. ECF No. 156 at 91:14–20; TGL Ex. 8.

[75] *Amended and Restatement Agency Agreement* (the "***Amended Asian Express Agency Agreement***") and *Amended and Restated Agency Agreement* (the "***Amended Rooftop Group USA Agency Agreement***") (together, the "***Amended Agency Agreements***") TGL Exs. 21 and 22.

[76] Adv. ECF No. 156 at 70:22 thru 71:9 and 74:11–19.

[77] Adv. ECF No. 156 at 75:1 thru 76:15; TGL Ex. 9.

of cash in order for the Agent to pay for operating expenses in connection with the Agent's performance of its duties hereunder[.][78]

- [A]ll debts, liabilities, claims and obligations . . . of the Agent shall not be borne by the Company or any other Rooftop Group member.[79]

## 2. TGL Requires Mr. Matloff to Execute a Deed of Guaranty

Although Mr. Matloff executed the *Personal Guaranty*[80] on July 25, 2016, TGL required Mr. Matloff to provide a supplemental personal guarantee.[81]  Therefore, on October 30, 2016, Mr. Matloff executed a *Deed of Guarantee*.[82]  According to Mr. Yee, a key feature of the *Deed of Guarantee* was to require Mr. Matloff to guarantee the "punctual performance by Obligors of all the Obligor's payment obligations under the Finance Documents."[83]  The *Personal Guaranty* and *Deed of Guarantee*, (together, the "***Matloff Guaranty***").

## H. The Rooftop Entities Experience Liquidity Issues

Mr. Yee testified that in late 2016, TGL began seeing that the Rooftop business was experiencing liquidity issues and that "an [inconsistency] of cash flows into the charge account"[84] was caused, in part, by the inability of the Rooftop entities to release and begin selling the *Star Wars*®-themed drones in time for the 2016 holiday season.[85]  TGL was also concerned that the

---

[78] TGL Ex. 21 at 9, ¶ 9(a)(ii)(A); TGL Ex. 22 at 9, ¶ 9(a)(ii)(A).

[79] TGL Ex. 21 at 11, ¶ 9(a)(ix); TGL Ex. 22 at 10, ¶ 9(a)(viii).

[80] TGL Ex. 15.

[81] Adv. ECF No. 156 at 96:7–9.

[82] TGL Ex. 18.

[83] TGL Ex. 18 at 2, ¶ 2.1(a); Adv. ECF No. 156 at 97:19 thru 98:12.

[84] Adv. ECF No. 156 at 103:5–9.

[85] Adv. ECF No. 156 at 104:1–23.

Rooftop entities were not timely reporting information and not maintaining the required loan-to-value ratios.[86]

The liquidity issues were primarily caused by the delayed launch of the *Star Wars*®-themed drones. Because the launch was delayed, Rooftop Singapore was forced to postpone the official launch from the fall of 2016 to the fall of 2017,[87] thereby missing the 2016 holiday season. The financial impact of missing the 2016 holiday season was summarized in an email prepared by Mr. Chew, wherein he stated "[i]n 2016 Rooftop generated $81mm in sales, although it had purchase orders from customers amounting to $132mm. The difference was due to unfulfilled Star Wars orders. Had these shipments been made, an additional $17.8mm in profit would have been generated [in 2016]."[88] Therefore, rather than generating profit in 2016, Rooftop Singapore was forced to hold $40 million worth of *Star Wars*®-themed excess inventory that could not be shipped.[89]

Because the inventory could not be shipped and sold, the Rooftop entities were not able to pay their manufacturer vendors. Because the manufacturer vendors were not being paid, they withheld both the *Star Wars*®-themed drones and the Propel-themed drones that had been manufactured, causing the required loan-to-value ratios in the 2016 Loan Agreement to be further negatively affected.[90]

---

[86] Adv. ECF No. 156 at 102:20 thru 103:3.

[87] Adv. ECF No. 154 at 127:19 thru 130:18.

[88] Mat. Ex. 102; Adv. ECF No. 154 at 133:17 thru 134:25.

[89] Mat. Ex. 52 at 5 (reflecting year-over-year increase in inventory); Adv. ECF No. 154 at 135:1--21.

[90] Adv. ECF No. 156 at 104:7–23.

The 2016 Loan Agreement was due to mature on June 28, 2017. However, because of the liquidity issues caused primarily by the delayed launch of the *Star Wars*®-themed drones, the parties scheduled a meeting in February 2017 to discuss Rooftop Singapore's increased financing requirements and potential breaches of the 2016 Loan Agreement.[91]

On June 27, 2017, TGL and Rooftop Singapore agreed to a Term Sheet[92] providing for a potential extension of the maturity date of the 2016 Loan Agreement and a potential new credit facility. Ultimately, TGL executed a *Loan Extension Agreement*[93] with Rooftop Singapore, Mr. Matloff, Asian Express, and Gandiva, extending the maturity date of the 2016 Loan Agreement to September 28, 2017. Rooftop Singapore ultimately repaid the 2016 Loan Agreement and entered into new credit facility with TGL in 2017.

## I.     The 2017 Loan Agreement with TGL

On July 5, 2017, TGL entered into an *Amended Facility Agreement*[94] with Rooftop Singapore, Mr. Matloff, Asian Express, and Gandiva, which was further amended on August 8, 2017, by the *Amended and Restated Facility Agreement*[95] (together, the "***2017 Loan Agreement***"). The 2017 Loan Agreement provided, in relevant part, (i) an increased facility to be made available to Rooftop Singapore in the amount of $10 million, with TGL agreeing "to exercise its best efforts to increase the Increased Facility by up to an additional US$ 10 million;" (ii) an increased interest rate of 2.5% per month (30% annually) (with a potential default penalty

---

[91] Adv. ECF No. at 104:24 thru 105:5; TGL Ex. 26.

[92] *Summary of Indicative Terms and Conditions* (the "***Term Sheet***") TGL Ex. 37; Adv. ECF No. 156 at 110:12 thru 111:22.

[93] Mat. Ex. 16.

[94] TGL Ex. 44.

[95] TGL Ex. 51.

interest rate of 4.5% per month [54% annually]); (iii) a maturity date of September 28, 2017, regarding the $10 million "lent to [Rooftop Singapore] under the Loan Agreement;" and (iv) a maturity date of "six calendar months from the date of the first drawdown of the Increased Facility," resulting in a maturity date of January 7, 2018, for the Increased Facility.[96]   The maturity date for the Increased Facility, however, was subsequently shortened by TGL to October 28, 2017, by a subsequent side letter between the parties dated August 8, 2017 (discussed below).

The 2017 Loan Agreement also provided, among other conditions, the following:

- The loan proceeds were to be used "in accordance with the approved Business Plan."[97]  No such "Business Plan," however, was offered into evidence at trial.

- Mr. Chew was to remain as CFO of Rooftop Singapore.[98]

- Rooftop Singapore was required to meet with TGL "at the end of each week and provide (a) a list of planned disbursements for [TGL's] pre-approval; and (b) a review of all cash flows and balances from [Rooftop Singapore's] and Asian Express's bank accounts for the previous week."[99]

- Rooftop Singapore was to instruct the customers under all purchase orders assigned to TGL to remit payments to the Charged Account.[100]

- Any material deviations from the operational and financial plans submitted to TGL required TGL's "Lender Consent."[101]

As part of the 2017 Loan Agreement, TGL required Rooftop Singapore to execute a *Consulting Services Agreement* (the "**Consulting Agreement**")[102] with TGL.   Under the

---

[96] TGL Ex. 51.

[97] TGL Ex. 51 at 4, ¶ 2.2.

[98] TGL Ex. 51 at 4, ¶ 2.3(ii).

[99] TGL Ex. 51 at 5, ¶ 3.1.

[100] TGL Ex. 51 at 5, ¶ 3.2.

[101] TGL Ex. 51 at 5, ¶ 5.1.

[102] TGL Ex. 39.

Consulting Agreement, TGL would advise Rooftop Singapore "on its financing strategy and on consolidating its debt[.]"[103]

TGL ultimately funded $11.25 million to Rooftop Singapore in the following three advances: (i) $3 million on July 6, 2017; (ii) $7 million on July 20, 2017, and (iii) $1.25 million on August 8, 2017.[104]

Before and after the execution of the 2017 Loan Agreement, TGL required Rooftop Singapore and several other parties[105] to execute five "side letters" providing "conditions and clarity" to the 2017 Loan Agreement.[106] The first three "side letters" were dated on or about the dates of the above noted three advances made under the 2017 Loan Agreement. The last two "side letters" were dated after TGL's last advance under the 2017 Loan Agreement.

### 1.    July 5, 2017 Side Letter[107]

Under the July 5, 2017 Side Letter, TGL primarily sought to require stricter cash controls and to clarify other provisions in the 2017 Loan Agreement including, in relevant part:

- Reducing TGL's pre-approval requirement for expense disbursements from $500,000 (as previously contained in the 2016 Loan Agreement) to $200,000.[108]

---

[103] TGL Ex. 39; Adv. ECF No. 157 at 139:4–9.

[104] Mat. Ex. 63.

[105] The parties to each of side letters included TGL, Polar Ventures Overseas Limited, Rooftop Singapore, Mr. Matloff, Asian Express, Gandiva, Rooftop Group USA, Rooftop Services, and Rooftop Services HK Limited.

[106] Adv. ECF No. 156 at 124:7–17; Adv. ECF No. 157 at 83:14 thru 85:10; 87:14–25; 90:3–13; and 96:6–9. Mr. Yee testified that Rooftop Singapore requested that TGL use "side letters" to document TGL's additional conditions, as opposed to simply amending the 2017 Loan Agreement, "to shield any disclosure to other creditors who have rights to see the loan agreement" and "to avoid having the creditors demanding the same conditionalities." Adv. ECF No. 157 at 96:10–24.

[107] *Side Letter Agreement dated as of July 5, 2017* (the "***July 5, 2017 Side Letter***") Mat. Ex. 18.

[108] Mat. Ex. 18 at 3, ¶ 7(a)(i).

- Requiring Rooftop Singapore to "have all purchasers under purchase orders assigned to TGL make future payments into the account at HSBC that has been charged to TGL."[109]

- Preventing Rooftop Singapore from paying "[Mr.] Matloff or any person on his behalf . . . any bonus, commissions, or similar type of compensation prior to the date [Rooftop Singapore]'s most recent quarterly financial statement reflects positive net cash flow."[110]

- Requiring that "the bonus paid to [Mr. Matloff] in 2017 for 2016 shall be reclassified and treated as a loan from Rooftop [Singapore] to [Mr. Matloff], and [Mr. Matloff] shall repay such loan as and when reasonably practicable."[111]

- Clarifying and confirming that "[t]he guarantee of [Mr.] Matloff covers the liabilities under the Finance Documents relating to the Extension and the Amended Facility Agreement, whether or not such liabilities exceed [$20 million]."[112]

- Providing that if Rooftop Singapore fails to pay its obligations on or before a required maturity date of a loan that Gandiva shall transfer "0.1% of the fully diluted equity in in ordinary voting shares of Rooftop [Singapore] to TGL.[113]

### 2. July 20, 2017 Side Letter[114]

The relevant change included in the July 20, 2017 Side Letter was to provide for possible "Fresh Financing" of up to $20 million in additional funding.[115]  TGL did not fund such additional financing and the potential for such "Fresh Financing" was subsequently withdrawn by TGL in the next Side Letter.[116]

---

[109] Mat. Ex. 18 at 4, ¶ 7(a)(iv).

[110] Mat. Ex. 18 at 1, ¶ 2.

[111] Mat. Ex. 18 at 1, ¶ 2.

[112] Mat. Ex. 18 at 2, ¶ 5.

[113] Mat. Ex. 18 at 1, ¶ 3.

[114] *Amended and Restated Side Letter Agreement dated as of July 20, 2017* (the "***July 20, 2017 Side Letter***") Mat. Ex. 19.

[115] Mat. Ex. 19 at 1, ¶ 1.

[116] *Compare* Mat. Ex. 19 at 1, ¶ 1 *with* Mat. Ex. 20 at 1, ¶ 1.

### 3. August 8, 2017 Side Letter[117]

The relevant changes included in the August 8, 2017 Side Letter were to (i) shorten the maturity date for the final advance of $1.25 million from January 7, 2018, to October 28, 2017;[118] and (ii) withdraw the potential "Fresh Financing" that was provided in the July 20, 2017 Side Letter.

### 4. September 22, 2017 Side Letter[119]

The September 22, 2017 Side Letter contained several new provisions including, in relevant part:

- Providing TGL with "read only" access to Rooftop Group USA's Chase Bank account to which receivables from purchase orders pledged to TGL were to be deposited before being sent to the Charged Accounts.[120]

- Providing that Mr. Chew and Mr. Tuli:

    > shall be responsible . . . on a global basis for implementing and managing cost control systems, other operating and financial initiatives designed to effectuate the [business and funding] plan [and] a system to keep Rooftop [Singapore] and Asian Express' purchase orders and accounts receivable (and the inventory underlying them and the proceeds thereof) clearly segregated and identifiable in relation to any other purchase orders or accounts receivable factored or financed by . . . any other third party and to effectively monitor and manage the cash flows.[121]

The provision requiring the continued involvement of Mr. Chew and Mr. Tuli was consistent with the prior course of dealing between TGL and Rooftop Singapore. Mr. Chew and

---

[117]*Amended and Restated Side Letter Agreement dated as of August 8, 2017 (the "Third Amendment Dage")* (the "**August 8, 2017 Side Letter**") Mat. Ex. 20.

[118] Mat. Ex. 20 at 3, ¶ 4(f). Adv. ECF No. 157 at 89:7–24.

[119]*Amended and Restated Side Letter Agreement dated as of September 22, 2017 (the "**September 22, 2017 Side Letter**")* Mat. Ex. 21.

[120] Mat. Ex. 21 at 6, ¶ 7A.

[121] Mat. Ex. 21 at 1, ¶ 2.

25

his finance team had previously been responsible for these items, and Mr. Chew had regularly communicated with TGL concerning these items from the beginning of TGL's lending relationship in 2016 with Rooftop Singapore.[122]

### 5. January 16, 2018 Side Letter[123]

The primary amendments contained in the January 16, 2018 Side Letter include:

- Reducing TGL's pre-approval requirement for expense disbursements from $200,000 (as previously contained in the July 5, 2017 Side Letter) to $50,000.[124]

- Requiring an allocation of the proceeds of Rooftop Singapore's purchase orders within the Charged Accounts.[125]

- TGL agreed to forebear from declaring a default on the 2017 Loan Agreement.[126]

- TGL agreed to extend the maturity date for the 2017 Loan Agreement to February 12, 2018.[127]

- "All purchase orders, and accounts receivable heretofore or hereafter generated by Rooftop or any of its affiliates … shall be, and hereby are, assigned to TGL."[128]

- "As further purchase orders and accounts receivable . . . are generated, these shall be similarly assigned by Rooftop [Singapore] and/or the applicable affiliate."[129]

Although several of the Side Letters made references to potential new advances or extensions of credit by TGL, no evidence was offered or presented during trial to show or

---

[122] Mat. Exs. 94, 103, 108, 110, 112, and 132; TGL Exs. 35, 69, and 207.

[123] *Amended and Restated Side Letter Agreement dated as of January 16, 2018 (the "Fourth Amended Date")* (the "***January 16, 2018 Side Letter***") Mat. Ex. 22.

[124] Mat. Ex. 22 at 7, ¶ 7(a)(i).

[125] Mat. Ex. 22 at 9, ¶ 9A.

[126] Mat. Ex. 22 at 1, ¶ 1; Adv. ECF. No. 156 at 131:4‒3.

[127] Mat. Ex. 22 at 4, ¶ 4(g); Adv. ECF. No. 156 at 131:19 thru 132:6.

[128] Mat. Ex. 22 at 9, ¶ 9A.

[129] Mat. Ex. 22 at 9, ¶ 9A.

establish that TGL ever made any new advances or extensions of credit under any of the Side Letters.

**J.      Rooftop Singapore Breaches the 2017 Loan Agreement and TGL Issues a Notice of Default**

On the maturity date of the 2017 Loan Agreement—December 28, 2017—Rooftop Singapore, through Mr. Chew, informed TGL that "Rooftop [Singapore] will not be paying interest and remaining principal today."[130]   Thereafter, on January 3, 2018, Rooftop Singapore made its last payment to TGL on the outstanding loans due under the 2017 Loan Agreement, which left a remaining principal balance of $3,903,895.65.[131]   Although Rooftop Singapore failed to pay off the 2017 Loan Agreement by its maturity date, TGL agreed to forebear from immediately declaring a default, as reflected in the January 16, 2018 Side Letter.

TGL and Rooftop Singapore scheduled a meeting for February 12, 2018, to discuss the status of the 2017 Loan Agreement.   However, on February 11, 2018—the day before the scheduled February 12, 2018, meeting—Mr. Hiro Mukaibo—a colleague of Mr. Yee—sent the following email with the subject line "tomorrow plan" to (i) Mr. Yee and Mr. Tomo Kinouchi— both colleagues of Mr. Mukaibo—and (ii) Mr. Chew, Rooftop Singapore's CFO.[132]   This email, among other evidence, raise serious concerns about Mr. Chew's loyalty to Rooftop Singapore and his connections with TGL.

---

[130] TGL Ex. 69 at 4.

[131] Mat. Ex. 63 at 3–4.

[132] Mat. Ex. 132; TGL Ex. 210 at 7.

**To:**      Tomo Kinouchi[tomo.kinouchi@aktiscapital.com]; Thian Chew[thian@rooftopbrands.com]
**Cc:**      Danny Yee[danny.yee@aktiscapital.com]; Alan Yamashita[alanyama@gmail.com]; Fred
Chang[fchang42@hotmail.com]
**From:**    Hiro Mukaibo[hiro.mukaibo@aktiscapital.com]
**Sent:**    Sun 2/11/2018 12:07:14 PM (UTC)
**Subject:** tomorrow plan

Hi all

Fred waiting for the default notice letter, tomorrow morning i will sign in office.

Tomo Thian you two accompany me for the first half.

Thian you come as rooftop, just to clarify numbers.

Thian and Darren will come to our office at 10 am.

First we will sweep interest and commissions from the emergency pool.

60/40 sweep will be forced from Feb 13.

We will have the right to look for buyers of equity from Feb 13.

We will show him the default letter, but will first like to listen to his presentations and his thoughts.

-------------

10am-11:30am I will have Darren and Thian go over the presentation material (Tomo participates.)

I will listen to how Darren plans the cash flow and how he pays back suppliers and Creditors.

I will go over all the numbers and each point I will argue with him if his plan is feasible or not.

First I need to have same picture of the firm with him.

11:30 we will go to one on one for 1.5 hours.

Feb15 notice will be effective.

First arument is his failure as CEO position and how he takes his responsibility of Disney business loss of 25mio us$ and to all parties.

I will be going through my proposal and conditions to him.

We will give him 3 days to come back wheher he wants to go through that route and take my conditions.



If not, we will pursue judicial proceedure, which will possibly kill all the business and he will be still liable for the gurantees he have made.

If there is an agreement, then I will have Danny Alan and Thian join to goover what we decided.

Hiro

NOTICE: This message, including any attachments, is privileged and may contain confidential information intended only for the person(s) named above. Any other distribution, copying or disclosure is strictly prohibited. If you are not the intended recipient or have received this message in error, please notify us immediately by replying to this email and permanently delete the original transmission from us, including any attachments, without making a copy. Please consider the environment before printing this e-mail.

The February 12, 2018, meeting took place as planned, and as contemplated in Mr.

Mukaibo's email, TGL handed Mr. Matloff a notice of default letter that was to take effect on

February 15, 2018.[133] Thereafter, on February 15, 2018, TGL's counsel sent a formal notice of default to Rooftop Singapore.[134]

The February 11, 2018, email from Mr. Mukaibo also illustrates that Mr. Chew's allegiance may have been to TGL, as opposed to Rooftop Singapore—the company for whom he was the CFO—throughout TGL's lending relationship with Rooftop Singapore.

## K.   Mr. Chew

Mr. Chew was hired by Rooftop Group USA in 2014 as its CFO.[135] Mr. Chew continued to serve as Rooftop Singapore's CFO until he resigned on April 30, 2018.[136] As CFO, Mr. Chew played the central role in overseeing the financial management and bookkeeping functions for the business.[137] Mr. Matloff testified credibly that he relied heavily on Mr. Chew to oversee all aspects of the consolidated Rooftop organization's financial accounting and management from the time Mr. Chew joined the organization in June 2014 until Mr. Chew resigned.[138]

The overwhelming evidence during the trial established that TGL also placed a great deal of confidence in Mr. Chew and looked to Mr. Chew as its primary source to obtain financial information and accounting reporting for Rooftop Singapore and its subsidiaries. For example, in the 2016 Loan Agreement and the 2017 Loan Agreement, as a condition to fund the loans, TGL required that Mr. Chew remain as the CFO of Rooftop Singapore. In addition, TGL required that

---

[133] TGL Ex. 133 at 5.

[134] TGL Ex. 75; Adv. ECF No. 156 at 134:15–23.

[135] Adv. ECF No. 154 at 102:17–20.

[136] Mat. Ex. 144.

[137] Mat. Ex. 130 represents an example of Mr. Chew's reporting of financial and accounting information to the Rooftop Singapore's management team.

[138] Adv. ECF No. 154 at 106:15 thru 107:22; 169:12–15; and 262:5–12.

Mr. Chew's duties and responsibilities be expanded within Rooftop Singapore in both the September 22, 2017 Side Letter and January 16, 2018 Side Letter.[139]

Numerous email communications between TGL and Mr. Chew further evidence TGL's confidence in and reliance upon Mr. Chew and his finance team for information and accounting reporting from Rooftop Singapore, including Rooftop Singapore's requirement to obtain approvals for the payment of expenses and other miscellaneous requests.[140]  TGL also communicated regularly with Mr. Chew regarding Rooftop Singapore's investor presentations and other financial reporting media.[141]  Finally, Mr. Yee admitted in his testimony that he and TGL considered Mr. Chew to be "the lead for the facility" during the negotiations of the terms of the 2016 Loan Agreement.[142]  And throughout his testimony, Mr. Yee admitted that he and TGL had confidence in and relied upon Mr. Chew for financial information and accounting reporting from Rooftop Singapore.[143]

At the same time Mr. Chew was the CFO for Rooftop Group USA and then Rooftop Singapore, he was also a partner and owner of Polar Ventures.[144]  Polar Ventures also had a lending relationship with Rooftop Group USA and Rooftop Singapore that predated and continued during TGL's lending relationship with Rooftop Singapore.[145]  Mr. Chew's partner at Polar Ventures was Mr. Alan Yamashita ("*Mr. Yamashita*").[146]  It was Mr. Yamashita that

---

[139] Mat. Exs. 21 and 22.

[140] Mat. Exs 110, 117, 125, 127, and 132.

[141] Mat. Exs. 112 and 142.

[142] Adv. ECF No. 157 at 149:11–13.

[143] Adv. ECF No. 157 at 132:1–4 and 134:14–23.

[144] Adv. ECF No. 156 at 73:13; Adv. ECF No. 157 at 132:21–25

[145] Adv. ECF No. 156 at 73:8–15.

[146] Adv. ECF No. 156 at 134:24 thru 135:3.

initially introduced Mr. Chew to Mr. Yee in or around the Christmas Holiday season in 2015.[147]
Mr. Yee first met Mr. Yamashita in 1979 and was a colleague with him for more than fifteen
years while they both worked at Goldman Sachs.[148]

The credible evidence in the record suggests that Mr. Chew's loyalty favored both Polar
Ventures and TGL over Rooftop Group USA and Rooftop Singapore. Mr. Chew's loyalty (or
lack thereof) to Rooftop Group USA and Rooftop Singapore, however, is not directly before the
Court. Rather, what is directly before the Court is the issue of reliance, if any, that TGL placed
on Mr. Matloff when it came to financial information and accounting reporting from the Rooftop
entities. And on that issue, the evidence overwhelmingly established that from the time TGL
began its due diligence in 2016 through April 2018, TGL placed little, if any, actual reliance on
Mr. Matloff for any such financial information and accounting reporting, but rather, TGL placed
its reliance on Mr. Chew.

## L. TGL files suit against Mr. Matloff based on the Matloff Guaranty

On April 27, 2018, TGL filed suit against Mr. Matloff in the High Court of the Republic
of Singapore (the "***Singapore Court***") based on the Matloff Guaranty of Rooftop Singapore's
obligations under the 2017 Loan Agreement.[149] On December 5, 2018, the Singapore Court
issued its *Order of Court*[150] awarding TGL a judgment against Mr. Matloff in the amount of
$4,427,209.82 (the "***Matloff Singapore Judgment***").

---

[147] Adv. ECF No. 157 at 131:16–23.

[148] Adv. ECF No. 157 at 132:13–25.

[149] Adv. ECF No. 156 at 145:25 thru 146:2.

[150] TGL Ex. 114; Adv. ECF No. 156 at 146:3–14.

**M.    Rooftop Singapore files an arbitration proceeding against TGL in the Singapore International Arbitration Centre**

On July 20, 2018, Rooftop Singapore initiated an arbitration proceeding against TGL with the Singapore International Arbitration Centre (the "**Singapore Arbitration**").[151]    Rooftop Singapore's primary claim was that its loan agreements with TGL were null and void because they were signed under duress.[152]    On April 22, 2019, the arbitrator issued his *Final Award*,[153] ultimately dismissing Rooftop Singapore's claims against TGL and ordering Rooftop Singapore to reimburse TGL its legal fees and costs.[154]

**N.    Rooftop Singapore Ultimately Ceases Operations and Issues License to Amax**

When Mr. Chew resigned as the CFO of Rooftop Singapore (which occurred three days after TGL commenced litigation against Mr. Matloff), he did so without an identified replacement to take over his role as CFO for Rooftop Singapore.    Shortly thereafter, Mr. Chew's entire accounting staff located in the Hong Kong office also resigned.[155]    Although TGL knew that Mr. Chew and his entire Hong Kong staff had resigned, there is no evidence in the record to suggest that TGL took any steps to designate a CFO replacement following Mr. Chew's resignation.

Rooftop Singapore then hired an interim CFO by the name of Mr. Michael Potter, but he resigned after a couple of weeks because Rooftop Singapore and its subsidiaries were in "such financial duress."[156]    Therefore, after Mr. Chew resigned, Rooftop Singapore did not have the

---

[151] TGL Ex. 210 at 692.

[152] TGL Ex. 210 at 692; Adv. ECF No. 156 at 147:9 thru 148:10.

[153] TGL Ex. 210 at 692.

[154] TGL Ex. 210 at 763.

[155] Adv. ECF No. 3 at 194:1–6

[156] Adv. ECF No. 154 at 193:22 thru 194:4.

benefit of a professional, full-time CFO for the remaining time it conducted business.[157] Rather, after Mr. Chew and his staff resigned, the in-house accounting and bookkeeping functions fell back on Ms. Ocampo and Ms. York, who had performed those tasks prior to 2014.[158] Mr. Schafman and Ms. Newbrand, however, continued to be retained by the Rooftop entities to continue performing the accounting and bookkeeping services that they had been performing since 2012.

During that same period, Mr. Matloff attempted to find new financing to take out the TGL outstanding loans, but his efforts were not successful.[159] Because Rooftop Singapore no longer had access to sufficient funding, Rooftop Singapore (and in turn, Asian Express) was not able to timely pay the Chinese suppliers and manufacturers. Therefore, the Chinese suppliers and manufacturers immediately stopped shipping goods, and according to Mr. Matloff, "at that point, it was game over."[160] Rooftop Singapore was at substantial risk of failing to deliver the Propel-brand drone products to its customers in time for their annual retail purchasing cycle. Mr. Matloff testified credibly that if Rooftop Singapore was not able to timely deliver the Propel-brand drone products to its retail customers, Rooftop Singapore would lose its customers and "lose complete credibility" in the retail marketplace.[161]

Because Rooftop Singapore did not have the financial ability to pay the Chinese suppliers and manufactures or to timely deliver the Propel-brand drone products ordered by its retail customers, on February 14, 2019, Mr. Matloff (and, in turn, Rooftop Singapore) entered into a

---

[157] Adv. ECF No. 154 at 195:24 thru 196:9.

[158] Adv. ECF No. 154 at 196:4–17.

[159] Adv. ECF No. 154 at 196:20 thru 197:4.

[160] Adv. ECF No. 154 at 201:19–24.

[161] Adv. ECF No. 154 at 199:14 thru 200:21.

*Trademark License Agreement*[162] and a side letter dated February 24, 2019[163] (together, the "***Amax License***") with Amax Industrial Group China Co., Ltd., a Hong Kong company ("***Amax***"). Mr. Matloff testified credibly that the business purpose of granting the Amax License was to (i) "keep the brand alive and to get someone to negotiate with those [Chinese] factories,"[164] (ii) "preserve the Propel brand for the – for the benefit of all parties involved,"[165] and (iii) "not stop the shipments, to keep the shipments going."[166]

Mr. Matloff testified credibly that he/Rooftop Singapore selected Amax as the licensee because (i) he had known Amax's owner, Ms. Amin Ma ("***Ms. Ma***"), for over fifteen years and had trusted her; (ii) Ms. Ma was already in the toy remote control business with her own line of remote control products; (iii) he believed that Ms. Ma—and, in turn, Amax—would be the only likely candidates willing to take on the risk associated with the Amax License; and (iv) Ms. Ma had experience and relationships with the Chinese manufacturers and suppliers.[167] Additionally, in May of 2018, Rooftop Singapore had engaged Amax as an intermediary to assist Rooftop Singapore with exchanging funds into renminbi—the currency used in the People's Republic of China—which was necessary to pay creditors located in mainland China. The company Rooftop Singapore historically used for the intermediary exchange service, Huang Yong Chun, was not able to continue performing that service in the spring of 2018.[168]

---

[162] TGL Ex. 119.

[163] TGL Ex. 120.

[164] Adv. ECF No. 154 at 202:7–12.

[165] Adv. ECF No. 154 at 204:10–13.

[166] Adv. ECF No. 154 at 204:15–16.

[167] Adv. ECF No. 154 at 202:24 thru 203:22.

[168] Adv. ECF No. 154 at 228:10–23. Mr. Matloff and Ms. York each testified that because suppliers and manufacturers located within mainland China did not accept Hong Kong or U.S. dollars, companies like Haung Yong

Under the Amax License, Amax was required, in part, to:

- Pay Rooftop Singapore a 3.5% royalty.[169]

- Hire Rooftop Singapore's core China employees that were critical to maintaining the manufacturing and production of the Propel-brand products.[170]

- Manufacture the goods using only Propel approved "core suppliers."[171]

- Pay an additional 5% over cost to the core suppliers until their outstanding debts owed by Rooftop Singapore/Asian Express have been paid.[172]

The Amax License is the only license agreement granted by Rooftop Singapore of the Propel-brand products.[173] Further, the Amax License is a non-exclusive license only for North America.[174]

On July 1, 2019, Mr. Matloff and Amax entered into a *Consultancy Agreement*.[175] Essentially, the Consultancy Agreement provided that Mr. Matloff was required to perform the same services for Amax that he was performing for Rooftop Singapore and its subsidiaries.[176]

---

Chun were used to exchange foreign currencies into renminbi so that Rooftop Singapore and Asian Express could pay their mainland China creditors' invoices. Adv. ECF No. 154 at 218:1–15; Adv. ECF No. 155 at 63:15 thru 64:12. Mr. Tuli—the COO of Rooftop Singapore—was generally responsible for the currency exchange issues so that the mainland China creditors could be paid. Adv. ECF No. 154 at 225:12–20.

[169] TGL Ex. 119.

[170] TGL Ex. 120.

[171] TGL Ex. 120.

[172] TGL Ex. 120.

[173] Adv. ECF No. 154 at 202:18–20.

[174] TGL Exs. 119 and 120; Adv. ECF No. 154 at 207:8–13.

[175] TGL Ex. 128. Mr. Matloff executed the Consultancy Agreement three months after Rooftop Singapore filed for bankruptcy.

[176] Adv. ECF No. 154 at 58:18–21.

Eventually, Ms. Ocampo, Ms. York, and Mr. McEnaney each begin working for Amax.[177] And Mr. Dixon was retained by Amax for tax consulting.[178]

## O. Rooftop Singapore, Mr. Matloff, Rooftop Group USA, and Rooftop Services each file for Bankruptcy

On April 30, 2019, Rooftop Singapore filed a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code.[179]

On June 19, 2019, Mr. Matloff filed a Voluntary Petition for relief under Chapter 7 of the Bankruptcy Code.[180]

On August 25, 2019, Rooftop Group USA[181] and Rooftop Services[182] each filed a Voluntary Petition for relief under Chapter 7 of the Bankruptcy Code.

The bankruptcy cases for Rooftop Group USA and Rooftop Services were subsequently converted to cases under Chapter 11 of the Bankruptcy Code. The bankruptcy cases for Rooftop Singapore, Rooftop Group USA, and Rooftop Services were then jointly administered under Case No. 19-43402 and they ultimately confirmed their joint plan of reorganization/liquidation.[183]

---

[177] Adv. ECF No. 154 at 53:13 thru 55:10.

[178] Adv. ECF No. 171 at 15:9–10.

[179] *In re Rooftop Group International Pte, Ltd*; Case No. 19-43402-mxm-11 filed in the United States Bankruptcy Court for the Northern District of Texas [ECF No. 1].

[180] *In re Darren Scott Matloff*, Case No. 19-44253-mxm-7 filed in the United States Bankruptcy Court for the Northern District of Texas [ECF No. 1].

[181] *In re Rooftop Group USA, Inc*.; Case No. 19-44234-mxm-7 filed in the United States Bankruptcy Court for the Northern District of Texas [ECF No. 1].

[182] *In re Rooftop Group Services (US), Inc*.; Case No. 19-44235-mxm-7 filed in the United States Bankruptcy Court for the Northern District of Texas [ECF No. 1].

[183] Case No. 19-43402, ECF No. 259.

**P.      TGL's Proof of Claim filed in Mr. Matloff's Bankruptcy Case**

During the lending relationship between TGL and Rooftop Singapore, TGL funded $21,250,000 in loans to Rooftop Singapore.[184]  From September 30, 2016, thru March 1, 2018, Roooftop Singapore made principal and interest payments to TGL totaling $22,359,587—which represented $17,346,104 in principal reduction payments and $5,013,483 in interest payments.[185]

June 24, 2021, TGL filed its *Proof of Claim*[186] in Mr. Matloff's Bankruptcy Case.  In its Proof of Claim, TGL asserts a single "Liquidated Claim" against Mr. Matloff in the total amount of $8,140,842.02 as of June 19, 2019.[187]  The components of TGL's alleged claim include outstanding principal of $3,903,895.65, accrued interest of $2,917,703.52 (an interest rate of 5.0% per month [60% annually], and additional amounts associated with the Matloff Guaranty Judgment, Singapore Arbitration, and attorneys' fees and costs.

**Q.      TGL allegations concerning Ms. Yeon and the Yeon Fashion business**

TGL raised several allegations and concerns regarding Ms. Yeon and the Yeon Fashion business.  Therefore, the following is a discussion of the relationships between Ms. Yeon and the Yeon Fashion business with Mr. Matloff, Rooftop Group USA, and other entities.

*1.      The History and Ownership of Yeon Fashion*

In 2014, Rooftop Group USA invested in a clothing fashion line of business called Yeon ("***Yeon Fashion***") created by Ms. Soe Yeon Park ("***Ms. Yeon***").  Yeon Fashion was treated as a

---

[184] Mat. Ex. 63 at 3–4.  The following loan amounts were funded by TGL (i) $7,000,000 on July 28, 2016; (ii) $3,000,000 on September 1, 2016; (iii) $3,000,000 on July 6, 2017; (iv) $7,000,000 on July 20, 2017; and (v) $1,250,000 on August 8, 2017.

[185] Mat. Ex. 63 at 3–4.

[186] TGL Ex. 210.

[187] TGL Ex. 210 at 7–8.

business segment of Rooftop Group USA.[188]   However, during the 2015 restructuring of Rooftop Group USA, detailed *supra*, Asian Express acquired the Yeon Fashion business segment from Rooftop Group USA.[189]   Immediately thereafter, Asian Express conveyed the Yeon Fashion business to Gandiva.[190]   Thereafter, in 2016, Yeon Fashion was separately incorporated as a wholly owned subsidiary of Gandiva.[191]   Gandiva then subsequently transferred its equity ownership in Yeon Fashion to the Matloff Family Trust.[192]   As previously noted, Mr. Matloff's bankruptcy estate may have a potential beneficial interest in the Matloff Family Trust, as disclosed by Mr. Matloff in his personal bankruptcy schedules.[193]

Although Yeon Fashion had nothing to do with Rooftop's primary business model of developing, designing, manufacturing, and selling Propel-brand remote control helicopters and drones, the credible evidence established that Yeon Fashion was a serious business venture.  TGL offered into evidence a Forbes Magazine article titled ***The Story of Up-and-Coming Designer Yeon Park*** that was published on July 24, 2017.[194]   The Forbes article discussed Ms. Yeon's studies at the Parsons School of Design in New York and her various internships with various designers.  The author also reviewed several of Ms. Yeon's upcoming 2017 fall fashion collection noting that the "collection is gaining recognition and has caught the eyes of buyers from high-end retailers like Barney's and Bergdorf Goodman" and that "Yeon is the name that will soon be the

---

[188] Mat. Ex. 84 at 2; Adv. ECF No. 158 at 17:7 thru 18:23; Adv. ECF No. 158 at 63:9–11; Adv. ECF No. 154 at 11:19 thru 12:2; Adv. ECF No. 171-2 at 45:3–16.

[189] Mat. Ex. 84; Adv. ECF No. 158 at 17:7–19; Adv. ECF No. 158 at 63:9–11.

[190] Mat. Ex. 84 at 18.

[191] Adv. ECF No. 158 at 17:14 thru 18:10.

[192] Adv. ECF No. 154 at 73:20 thru 74;3; Adv. ECF No. 158 at 17:14 thru 18:10.

[193] Mat. Exs. 8 at 8; Mat. Ex. 9 at 10; TGL Ex. 146 at 4.

[194] TGL Ex. 50; Adv. ECF No. 154 at 61:16–21.

buzz among fashions' cognoscente."[195]   The Forbes article also noted that "[w]ith a single investor as her financial partner, [Ms. Yeon] launched her collection in 2014" and that Ms. Yeon was "fortunate in her working relationship with her partner in that she's been granted the time and to slowly grow the identity of her brand without the pressure to quickly recoup the investment."[196]   At trial, the evidence established that Rooftop Group USA was the "single investor" referenced in the article.[197]

### 2.   *Yeon Fashion's operating expenses paid by Rooftop Group USA from 2015– 2019*

Ms. Yeon was originally employed by Rooftop Group USA in 2014.   Although Rooftop Group USA conveyed the Yeon Fashion business to Asian Express in 2015, as detailed *infra*, Rooftop Group USA continued to employ Ms. Yeon and her staff[198] into 2019.   In addition, Rooftop Group USA continued to fund Yeon Fashion's operating expenses, including payroll and lease obligations.

Between 2015 and early 2017, the expenditures made by Rooftop Group USA on behalf of Yeon Fashion were originally recorded as an expense of Rooftop Group USA.[199]   But in or around 2017, Rooftop Group USA made the decision to reclassify the expenditures that had been made on behalf of Yeon Fashion from an expense of Rooftop Group USA to a "*Due From Related Party*" receivable due from Yeon Fashion.[200]   TGL contends that the Yeon Fashion related

---

[195] TGL Ex. 50.

[196] TGL Ex. 50 at 6–7.

[197] Adv. ECF No. 154 at 61:16–23.

[198] Ms. Alexandria Cabrales and Ms. Elizabetta Venturelli worked on Yeon Fashion business, but their salaries were paid by Rooftop Group USA.  *See* Adv. ECF No. 154 at 76:18–20.

[199] Adv ECF No. 154 at 68:11–15.

[200] Mat. Exs. 54 and 55; Adv. ECF No. 158 at 18:18 thru 19:1.

expenses should have been reclassified as salary or compensation to Mr. Matloff (thereby requiring Mr. Matloff to pay federal income taxes on the "compensation"), as opposed to reclassifying the expenses as a "due from" loan to Yeon Fashion.[201] TGL's contention, however, would not have been in the best interest of Rooftop Group USA. By reclassifying the expenses as a "due from" loan to Yeon Fashion, Rooftop Group USA was preserving the possibility of being reimbursed by Yeon Fashion for its expenses that Rooftop Group USA had funded on behalf of Yeon Fashion. Further, both Mr. Nelson and Mr. Matloff denied TGL's assertion that Mr. Matloff was trying to avoid having to pay personal income taxes by structuring the reclassification of the Yeon Fashion expenses as a "due from" loan to Yeon Fashion and the Court found their testimony credible.[202]

The Rooftop Group USA books and records (including federal income tax returns) reveal that it had paid operating expenses, including payroll and rent, for Yeon Fashion in the following net amounts for the years indicated:

- Yeon Fashion expenses paid during 2015:    $1,065,876[203]
- Yeon Fashion expenses paid during 2016:    $1,646,056[204]
- Yeon Fashion expenses paid during 2017:    $1,348,183[205]

---

[201] TGL Ex. 78.

[202] Adv. ECF No. 154 at 70:11–14; Adv. ECF No. 158 at 62:3–9 and 84:5–15.

[203] Mat. Ex. 40 at 13.

[204] Mat. Ex. 40 at 13 (2016 ending balance of $2,711,932 less 2016 beginning balance of $1,065,876 1 equals $1,646,056 increase in net outstanding loan receivable during 2016). *See also* TGL Ex. 183 (email from Ms. York confirming that 2016 Yeon Fashion expenses of approximately $1.6 million.

[205] Mat. Ex. 41 at 13 (2017 ending loan receivable balance of $4,060,115 less 2017 beginning balance of 2,711,932 equals $1,348,183 increase in net outstanding loan receivable during 2017).

- Yeon Fashion expenses paid during 2018:      $   176,672[206]

- Yeon Fashion expenses paid during 2019:      $     29,669[207]

Total "Due From" Yeon Fashion as of December 31, 2019:   $4,266,456[208]

Other than the bookkeeping entries reflected in the general ledger and QuickBooks, there are no other formal written agreements or loan documents between Mr. Matloff, Rooftop Group USA, Ms. Yeon, and Yeon Fashion to memorialize the decision to reclassify the expenditures as a "due from" Yeon Fashion.

### 3. Mr. Matloff's Loans to Yeon Fashion from 2015–2019

Mr. Matloff apparently also made personal loans to Ms. Yeon or Yeon Fashion of at least $550,570.11.[209] During the trial, however, the evidence was sparce concerning Mr. Matloff's personal loans to Ms. Yeon or Yeon Fashion. Other than Mr. Matloff's bankruptcy schedules reflecting the $550,570.11 receivable due from "Atelier, Inc./ Yeon," the evidence at trial merely suggested that (i) there is no promissory note or loan agreement evidencing the alleged $550,570.11 receivable due from "Atelier, Inc/Yeon";[210] and (ii) on October 10, 2017—more than twenty months prior to Mr. Matloff's bankruptcy filing—Mr. Matloff wired $60,000 to Ms. Yeon from his personal bank account.[211] There was no evidence offered at trial to suggest why

---

[206] Mat. Ex. 54; *see also* Mat. Ex. 42 at 15 (2018 ending loan receivable balance of $4,236,787 less 2018 beginning balance of $4,060,115 equals $176,672 increase in net outstanding loan receivable during 2018).

[207] Mat. Ex. 55; *see also* Mat. Ex. 43 at 15 (2019 ending loan receivable balance of $4,266,456 less 2019 beginning balance of $4,236,787 equals $29,669 increase decrease in net outstanding loan receivable during 2019).

[208] Mat. Ex. 43 at 15.

[209] TGL Ex. 146 at 4; *see also* Adv. ECF No. 154 at 64:9–13.

[210] Adv. ECF No. 154 at 64:9–18.

[211] TGL Ex. 159-3 at 12; Adv. ECF No. 154 at 86:3–18.

either of the loans or transfers were made by Mr. Matloff to Ms. Yeon, Atelier, Inc., or Yeon Fashion.

### 4. *Ms. Yeon's Employment and Visa Status*

TGL contends that "Matloff falsely represented Yeon as a Rooftop [Group] USA employee to the tax authorities."[212] Contrary to TGL's contention, the overwhelming credible evidence established that Ms. Yeon was an employee of Rooftop Group USA from 2014 through 2019. Throughout this entire period—2014 through 2019—Rooftop Group USA had funded the operating expenses of the Yeon Fashion business, including the salary of Ms. Yeon. As a result, the immigration status of Ms. Yeon was of keen interest to Rooftop Group USA.

As previously noted, an intended goal of the 2015 business restructuring was to transition operations and employees from Rooftop Group USA to Rooftop Services.[213] However, because Ms. Yeon was in the process of applying for a visa, her immigration attorney raised a concern that if her employment status with Rooftop Group USA changed during the application process, it might cause an unintended issue with her visa application.[214]

TGL insinuates that Mr. Matloff, Ms. Yeon, and perhaps others were acting nefariously regarding Ms. Yeon's visa application. Of course, any issues concerning Ms. Yeon's formal visa application are not before the Court and this Court makes no comments or opinions concerning Ms. Yeon's visa application or immigration states.[215] But, for purposes of the issues before this Court, the credible evidence established that Ms. Yeon, her immigration attorney, and Rooftop

---

[212] Adv. ECF No. 165 at 2.

[213] Adv. ECF No. 158 at 9:4 thru 11:6.

[214] TGL Ex. 48 at 6–9. *See also* Adv. ECF No. 158 at 17:7 thru 18:23 and 61:10 thru 64:5; Adv. ECF No. 155 at 106:15 thru 110:23.

[215] Clearly, such issues, if any, are better left to Federal Courts that exercise jurisdiction over such issues.

Group USA were taking reasonable and cautious efforts not to disrupt Ms. Yeon's visa application

while Rooftop Group USA was in the process of transitioning employees (including Ms. Yeon)

to Rooftop Services. No credible evidence supports TGL's suggestion that Mr. Matloff, Ms.

Yeon, Ms. Yeon's immigration attorney, or anyone else were acting nefariously or attempting to

conceal or mislead any United States governmental agency regarding Ms. Yeon—who had been

working for Rooftop Group USA since 2014.

## R.     TGL allegations regarding Mr. McEnaney and Q4 Brands

TGL raised several allegations and concerns regarding Mr. McEnaney and Q4 Brands

including:

- Rooftop Group USA and Mr. Matloff "made and received numerous loans from Mr. Matloff's friends and family, including . . . [Mr.] McEnaney or his company Q4 Brands."[216]

- "Matloff did not document these loans or track indebtedness or repayment via any book or record."[217]

- "Matloff failed to disclose the following preference period payments that he directed from Rooftop [Group] USA: . . . $5,000 on June 7, 2019 to Q4 Brands; . . . $10,000 on June 19, 2019 to Q4 Brands."[218]

- "In December 2017, Matloff approved the transfer of $50,000 that was allegedly owed for commissions to Q4 Brands" and "[t]he very next day, McEnaney transferred $30,000 from Q4 Brands' bank account to Matloff's personal account, which Matloff knew that TGL would not be able to monitor."[219]

- "The next month, Matloff again approved the transfer of $60,000 that was allegedly owed to McEnaney as commissions. . . . This time, the same day,

---

[216] Adv. ECF No. 4 at 12, ¶ 50.

[217] Adv. ECF No. 4 at 12, ¶ 50.

[218] Adv. ECF No. 4 at 11, ¶ 44.

[219] Adv. ECF No. 165 at 19.

McEnaney transferred the entire $60,000 to Matloff's personal account ending."[220]

- Mr. McEnaney and Mr. Matloff "both characterized these transfers as "loans" but . . . there were no loan documents."[221]

- Matloff fraudulently transferred property of Rooftop Group USA to Q4 Brands totaling $152,000 from September 2018 through June 2019.[222]

The credible evidence at trial established that Mr. McEnaney was never an employee of Rooftop Group USA or Rooftop Services. Rather, Mr. McEnaney (and his company Q4 Brands)[223] began working with Rooftop Group USA as a 1099 independent contractor from 2008 until Rooftop Group USA ceased operations in 2019.[224] As an independent contractor, Mr. McEnaney worked with Rooftop Group USA's retail customers to generate sales for Rooftop Group USA.[225] As compensation for his work, Mr. McEnaney and Q4 Brands received commissions based on the net sales he generated for Rooftop Group USA.[226]

The credible evidence further established that the transfers by Rooftop Group USA to Q4 brands were for commissions due to Mr. McEnaney and Q4 Brands. Ms. York testified credibly that each of the payments highlighted by TGL were transfers for compensation and commission payments that were owed by Rooftop Group USA to Mr. McEnaney and Q4 Brands.[227] Ms. York testified further that she prepared the commissions reports and authorized the payments and that

---

[220] Adv. ECF No. 165 at 19.

[221] Adv. ECF No. 165 at 19.

[222] Adv. ECF No. 165 at 51.

[223] Adv. ECF No. 154 at 89:15 thru 90:3.

[224] Adv. ECF No. 171-1 at 9:8–11 and 81:1–17; Adv. ECF No. 154 at 209:24 thru 210:13.

[225] Mat. Ex. 76; Adv. ECF No. 171-1 at 10:4–17; Adv. ECF No. 155 at 68:9–23.

[226] Adv. ECF No. 154 at 210:9–19; Adv. ECF No. 155 at 68:9 thru 71:21; Mat. Exs. 76, 85, 86, and 87.

[227] Adv. ECF No. 155 at 69:13 thru 72:19 and 101:9–21; Adv. ECF No. 154 at 210:9–13 and 211:13 thru 212:10; *see also* Mat. Exs. 76, 85, 86, and 87.

44

"[Mr. Matloff] did not direct me or instruct me to pay those."[228]  Mr. McEnaney corroborated Ms. York's testimony in his deposition testimony.[229]

TGL failed to offer any credible evidence to support its contentions that the payments to Mr. McEnaney or Q4 Brands were fraudulent, improper, or not properly documented in Rooftop Group USA's books and records.  Although Mr. Matloff admitted that Mr. McEnaney made personal loans to him in December 2017 and January 2018,[230] TGL failed to offer any credible evidence to suggest that the loans to Mr. Matloff were intended to hinder, delay, or defraud TGL or any creditor of Rooftop Group USA, Rooftop Services, or Rooftop Singapore.

Finally, TGL failed to offer any credible evidence to suggest that Mr. Matloff "directed" Rooftop Group USA to make the $5,000 payment to Q4 Brands on June 7, 2019, or the $10,000 payment to Q4 Brands on June 19, 2019.[231]  Again, the credible evidence established that the payments to Mr. McEnaney and Q4 Brands were for earned compensations as determined and authorized by Ms. York.

## S.    TGL contends that Rooftop Group USA and Rooftop Services failed to keep adequate records

TGL contends that Rooftop Group USA and Rooftop Services failed to keep or preserve adequate records from which their financial condition or business transactions might be ascertained, and Mr. Matloff caused such failure.[232]  The Court will next address what the credible evidenced established regarding the accounting and financial record keeping systems for the

---

[228] Adv. ECF No. 155 at 71:17–21 and 101:9–21; *see also* Adv. ECF No. 154 at 23:13–18; Adv. ECF No. 171-1 at 74:10–25.

[229] Adv. ECF No. 171-1 at 30:15 thru 31:8 and 74:10–23.

[230] Adv. ECF No. 154 at 90:5 thru 92:15.

[231] Adv. ECF No. 4 at 11, ¶ 44.

[232] Adv. ECF No. 4 (Counts Four and Five).

Rooftop entities. First, it is important to recall that Rooftop Group USA began in 2008 as a "family business" owned by Mr. Matloff. Then, in 2015, the business underwent a substantial restructuring, detailed *supra*, which created Rooftop Singapore, Rooftop Services, and several other subsidiaries under Rooftop Singapore. The Rooftop business was operating in several countries under three different ownership structures—Rooftop Group USA (owned by Mr. Matloff), Rooftop Singapore and its subsidiaries, including Rooftop Services (owned by Gandiva which was owned by the Matloff Family Trust), and Asian Express (owned by Ms. Chen).

Ms. Ocampo and Ms. York were employees in the accounting and finance departments of Rooftop Group USA (from 2008 and 2010 respectively) and then by Rooftop Services from 2015 through 2019. Ms. Ocampo confirmed that the accounting firm of Edward L. Schafman, P.C.—and specifically, Mr. Schafman and Ms. Newbrand, both of whom are CPAs[233]—was engaged by Rooftop Group USA (from 2012) and by Rooftop Services (from 2015) through 2019. Mr. Schafman and Ms. Newbrand provided traditional bookkeeping services for the Rooftop business, including maintaining the general ledger and the QuickBooks bookkeeping system for the Rooftop entities.[234]

Both Ms. Ocampo and Ms. York provided credible and uncontroverted testimony detailing the record-keeping and accounting functions for the various Rooftop businesses from 2008 through mid-2019—when Mr. Matloff and the three Rooftop entities filed bankruptcy. Although Ms. Newbrand and Mr. Schafman did not provide live testimony during the trial, their designated deposition testimony corroborated the uncontroverted testimony of Ms. Ocampo and Ms. York.

---

[233] Adv. ECF No. 171-2 at 128:9–11.

[234] Adv. ECF No. 155 at 10:8–15; 12:10–15; and 46:23 thru 48:4.

### 1.    Ms. Ocampo's role and responsibilities

During the initial years from 2008 through 2012, Ms. Ocampo was responsible for the day-to-day bookkeeping and accounting functions for Rooftop Group USA.[235]  In 2012, Rooftop Group USA engaged Mr. Schafman's accounting firm and he and Ms. Newbrand began providing the day-to-day bookkeeping functions and maintaining the QuickBooks system for Rooftop Group USA.[236]  During Ms. Ocampo's entire time working with the Rooftop entities, she was in regular contact with Ms. Newbrand and Ms. York.

In response to the assertion by TGL and Mr. Vaclavek, discussed *infra*, that the Rooftop QuickBooks system was "a mess,"[237] Ms. Ocampo testified credibly that the QuickBooks system was always reconciled and included all the transactions, dates, amounts, recipients, and other information that was typically included in QuickBooks.[238]  Ms. Ocampo credibly explained that the only issue she referenced was "a mess" was the need to recategorize some of the payroll and travel expenses accounts for 2018 and 2019.[239]

With respect to the payroll issues in 2018, Ms. Ocampo explained why Rooftop Group USA had been paying employees directly by wire transfers as opposed to through the ADP payroll system.  Although the Rooftop employees were being paid their correct net payroll, the Rooftop entities did not have sufficient cash to make the payroll taxes timely.  Therefore, Ms. Ocampo

---

[235] Adv. ECF No. 155 at 9:20 thru 10:5.

[236] Adv. ECF No. 155 at 10:8–15 and 12:10–20.

[237] TGL Exs. 135, 138, and 140.

[238] Adv. ECF No. 155 at 15:2–16.

[239] Adv. ECF No. 155 at 14:2 thru 16:5.

was required to file amended payroll tax filings. Ultimately, the payroll issue was resolved, the payroll taxes were paid, and the payroll tax filings were amended.[240]

Regarding the need to reclassify some of the travel and other business expense accounts for 2019, Ms. Ocampo testified credibly about the process she used to reclassify such items between Mr. Matloff, Rooftop Group USA, and Rooftop Services.[241] She also confirmed that she had used the same process to properly classify the travel and other business expense accounts that she used "from day one" in 2008 through 2019.[242] TGL offered no evidence which contradicted or refuted this process.

Even though Ms. Campo is Mr. Matloff's sister, she testified credibly that "I do love my brother" but also that "I'm here because I want the truth to come out."[243] Overall, the Court found Ms. Campo to be a very credible witness.

### 2. Ms. York's role and responsibilities

Ms. York was a member of the accounting and finance department from 2010 through 2019. Throughout her time with Rooftop Group USA and Rooftop Services, she was in regular contact with Ms. Ocampo, Ms. Newbrand,[244] and Mr. Chew.[245] Ms. York testified credibly to the division of labor among the accounting and finance teams. Ms. York testified that the various accounting books and records of Rooftop Singapore, Rooftop Group USA, and Rooftop Services were maintained by different people in different locations. For example, (i) the QuickBooks data

---

[240] Adv. ECF No. 155 at 17:9 thru 19:25.

[241] Adv. ECF No. 155 at 21:21 thru 34:12 and 36:17–24.

[242] Adv. ECF No. 155 at 36:21–24.

[243] Adv. ECF No. 155 at 35:9–12.

[244] Adv. ECF No. 155 at 46:18 thru 48:4 and 59:5–25.

[245] Adv. ECF No. 155 at 53:4–25.

files, invoices, and accounts payable for Rooftop Group USA and Rooftop Services were maintained by Mr. Schafman and Ms. Newbrand in Houston, Texas, from 2012 through mid-2018; (ii) information on payables, receivables, and purchase orders were maintained by Ms. York and her team in Toronto, Canada; (iii) the inventory data was maintained by the third-party warehouses who stored the inventory; and (iv) the "big picture" and other financial and accounting records were managed and maintained by Mr. Chew and his team in Hong Kong. [246]

Ms. York also testified credibly that accounting and financial information relevant to the third-party lenders, including TGL, was maintained by Mr. Chew and his finance team in Hong Kong.[247] According to Ms. York, Mr. Chew and his finance team were "supposed to maintain all of the books of accounts of the whole company for Rooftop Singapore and Asian Express and Rooftop [Group] USA."[248] Ms. York further testified that Mr. Chew and his finance team were "extremely professional and all came from an accounting and finance background."[249] Mr. Yee's testimony corroborated Ms. York's testimony as he admitted that his "point of contact" for accounting and financial information was Mr. Chew.[250]

Ms. York confirmed the protocol she would follow to obtain the requisite approvals from TGL to pay vendor invoices. Ms. York would notify Mr. Chew the vendors' payables which were due and which vendors needed to be paid, and then Mr. Chew and his finance team would solicit the necessary approvals from TGL.[251] Ms. York testified further that TGL monitored not

---

[246] Adv. ECF No. 155 at 46:18 thru 48:3 thru 50:2; 53:1–-22; and 53:6–13. Adv. ECF No. 171-2 at 121:5–18; 128:22 thru 129:1; and 138:12 thru 141:7.

[247] Adv. ECF No. 155 at 52:23 thru 53:3.

[248] Adv. ECF No. 155 at 53:6–13.

[249] Adv. ECF No. 155 at 66:22 thru 67:1.

[250] Adv. ECF No. 156 at 152:19 thru 153:3.

[251] Adv. ECF No. 155 at 54:1 thru 55:3 and 80:19 thru 81:5.

only proceeds of its collateral, but also the proceeds of other lenders' collateral.[252] And TGL would take days to approve payment of invoices, which had adverse consequences for the operation of the Rooftop business and hindered Ms. York from effectively performing her job.[253] Ms. York testified credibly that "I sometimes felt as though I had one hand tied behind my back because I had to ask for approvals, wait for those approvals, and you know, such a time sensitive matter, I wanted to be able to make sure that bills were always paid on time, and that was not possible with these controls in place."[254]

Ms. York testified that when Mr. Chew resigned in April 2018, Rooftop Singapore, Rooftop Services, and Rooftop Group USA were left without a CFO, causing the in-house accounting and finance departments to be disrupted and shorthanded. Those who remained—Ms. York and Ms. Ocampo, along with the retained services provided by Ms. Newbrand—did the best they could to maintain the accounting and finance functions and systems for each of those entities.[255]

Finally, Ms. York testified credibly that Mr. Matloff had limited involvement with the Rooftop entities' QuickBooks files, bookkeeping and accounting functions, or record maintenance and retention issues.[256]

The Court found the testimony of Ms. York to be very credible and instructive.

---

[252] TGL Ex. 135; Adv. ECF No. 155 at 77:25 thru 78:5.

[253] Adv. ECF No. 155 at 80:24 thru 82:16.

[254] Adv. ECF Np. 155 at 82:11–16 and 83:12 thru 89:23; *see also* Mat. Exs. 129 and 137.

[255] Adv. ECF No. 155 at 60:1–9.

[256] Adv. ECF No. 155 at 55:17 thru 56:20.

### 3.      Mr. Schafman's and Ms. Newbrand's roles and responsibilities

Neither Mr. Schafman nor Ms. Newbrand testified at trial, but their prior deposition transcripts were admitted into evidence.[257] Both Mr. Schafman's and Ms. Newbrand's deposition testimony corroborated the testimony of Ms. Ocampo and Ms. York concerning the work they performed for Rooftop Group USA and Rooftop Services from 2012 through 2019.[258] Mr. Schafman confirmed that Ms. Newbrand performed most of the work by his firm for the Rooftop entities,[259] and that neither he nor Ms. Newbrand communicated very much with Mr. Matloff.[260] Rather, they primarily communicated with Ms. Ocampo and Ms. York.[261]

### 4.      TGL's Expert Witness Mr. John Vaclavek

In support of TGL's contention that Rooftop Group USA and Rooftop Services failed to keep or preserve adequate books and records from which their financial condition or business transactions might be ascertained, TGL engaged Mr. John Vaclavek ("*Mr. Vaclavek*") to testify as an expert witness for TGL.[262] Mr. Vaclavek has nearly thirty years of experience as a Certified Public Accountant and works at Williams-Keepers, LLC, a certified public accounting and consulting firm.[263] Mr. Vaclavek has worked in various audit positions within Williams-Keepers since 1986, with the exception of a three-year period where he served as the chief financial officer

---

[257] Adv ECF Nos. 171-2 (Newbrand) and 171-3 (Schafman).

[258] Adv. ECF No. 171-3 at 54:3–16; 67:19 thru 68:9; and 72:20 thru 73:14; Adv. ECF No. 171-2 at 119:18 thru 120:15; 121:5 thru 122:11; 125:22 thru 126:11; and 128:22 thru 129:1.

[259] Adv. ECF No. 171-3 at 21:7–20.

[260] Adv. ECF No. 171-3 at 24:8–13; Adv ECF No. 171-2 at 45:19–21.

[261] Adv. ECF No. 171-2 at 45:19–24.

[262] Adv. ECF No. 157 at 197:11–12.

[263] Adv. ECF No. 157 at 191:5–11 and 192:7–10.

of a family owned company.[264] Mr. Vaclavek has also been a Certified Fraud Examiner and a Certified Global Management Accountant since approximately 2010.[265]

Mr. Vaclavek is currently the partner in charge of the Special Services Group at Williams-Keepers, which performs bankruptcy, fraud, and litigation support.[266] Mr. Valclavek testified that he has been involved in approximately forty bankruptcy related proceedings over the course of his career, related mostly to Chapter 11 work.[267] Although he has never been retained in a Chapter 7 case, Mr. Vaclavek testified that he has been involved in bankruptcy case engagements that required the review of financial records his "entire career."[268] But, Mr. Vaclavek admitted that this is the first case that he has been engaged to play any kind of role in a suit involving a challenge to a Chapter 7 discharge under either § 727 or § 523.[269]

Mr. Vaclavek testified that to arrive at his opinions in this case, he reviewed the following items: (i) Mr. Matloff's prior deposition transcripts for background on the matter; (ii) various financial documents in the virtual data room provided by Mr. Matloff, Rooftop Group USA, Rooftop Services, and Rooftop Singapore, including financial statements, audits, bank statements, and invoices; (iii) email correspondence with Mr. Schafman; (iv) the deposition transcripts of Mr. Schafman and Ms. Newbrand; and (v) exhibits to Mr. Dixon's deposition.[270]

---

[264] Adv. ECF No. 157 at 191:5–11 and 192:7–25.

[265] Adv. ECF No. 157 at 191:20–25 and 192:1–6.

[266] Adv. ECF No. 157 at 194:12–21.

[267] Adv. ECF No. 157 at 196:13–16.

[268] Adv. ECF No. 157 at 267: 7–15.

[269] Adv. ECF No. 157 at 267:7–11.

[270] Adv. ECF No. 157 at 199:19 thru 203:7.

Mr. Vaclavek admitted, however, that throughout the course of his investigation, except for a brief conversation with Mr. Chew—who did not provide him with any information upon which he relied to arrive at his conclusions[271]—he never interviewed or attempted to contact Mr. Matloff, Ms. Ocampo, Ms. York, or any of the other former Rooftop Group USA, Rooftop Services, or Rooftop Singapore bookkeeping or accounting staff, nor did he interview or speak with any of the Rooftop entities' outside accounting professionals including Mr. Schafman, Ms. Newbrand, or Mr. Dixon.[272] Rather, Mr. Vaclavek only analyzed and considered financial records and documents that were directly provided to him by TGL, which he understood "to represent all of the accounting records of the company."[273] The credible evidence at trial established, however, that substantial additional accounting and financial records for Rooftop Group USA, Rooftop Services, and Rooftop Singapore existed, but were not reviewed or considered by Mr. Vaclavek.[274]

Based on the limited documents he did review, Mr. Vaclavek concluded that "[w]e found incomplete accounting records, we found inconsistent treatment of transactions, and we found lack of underlying documentary support, so I would question the reliability of the financials."[275] In support of his conclusions, Mr. Vaclavek focused his testimony on the following general categories: (i) a discrete "financial statement" dated June 26, 2018, that he "found" in the data

---

[271] Adv. ECF No. 157 at 228:15–19.

[272] Adv. ECF No. 157 at 227:23 thru 228:14.

[273] TGL Ex. 157 at 228:20 thru 229:1.

[274] TGL Ex. 157 at 229:2 thru 235:2.

[275] Adv. ECF No. 157 at 227:6–12.

room;[276] (ii) an email chain commencing on May 19, 2020, through June 1, 2020;[277] (iii) certain QuickBooks files that he "found" in the data room;[278] (iv) certain intercompany transactions between Rooftop Group USA and Rooftop Services;[279] (v) transactions between Rooftop Group USA and Fortune Eight & Hind International;[280] and (vi) transactions between Rooftop Group USA and Ms. Yeon and Yeon Fashion.[281]   The Court will address each of the above subject matters testified to by Mr. Vaclavek in support his conclusions.

a.    A discrete "financial statement" located in the "data room"

Mr. Vaclavek first points to alleged discrepancies he purportedly found in the Rooftop Group USA books and records.  To support his finding of such alleged discrepancies, Mr. Valclavek testified that he "found" a "financial statement" in the data room that was dated June 26, 2018, for the five-month period ending May 31, 2018.[282]  The alleged "financial statement" itself was not offered into evidence.  Further, Mr. Vaclavek did not identify who prepared the alleged "financial statement" or for what purpose the alleged "financial statement" had been prepared.  Additionally, Mr. Vaclavek's testimony suggests that he did not attempt to ascertain the purpose or reliability of the alleged "financial statement."

The alleged "financial statement" apparently reflected that as of May 31, 2018, Rooftop Group USA had total assets of $398,937.[283]  A cursory review of other reliable books and records

---

[276] TGL Ex. 166; Adv. ECF No. 157 at 200:10–23 and 203:20 thru 204:3.

[277] TGL Ex. 139; Adv. ECF No. 157 at 204:20 thru 206:20.

[278] TGL Ex. 166; Adv. ECF No. 157 at 204:4–12; 208:6 thru 209:10; and 210:4–24.

[279] TGL Ex. 137; Adv. ECF No. 157 at 211:11 thru 213:24.

[280] TGL Exs. 198 and 123; Adv. ECF No. 213:25 thru 218:11.

[281] TGL Exs. 50 and 169; Adv. ECF No. 157 at 218:15 thru 225:4 and 226:9–25.

[282] Adv. ECF No. 157 at 204:2–3.

[283] TGL Ex. 166; Adv. ECF No. 157 at 203:20 thru 204:19.

for Rooftop Group USA that were available to Mr. Vaclavek should have caused Mr. Vaclavek to question the accuracy and reliability of a document he "found" in that "data room" that allegedly asserted that Rooftop Group USA had total assets of only $398,937 as of May 31, 2018. For example, the following books and records each reflected that Rooftop Group USA had significantly more total assets than what was reflected in the "financial statement":

- 2016 Federal Income Tax Return       $4,826,450 total assets as of 12/31/2016[284]
- 2017 Federal Income Tax Return       $5,285,395 total assets as of 12/31/2017[285]
- 2018 Federal Income Tax Return       $6,418,275 total assets as of 12/31/2018[286]
- Rooftop Group USA balance sheet    $7,250,725 total assets as of 5/31/2018[287]
- Rooftop Group USA balance sheet    $5,469,371 total assets as of 12/31/2018[288]

Consequently, the credible evidence suggests that the reliability of any analysis that used the data contained in the "financial statement" is flawed and highly questionable, at best.  Mr. Vaclavek, however, used the flawed and unreliable data reflected in the "financial statement" in a demonstrative exhibit he prepared and discussed during his testimony to support his opinions.[289] Because the Court finds that the credible evidence suggests that the data contained in the "financial statement" is unreliable and flawed, the Court likewise finds that Mr. Vaclavek's use and reliance on such data to support his opinion is also flawed.  Therefore, on the reliability and relevance of the "financial statement" that was "found" in the "data room" and relied upon by

---

[284] Mat Ex. 40.

[285] Mat Ex. 41.

[286] Mat Ex. 42.

[287] TGL Ex. 189.

[288] Mat Ex. 54.

[289] TGL Ex. 166; Adv. ECF No. 157 at 204:2–19 and 238:3–15.

Mr. Vaclavek, the Court found Mr. Vaclavek's testimony, opinions, and conclusions to be flawed and not persuasive.

> ### b. *An email chain commencing on May 19, 2020, through June 1, 2020*

Mr. Vaclavek then testified to email correspondence[290] between Ms. Ocampo and Mr. Randall Brakob (a staff accountant with Arete Advisors, LLP in Mr. Dixon's office)[291] as "anecdotal support" for his finding that Rooftop Group USA's financials are unreliable.[292] In that email, Ms. Ocampo wrote "I knew the books were a mess."[293] Mr. Vaclavek testified that Ms. Ocampo's email provides anecdotal support for his conclusion that "the financial statements changed significantly and were likely not reliable at the date of the bankruptcy filing."[294] But the credible evidence suggests that Mr. Vaclavek either misunderstood or exaggerated the context of Ms. Ocampo's statement in her email when she stated that she "knew the books were a mess."

Contrary to Mr. Vaclavek's interpretation of the context of Ms. Ocampo's statement, Ms. Ocampo credibly testified that she was referring only to the specific issue regarding the proper classification of payroll in general and Mr. Matloff's travel expenses.[295] The context of the email correspondence Mr. Vaclavek relied upon also supports Ms. Ocampo's testimony that these "messes" had to do with the classification and booking of payroll. Ms. Ocampo further testified that these "messes" were, in fact, fixed in both the general ledger and QuickBooks.[296]

---

[290] TGL Ex. 139.

[291] Adv. ECF No. 171 at 12:3–14.

[292] Adv. ECF No. 157 at 204:20 thru 205:3.

[293] TGL Ex. 139 at 5.

[294] Adv. ECF No. 157 at 207:16–25.

[295] TGL Exs. 135, 138, and 139; Adv. ECF No. 155 at 15:2 thru 16:5; 20:4 thru 21:20; and 30:3–24.

[296] Adv. ECF No. 155 at 17:25 thru 18:7.

Accordingly, Mr. Vaclavek's assumption that the email provided "anecdotal support" for his opinion was misplaced, as the issues in the email correspondence are related almost entirely to payroll. Therefore, on the "anecdotal support" purportedly provided by the email chain relied upon by Mr. Vaclavek, the Court found Mr. Vaclavek's testimony, opinions, and conclusions to be flawed and not persuasive.

        *c.*    *QuickBooks files located in the "data room"*

Next, Mr. Vaclavek testified concerning his "finding regarding a lack of transaction history for [Rooftop Group USA]."[297] Mr. Vaclavek testified that the QuickBooks file for Rooftop Group USA "started with a journal entry on June 30, 2017, and that journal entry had no – we found no support for that entry. And it was about an 84-line entry that posted beginning balances to carry forward."[298] With respect to that 84-line beginning balances journal entry, Mr. Vaclavek testified that he "would have expected to find the general ledger detail in the QuickBooks file or I would have expected to find a work paper of some sort rolling up to that journal entry."[299] Mr. Vaclavek testified that he found neither.[300]

In cross examination, however, Mr. Vaclavek admitted that he had not spoken to Ms. Newbrand, who maintained the QuickBooks file, or to any other bookkeepers or employees at Rooftop Group USA, Rooftop Services, or Rooftop Singapore to determine whether such support existed or there was an explanation for the 84-line journal entry made as the June 2017 beginning balance in QuickBooks.[301] Further, Ms. Newbrand's deposition testimony, which was included

---

[297] Adv. ECF No. 157 at 208:1–4.

[298] Adv. ECF No. 157 at 208:6–10.

[299] Adv. ECF No. 157 at 208:14–18.

[300] Adv. ECF No. 208:19–20.

[301] Adv. ECF No. 157 at 238:25 thru 240:5.

in the documents Mr. Vaclavek testified that he had reviewed prior to rendering his opinions, directly controverted Mr. Vaclavek's testimony. In her deposition testimony, Ms. Newbrand explained why the QuickBooks file required an 84-line journal entry in June 2018 as the beginning balances in the QuickBooks file:

> [T]here was an old set of Rooftop QuickBooks and a new set of Rooftop QuickBooks because the QuickBooks got -- I'm trying to think what the word is, where you have to fix them, and it wouldn't fix properly. And so I opened a new set of QuickBooks, and so for that particular year, I had to combine them to get the full set of the financials for Rooftop Group USA."[302]

> . . .

> I took the exact numbers that were at the end in the old QuickBooks, and I did a journal entry to bring them to the '17 books. So those numbers should be exactly the same.[303]

And when asked why the current Rooftop Group USA QuickBooks file began with a series of journal entries as of June 30, 2017, Ms. Newbrand responded that she had to create a new QuickBooks file because the old QuickBooks file "was corrupted."[304]

Additionally, Mr. Vaclavek admitted that he never reviewed nor inquired into the existence of any QuickBooks file for Rooftop Group USA for the period leading up to the June 2017 set of QuickBooks that began with the 84-line journal entry.[305] Mr. Vaclavek also admitted that he had no reason to doubt that Ms. Newbrand had properly and accurately transferred the data from the "old set QuickBooks" to the "new set of QuickBooks" through the 84-line journal

---

[302] Adv. ECF No. 171-2 at 26:11–19.

[303] Adv. ECF No. 171-2 at 139:15–19.

[304] Adv. ECF No. 171-2 at 139:21–25.

[305] Adv. ECF No. 157 at 241:25 thru 242:4.

entry.[306]  Finally, when asked why he drew the conclusion "that there was no such data in the books and records of the company," despite admitting that he had tax returns and bank statements for Rooftop Group USA predating the June 2017 set of QuickBooks, Mr. Vaclavek responded "I was not engaged to create the records.  I was engaged to evaluate what was available to me and looking at source documents such as bank statements to create the accounting records was not part of [my engagement]."[307]

Mr. Vaclavek next testified that he found a similar "lack of transaction history" with respect to Rooftop Services.[308]  Because Rooftop Services was listed as a subsidiary in the 2015 and 2016 financial statements for Rooftop Singapore, Mr. Vaclavek testified that he would have expected to find some sort of transaction history for that time period for Rooftop Services.  However, "the first entry in [Rooftop Services] on the QuickBooks files that was in the data room was dated April of 2017."[309]  When asked on cross-examination if he knew whether Rooftop Services had any transaction history before April of 2017, Mr. Vaclavek said that he "could not tell if it did or didn't."[310]  Contrary to Mr. Vaclavek's understanding, the credible evidence established that such records for Rooftop Services existed—he either was not provided with such files or he chose not to review such files.

Therefore, on the QuickBooks issues, the Court found Mr. Vaclavek's testimony, opinions, and conclusions to be flawed and not persuasive.

---

[306] Adv. ECF No. 157 at 244:8–12.

[307] Adv. ECF No. 157 at 244:25 thru 245:11.

[308] Adv. ECF No. 157 at 210:14–16.

[309] Adv. ECF No. 157 at 210:14–24.

[310] Adv. ECF No. 157 at 210:25 thru 211:2.

> d.    *Intercompany transactions between Rooftop Group USA and Rooftop Services*

Next, Mr. Vaclavek testified that he found "an issue with how inter-company borrowings between Rooftop Group  USA and Rooftop Services were reflected on the books and records" because the inter-company balances did not balance by approximately $351,000.[311] Mr. Vaclavek testified that the inter-company balances "should have been closed out appropriately, the balance at the end of each of these periods, and they did not for '17, '18, or '19."[312] Mr. Vaclavek testified that, ordinarily, he would expect the "due to and due from" between two companies to match[313] and "[t]he fact that the process went three years without catching the problem is what was the issue for me."[314]

Although the discrepancy between the Rooftop Group USA and Rooftop Services books and records did exist, Mr. Vaclavek confirmed that he was "nonetheless able to identify [the issue] from the general ledger" as well as "the source of the $351,132 discrepancy."[315]  A document prepared by Mr. Vaclavek shows an adjustment was posted to Rooftop Group USA at December 31, 2017, which debited payroll expense (increased the payroll expense account) and credited the Due from Rooftop Services asset account (decreased the Due From Rooftop Services asset account).[316]  This caused the intercompany discrepancy because no corresponding entry was booked in the books of Rooftop Services.

---

[311] Adv. ECF No. 157 at.211:11–20; TGL Exs. 167 and 202.

[312] Adv. ECF No. 157 at 212:2–22.

[313] Adv. ECF No. 157 at 250:4–8.

[314] Adv. ECF No. 157 at 251:17 thru 252:3.

[315] Adv. ECF No. 157 at 252:11 thru 254:19.

[316] TGL Ex. 202.

Although Mr. Vaclavek identified the discrepancy in the "due to and due from" accounts in the books and records of Rooftop Group USA and Rooftop Services as support for his finding that "I would question the reliability of the financials,"[317] he admitted that he was able to identify and ascertain the cause of the discrepancy from a single journal entry he identified in the Rooftop Group USA QuickBooks file.[318] Because Mr. Vaclavek admitted on cross-examination that he was able to easily resolve the discrepancy in the "due to and due from" accounts, Mr. Vaclavek's testimony, opinions, and conclusions based on the discrepancy of the intercompany "due to due from" accounts was not persuasive.

e. *Transactions between Rooftop Group USA and Fortune Eight & Hind International*

Mr. Vaclavek next testified to "issues with undocumented loans" involving two loan transactions—one with Fortune 8 for approximately $305,000 and one with Hind International Investment Limited for approximately $99,971.7—for which Mr. Vaclavek testified that he could not find any "documentary support" for these "loan transactions."[319] To support his analysis, Mr. Vaclavek provided a transaction detail from the Rooftop Group USA general ledger.[320]

On cross-examination, however, Mr. Vaclavek admitted that he had no difficulty in identifying the transactions in the Rooftop Group USA general ledger and he was able to identify the date, dollar amount, counterparty, and classification for each transaction.[321] Although Mr. Vaclavek suggested that he would have "expected to see" a loan document somewhere in the

---

[317] Adv. ECF No. 157 at 227:6–12.

[318] Adv. ECF No. 157 at 252:20 thru 253:6 and 254:16–19.

[319] Adv. ECF No. 157 at 213:25 thru 215:16.

[320] TGL Ex. 198.

[321] Adv. ECF No. 157 at 247:6 thru 248:1.

file,[322] he acknowledged that a loan document was not necessarily required for a valid loan to exist.[323]   Moreover, the credible evidence at trial suggested that the $305,000 loan in question was a short-term loan that was repaid in full less than three months after it was originally funded.[324]   Therefore, Mr. Vaclavek's testimony regarding the alleged lack of documentary support for the transactions between Rooftop Group USA and Fortune 8 and Hind International as support for his opinions was not persuasive.

f.   *Transactions between Rooftop Group USA and Ms. Yeon and Yeon Fashion*

Finally, in support of Mr. Vaclavek's opinions and conclusions, he provided testimony concerning the Rooftop Group USA transactions regarding Ms. Yeon and Yeon Fashion.  To put the transactions regarding Ms. Yeon and Yeon Fashion into full context, the Court incorporates herein by reference Section II. Q. *supra*, which details the credible evidence concerning Rooftop Group USA's relationship with Ms. Yeon and Yeon Fashion.

Throughout Mr. Vaclavek's testimony concerning Ms. Yeon and Yeon Fashion, it was evident that Mr. Vaclavek either did not grasp or understand the relationship between Rooftop Group USA and Ms. Yeon and Yeon Fashion or he had failed to review substantial credible evidence that was or should have been made available to him.

Mr. Vaclavek testified that "the financial statements show what I now understand to be a loan to [Ms. Yeon], or at least represented as a loan to [Ms. Yeon], for $4.267 million."[325]   Mr.

---

[322] Adv. ECF No. 157 at 246:9–17.

[323] Adv. ECF No. 157 at 246:20–24.

[324] TGL Ex. 198.

[325] Adv. ECF No. 157 at 221:3–5.

Vaclavek prepared a demonstrative to illustrate his findings with respect to the payments he concluded had been made to Ms. Yeon.[326]

Mr. Vaclavek testified that of the alleged $4.267 million loan to Ms. Yeon or Yeon Fashion, "I want to say there was about 360,000 that we actually had transactional detail,"[327] which he referenced on his demonstrative as consisting of 160 transactions totaling $368,328 for items including payroll, rent, shipping, and legal fees paid between June 30, 2017, through December 31, 2019.[328]

Mr. Vaclavek then testified that the balance of the alleged $4.267 million "loan" to Ms. Yeon comprised of "a single transaction posted on June 30, 2017 of $2.7 million"[329] and a "second transaction was on December 31, 2017, of $1.183 million."[330] Mr. Vaclavek testified that he did not find any support or transactional history for these two alleged transactions[331] nor did he find any promissory notes or loan agreements, which he testified that he would expect to find especially for a loan of that magnitude.[332]

The Court finds and concludes that Mr. Vaclavek's contention that the Rooftop Group USA books and records do not contain support or transactional history for the items that comprise the $4,266,456 "due from" Ms. Yeon and Yeon Fashion is contrary to the overwhelming credible evidence, as more fully detailed in Section II. Q., *supra*. Consequently, the Court found Mr.

---

[326] TGL Ex. 169; Adv. ECF No. 157 at 221:8–12.

[327] Adv. ECF No. 157 at 221:3–7.

[328] TGL Ex. 169.

[329] Adv. ECF No. 157 at 221:18–19; TGL Ex. 169.

[330] Adv. ECF No. 157 at 221:22–23; TGL Ex. 169.

[331] Adv. ECF No. 157 at 222:18–24.

[332] Adv. ECF No. 157 at 224:7–13.

Vaclavek's testimony, opinions, and conclusions concerning Rooftop Group USA's transactions with Ms. Yeon and Yeon Fashion to be flawed and not persuasive.

Overall, the Court finds and concludes that Mr. Vaclavek's analysis was based on limited documents that resulted in opinions and conclusions that were flawed, not credible, and not persuasive.

### 5. *Conclusions regarding the Rooftop entities' Record Keeping*

In conclusion, the credible evidence at trial established that the Rooftop entities maintained a quality accounting and finance staff that were responsible for maintaining the books and records for the Rooftop entities from 2008 through 2019. By 2018, when Mr. Chew resigned, the corporate structure, accounting, and finance systems were far more complex than they were when Mr. Chew was hired in 2014.[333] After Mr. Chew resigned, Ms. York, Ms. Ocampo, and Ms. Newbrand did their best to maintain the books and records for the Rooftop entities during what was a financially stressful and difficult period for the company. In addition, Mr. Matloff tried to hire a replacement CFO after Mr. Chew resigned, but his efforts were not successful.[334]

Finally, the overwhelming credible evidence established that Mr. Matloff had limited involvement with the Rooftop entities' QuickBooks files, bookkeeping and accounting functions, and record maintenance and retention issues.[335] Even Mr. Yee's testimony corroborates this finding when he confirmed that his "points of contact" were Mr. Chew for accounting and

---

[333] Adv. ECF No. 154 at 194:12–15.

[334] Adv. ECF No. 154 at 193:14–25.

[335] Adv. ECF No. 155 at 55:17 thru 56:20.

financial information, Mr. Nelson for Rooftop corporate structure information, and then finally

to Mr. Matloff for "the business in total especially in North American sales."[336]

### III. LEGAL ANALYSIS

TGL filed its Complaint against Mr. Mattloff on December 6, 2019. By its Complaint,

TGL is seeking a judgment that:

- TGL's alleged claim of $8,140,842.02 against Mr. Matloff is nondischargeable based on four independent theories under 11 U.S.C. §§ 523(a)(2), (4), and (6);

- Mr. Matloff's discharge (of alleged debt exceeding $67 million[337]) is denied based on seven independent theories under 11 U.S.C. § 727(a)(2), (3), (4), (5), and (7); and

- certain of Mr. Matloff's asserted exemptions be denied.

The Count will address each of the independent claims within each Count in the

Complaint, in turn.

### A. COUNT ONE: 11 U.S.C. § 523(a)

Count One of the Complaint, as construed by the Court, contains *four* independent

statutory bases for relief under § 523(a). The Court will address each in turn.

#### 1. § 523(a)(2)(A)—False Pretense, False Representation, or Actual Fraud

A debt may be declared nondischargeable under § 523(a)(2) if it is a debt "for money . . .

or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses,

a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's

financial condition."[338] TGL contends that Mr. Matloff owes a debt to TGL for money, property,

---

[336] Adv. ECF No. 156 at 152:19 thru 153:3.

[337] Case No. 19-44253; ECF No. 102.

[338] 11 U.S.C. § 523(a)(2)(A).

services, or an extension, renewal, or refinancing of credit obtained by false pretenses, a false representation, or actual fraud.[339]

The Fifth Circuit distinguishes false pretenses and false representations from "actual fraud" for purposes of § 523(a)(2)(A). False pretenses and false representations require that the creditor prove (i) the existence of a knowing and fraudulent falsehood, (ii) describing past or current facts, and (iii) that was justifiably relied upon by the creditor.[340] A debtor's representation related to a future action does not satisfy § 523(a)(2)(A) for a false pretense or false representation unless, at the time the representation was made, the creditor can establish that the debtor had no intention of fulfilling the promise or representation.[341]

To show actual fraud, the creditor must prove that (i) the debtor made a material representation, (ii) the representation was false, (iii) when the representation was made, the debtor knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion, (iv) the debtor made the representation with the intent that the creditor should act upon it, (v) the creditor acted in reliance on the representation, and (vi) the creditor thereby suffered an injury.[342]

---

[339] Adv. ECF No. 4 at 14 ¶ 62.

[340] *See RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995).

[341] *Beshears v. McCool (In re McCool)*, Adv. No. 16-43206, 2019 BL 372248, at *17 (Bankr. N.D. Tex. Sept. 30, 2019) (citing *In re Allison*, 960 F.2d 481, 484 (5th Cir. 1992)); *see also In re Bercier*, 934 F.2d 689, 692 (5th Cir. 1991) (overruled on other grounds by *Husky Intern. Electronics, Inc. v. Ritz*, 136 S.Ct. 1581 (2016)). *Husky* made clear that no misrepresentation is necessary to establish an "actual fraud" under § 523(a)(2)(A) of the Bankruptcy Code. Courts in the Fifth Circuit continue to follow *Bercier*'s requirement that a "false representation" under § 523(a)(2)(A) must relate to past or current facts. *See, e.g., In re Carter*, No. 17-35082, 2018 WL 6060391, at *23 (Bankr. S.D. Tex. Nov. 19, 2018); *In re Martin*, No. 15-41103, 2017 WL 1316928, at *10 (Bankr. E.D. Tex. Apr. 7, 2017).

[342] *See Saenz v. Gomez*, 899 F.3d 384, 391 (5th Cir. 2018) (citing *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001)).

Therefore, to establish that Mr. Matloff made a false pretense or false representation, TGL must prove that (i) Mr. Matloff (and not someone else) made a knowing and false representation; (ii) the false representation described a past or current fact; and (iii) TGL justifiably relied on the representation.[343] To satisfy the reliance element, the Supreme Court has held that the degree of reliance required under § 523(a)(2)(A) is justifiable reliance.[344]

To establish that Mr. Matloff committed actual fraud, TGL must prove that (i) Mr. Matloff (and not someone else) made a material representation, (ii) the representation was false, (iii) when the representation was made, Mr. Matloff knew it was false or he made it recklessly without any knowledge of the truth and as a positive assertion, (iv) Mr. Matloff made the representation with the intent that TGL should act upon it, (v) TGL acted in reliance on the representation, and (vi) TGL thereby suffered an injury

In support of TGL's § 523(a)(2)(A) claims, TGL makes the following contentions:

- Mr. Matloff "represented that Rooftop [Singapore] was the ultimate beneficiary of the Rooftop enterprise."[345]

- Mr. Matloff made false representations regarding "Rooftop's reorganized structure."[346]

- Mr. Matloff's never intended to comply with his obligations under the Matloff Guaranty.[347]

- Mr. Matloff falsely represented that he would repay the $1 million "bonus" he received.[348]

---

[343] *Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 398 (5th Cir. 2017).

[344] *Field v. Mans*, 516 U.S. 59, 70–71 (1995).

[345] Adv ECF No. 165 at 67; *see also* Adv. ECF No. 4 at 4, ¶¶ 16–20.

[346] Adv. ECF No. 165 at 68; *see also* Adv. ECF No. 4-6 at 4, ¶¶ 16–20.

[347] Adv. ECF No. 165 at 68–69; *see also* Adv. ECF No. 4 at 8, ¶ 27and 11, ¶ 48.

[348] Adv. ECF No. 165 at 69–70; *see also* Adv. ECF No. 4 at 10, ¶ 41.

- Mr. Matloff falsely represented that in 2018 he had additional funding arranged for Rooftop Singapore causing TGL to withhold exercising its full remedies at law.[349]

The Court will address each of TGL's contentions in turn.

        *a.*    *Mr. Matloff "represented that Rooftop [Singapore] was the ultimate beneficiary of the Rooftop enterprise"*

In support of TGL's § 523(a)(2)(A) count, TGL contends that "TGL lent money to Rooftop [Singapore] because Matloff represented that Rooftop [Singapore] was the ultimate beneficiary of the Rooftop enterprise."[350] In support of this contention, Mr. Yee testified that TGL required that the Agency Agreements be amended to "ensure that there was specificity in that the agents were conducting that business on behalf of Rooftop [Singapore] and that all -- all trading assets as a result of that -- that agent activity was for the benefit of Rooftop [Singapore]."[351] TGL then contends that "Matloff and Rooftop [Singapore] complied and prepared [A]mended [A]gency [A]greements . . . reflecting that request."[352] TGL concludes that "Matloff caused Rooftop [Singapore] to make these representations to TGL to obtain financing from TGL, but circumstantial evidence established that these representations were false when made."[353]

First, it is not clear what specific "representations" Mr. Matloff allegedly made that constitute "these representations" that TGL argues "were false when made." According to the Complaint, "these representations" included alleged representations that "any profits Rooftop

---

[349] Adv. ECF No. 4 at 6, ¶ 22 and 7, ¶ 26.

[350] Adv ECF No. 165 at 67.

[351] Adv. ECF No. 156 at 71:3–7.

[352] Adv ECF No. 165 at 67.

[353] Adv ECF No. 165 at 67.

[Group] USA generated in its business selling quadcopter drones were for the benefit of Rooftop [Services];"[354] and that "any profits Asian Express generated in its business of manufacturing and selling quadcopter drones were for the benefit of Rooftop Singapore."[355] But TGL did not offer any credible evidence to suggest or establish any actual false misrepresentations that Mr. Matloff made concerning the Agency Agreements or the organizational structure of Rooftop Singapore and its subsidiaries.

Mr. Yee's testimony was not persuasive (or credible) when he tried to describe precisely what Mr. Matloff may have falsely misrepresented about (i) the Agency Agreements and Amended Agency Agreements and the relationships and obligations of the various parties described in each agreement, or (ii) the organizational structure of Rooftop Singapore and its subsidiaries. Further, on the related matter of how funds were intended to flow under the Agency Agreements and Amended Agency Agreements, the Court found that the totality of the credible evidence established that Mr. Yee (and TGL) either misunderstood the terms of the Agency Agreements and Amended Agency Agreements or that he (and TGL) inexplicably believed that Rooftop Singapore and its subsidiaries would ignore their corporate formalities and duties.

Paragraph 9(a)(ii), which is identical in each of the Amended Agency Agreements states that, "for *all* customer contracts entered into by the Agent," all such customer payments received will be paid over to the corresponding principal, except that the Agents could first "retain from the customer payments *such amount of cash in order for the Agent to pay for operating expenses in connection with the Agent's performance of its duties hereunder*."[356] Part (B) of that same

---

[354] Adv. ECF No. 4 at 4, ¶ 16.

[355] Adv. ECF No. 4 at 5, ¶ 17.

[356] TGL. Ex. 21 at 9; TGL Ex. 22 at 9 (emphasis added).

provision extended the Agents' right to retain payments to include "existing and anticipated accounts payable of the Business which is carried on through the Agent pursuant to the Agreement which are due within 45 days of the Reference Date."[357]

Notwithstanding the relatively straightforward language in the Amended Agency Agreements, Mr. Yee testified that he had a different interpretation of what the Amended Agency Agreements intended.  According to Mr. Yee, the Amended Agency Agreements did not permit Rooftop Group USA to pay the manufacturing and supply costs incurred that were necessary to manufacture the Propel-brand products that were essential to fulfill the retail customers' purchase orders that created the receivables that were the subject of TGL's liens, despite extensive evidence that this was the clear historical practice of Rooftop Group USA and then Rooftop Singapore.[358]

Mr. Yee insisted that Rooftop Group USA itself did not have to pay for the product that it sold in fulfillment of customer contracts; instead, Mr. Yee claimed that product costs were the responsibility of Asian Express, which would be paid by Rooftop Singapore after available funds were first up-streamed from Rooftop Group USA to Rooftop Services under the Rooftop Group USA Agency Agreement and then by Rooftop Services to its corporate parent, Rooftop Singapore.[359]  Mr. Yee, however, could not identify any written agreement that would describe or substantiate his understanding of the Amended Agency Agreements.[360]  Further, Mr. Yee could not cite any provision in the 2016 Loan Agreement or the 2017 Loan Agreement that supported his understanding of the flow of funds requirements.  Finally, Mr. Nelson testified credibly when

---

[357] TGL. Ex. 21 at 9; TGL Ex. 22 at 9.

[358] *Compare* Adv. ECF No. 156 at 212:8 thru 213:1 (Mr. Yee Testimony) *with* Adv. ECF NO. 154 at 96:4–24 and 102:1–14 (Mr. Matloff Testimony); see also Mat. Ex. 46 (reflecting historical transfer activity).

[359] Adv. ECF No. 156 at 216:8 thru 217:3 and 239:16–25.

[360] Adv. ECF No. 156 at 217:4–11.

he flatly denied Mr. Yee's alleged construct of the 2016 Loan Agreement, 2017 Loan Agreement, and the Amended Agency Agreements.  Mr. Nelson testified credibly that it was never intended or contemplated for the Amended Agency Agreements to require Rooftop Group USA to upstream funds to Rooftop Services and then to Rooftop Singapore before Rooftop Group USA and Asian Express had covered their respective costs incurred in the operation of the business. Mr. Nelson added that such a provision would not make economic sense "because it would not have allowed [Rooftop Group USA and Asian Express] to operate in a fiscally sound [manner]."[361]  The Court found Mr. Nelson's testimony on these points to be credible and persuasive.

Mr. Yee testified further that he believed there to have been false representations concerning the disposition of "profits" generated in the business of selling the Propel-brand products.  Although in the Complaint TGL alleged that it was falsely represented that the Amended Agency Agreements were meant to operate such that any "profits" Rooftop [Group] USA or Asian Express generated in their businesses were for the benefit of Rooftop Singapore,"[362] Mr. Yee testified that what he meant by profits was "[t]he use of cash without our consent"[363] and that "I look at profits and cash synonymously," and that the alleged falsity of the representations made in the Amended Agency Agreements derived from the fact that "no substantial cash went to Rooftop Singapore."[364]  Thus, Mr. Yee testified, it was his belief that the cash generated by Asian Express, for instance, "was supposed to go to Rooftop Singapore even

---

[361] Adv. ECF No. 158 at 15:12–23.

[362] Adv. ECF No. 4 at 4–5, ¶¶ 16 and 17.

[363] Adv. ECF No. 156 at 233:14–21.

[364] Adv. ECF No. 156 at 234:14 thru 236:16.

before the payment of operating expenses incurred and reimbursable under the agency agreement."[365]  And Mr. Yee had the same answer for cash generated by Rooftop Group USA.[366]

Mr. Yee admitted that prior to entering into the 2016 Loan Agreement, TGL conducted extensive due diligence, including obtaining management accounts of the Rooftop entities' sales, profitability, and assets.[367]  TGL also obtained Rooftop Singapore's 2015 audited consolidated financial statements and independent auditor's report.[368]  TGL was also provided a copy of Mr. Chew's Audit Memo and copies of the Agency Agreements.[369]  Mr. Yee testified further that his "points of contact" for information and due diligence from Rooftop was "[o]f course, the CFO, Mr. Thian Chew with a lot of the financial information; Mr. Steve Nelson who gave us information in terms of the company's organization or new organization; and, of course, Mr. Matloff in regards to the – the business in total especially in North American sales."[370]  In addition, Mr. Yee acknowledged that Mr. Matloff had informed him that the Rooftop entities had just completed the 2015 corporate restructuring that, in part, created Rooftop Singapore.[371]

Based on the Court's review and analysis of the evidence, the Court finds and concludes that TGL failed to offer adequate credible evidence to satisfy its burden to establish that Mr. Matloff "represented that Rooftop [Singapore] was the ultimate beneficiary of the Rooftop enterprise" sufficient to satisfy any of the required elements necessary for a finding that Mr.

---

[365] Adv. ECF No. 156 at 236:24 thru 237:4.

[366] Adv. ECF No. 156 at 237:9–15.

[367] Adv. ECF No. 156 at 57:3–12.

[368] TGL Ex. 7; Adv. ECF No. 156 at 57:13 thru 58:15.

[369] TGL Exs. 4 and 5; Adv. ECF No. 156 at 66:21 thru 67:3.

[370] Adv. ECF No. 156 at 152:19 thru 153:3.

[371] Adv. ECF No. 156 at 62:4–14.

Matloff made either a false pretense, a false representation, or actual fraud as required under 11 U.S.C. § 523(a)(2)(A).

       *b.*    *Mr. Matloff made false representations regarding "Rooftop's reorganized structure"*

In support of TGL's § 523(a)(2)(A) count, TGL next contends that Mr. Matloff made false representations regarding "Rooftop's reorganization structure." This contention is similar to TGL's first contention. In response to this contention, the Court adopts all the findings and conclusions the Court made when considering TGL's contention that Mr. Matloff "represented that Rooftop [Singapore] was the ultimate beneficiary of the Rooftop enterprise." Based on those findings, and the Court's review and analysis of the evidence, the Court finds and concludes that TGL failed to offer adequate credible evidence to satisfy its burden to establish that Mr. Matloff made false representations regarding "Rooftop's reorganization structure" sufficient to satisfy any of the required elements necessary for a finding that Mr. Matloff made either a false pretense, a false representation, or actual fraud as required under 11 U.S.C. § 523(a)(2)(A).

       *c.*    *Mr. Matloff never intended to comply with his obligations under the Matloff Guaranty*

In support of TGL's § 523(a)(2)(A) count, TGL next contends that "Matloff's subsequent actions demonstrate that he never intended to comply with the provisions of the guarantees he executed, and thus made the representations in the guarantees falsely."[372] TGL alleges that "Matloff knew that he was unable to pay on his personal guaranties if called,"[373] and that "Matloff now admits that he was never able to pay under his Guaranty, even when he signed it."[374]

---

[372] Adv. ECF No. 165 at 68–69.

[373] Adv. ECF No. 4 at 11, ¶ 48.

[374] Adv. ECF No. 4 at 8, ¶ 27.

To prevail under § 523(a)(2)(A), TGL must establish (i) that Matloff made such a false representation, and (ii) that TGL justifiably relied on that representation to provide a loan or other extension, renewal, or refinancing of credit.  It is not sufficient for TGL to simply point to subsequent conduct or Matloff's subsequent failure to pay under the Personal Guaranty to satisfy the § 523(a)(2)(A) required elements.[375]  In addition, the Matloff Guaranty itself represents a promise relating to a *future* action.  If it is this promise that TGL contends was false, TGL must also establish that "when the representation [was] made, the debtor had no intention of performing as promised."[376]

TGL failed to offer sufficient credible evidence to establish that Mr. Matloff had no intention of performing the Matloff Guaranty when he signed it.  The Matloff Guaranty itself does not include representations of Mr. Matloff's ability (or lack thereof) to satisfy such obligations. In his testimony, Mr. Yee acknowledged that the Matloff Guaranty itself did not contain any such representations.[377]

Further, although Mr. Yee referred generically to "a number of representations to me that [Mr. Matloff] had net worth,"[378] when asked if he had any of the "contemporaneous correspondence" that he claimed contain such alleged oral representations, he conceded, "I do

---

[375] *Carto v. Oakley (In re Oakley)*, 503 B.R. 407, 433 (Bankr. E.D. Pa. 2013) (observing that where the debtor intended to perform at the time he made his promise but subsequently decided he could not or would not perform, then the initial representation was not false when made); *Standard Bank & Trust Co. v. Iaquinta (In re Iaquinta)*, 95 B.R. 576, 578 (Bankr. N.D. Ill. 1989) ("Ensuing conduct contrary to a former representation by the debtor does not establish that the original representation was false.").

[376] *See Allison*, 960 F.2d at 484.

[377] Adv. ECF No. 156 at 184:12 thru 188:2.

[378] Adv. ECF No. 156 at 188:5–6.

74

not."[379]  And no documents containing Mr. Matloff's alleged representations were offered into evidence at trial.

For Mr. Matloff's own part, on the other hand, he testified credibly that he made no such representations to TGL.[380]  Nor does the evidence support a finding that Mr. Matloff signed the Matloff Guaranty with no intention of performing it.  Finally, Mr. Matloff testified credibly that "[m]ore than anything, I wanted to pay these people back."[381]

Finally, TGL failed to establish that it justifiably relied on such alleged representations. The overwhelming evidence established that TGL was fully aware that Mr. Matloff's net worth in 2016 and 2017 was inextricably tied to the enterprise value of Rooftop Group USA and Rooftop Singapore.  Mr. Yee acknowledged in his testimony that, at the time TGL made the loans to Rooftop Singapore, TGL understood the value of Mr. Matloff's personal guaranty was tied to his illiquid value in Rooftop Group USA and Rooftop Singapore and his interest as a trust beneficiary in the Matloff Family Trust, which itself owned Rooftop Singapore.[382]

Because Mr. Matloff's own wealth was dependent on the enterprise value of Rooftop Singapore, even TGL's cursory investigation should have informed TGL that the very distress that might befall Rooftop Group USA or Rooftop Singapore would also adversely impair Mr. Matloff's ability to perform his obligations under the Matloff Guaranty.  To the extent TGL claims to have relied on Mr. Matloff's net worth, this reliance is precisely the sort of "blind reliance" courts routinely reject in this context.[383]

---

[379] Adv. ECF No. 156 at 188:7–14.

[380] Adv. ECF No. 154 at 124:14 thru 125:4 and 125:24 thru 126:3.

[381] Adv. ECF No. 154 at 192:17.

[382] Adv. ECF No. 156 at 191:1–12 and 192:13–19.

[383] *Field*, 516 U.S. at 71.

Based on the Court's review and analysis of the evidence, the Court finds and concludes that TGL failed to offer adequate credible evidence to satisfy its burden to establish that Mr. Matloff "never intended to comply with the provisions of the guarantees he executed, and thus made the representations in the guarantees falsely"[384] sufficient to satisfy any of the required elements necessary for a finding that Mr. Matloff made either a false pretense, a false representation, or actual fraud as required under 11 U.S.C. § 523(a)(2)(A).

> d.      *Mr. Matloff falsely represented that he would repay the $1 million "bonus" he received*

In support of TGL's § 523(a)(2)(A) count, it next contends that Mr. Matloff falsely represented that he would repay the $1 million "bonus" he received.[385]   In support of this contention, TGL states that "[o]n six separate occasions, Matloff promised that he would repay a bonus he received from Rooftop."[386]   TGL contends that Mr. Matloff made such representations in (i) the Term Sheet, (ii) the July 5, 2017 Side Letter, (iii) the July 20, 2017 Side Letter, (iv) the August 8, 2017 Side Letter, (v) the September 22, 2017 Side Letter, and (vi) the January 18, 2018 Side Letter.[387]   TGL contends that the "representations" contained within each of these documents were false, "as Matloff testified that he believed at the time he signed the agreements that he would not have to repay the funds and that he had no intention of doing so."[388]

Specifically, each of the Side Letters upon which TGL relies state "the bonus paid to DSM in 2017 for 2016 shall be reclassified and treated as a loan from Rooftop to DSM, and DSM shall

---

[384] Adv. ECF No. 165 at 68–69.

[385] Adv. ECF No. 165 at 69–70; *see also* Adv. ECF No. 4 at 10, ¶ 41.

[386] Adv. ECF No. 165 at 69.

[387] Adv. ECF No. 165 at 69.

[388] Adv. ECF No. 165 at 69; *see also* Adv. ECF No. 165 at 45:12–18.

repay such loan as and when reasonably practicable."[389]  In addition to the other factors that TGL must establish, because the "bonus provision" is an alleged promise relating to a future action, TGL must also establish that "when the representation [was] made, the debtor had no intention of performing as promised."[390]

Mr. Matloff did not execute any of the six documents in his personal capacity, so it is debatable to what extent he personally made "representations" in these documents.  But, because Mr. Matloff did execute the documents in his various corporate representative capacities, even if the Court assumes the "representations" contained in the six documents constitute Mr. Matloff's representations, TGL's contention fails for at least three reasons.

First, the "bonus provision" upon which TGL relies requires the repayment of "the bonus paid to DSM in 2017 for 2016," but does not provide any other specificity, such as the date(s) the alleged bonus was paid, or the amount(s) paid.  Mr. Matloff testified credibly that he never actually received any "bonus" payments in 2017 for bonuses earned in 2016.[391]  Mr. Matloff's testimony was corroborated by his 2016, 2017, and 2018 Federal Income Tax Returns.[392]  All three tax returns were prepared by Mr. Dixon, and none of the tax returns reflect any bonuses having been paid to Mr. Matloff.[393]  Therefore, because the credible evidence established that Mr. Matloff was not paid a bonus in 2016, 2017, or 2018, any corresponding obligation to repay such a bonus must necessarily not have arisen.

---

[389] Mat. Exs. 18, 19, 20, 21, and 22 each at 1, ¶ 2.

[390] *See Allison*, 960 F.2d at 484.

[391] Adv. ECF No. 154 at 146:12–18.

[392] Mat. Exs. 33, 34, and 35.

[393] Adv. ECF No. 154 at 146:22 thru 148:24.

Second, other than a Director's Remuneration certificate, discussed *infra*, TGL was not able to establish why it reasonably believed Mr. Matloff had received a $1 million bonus in either 2016 or 2017, or from what entity such a bonus was allegedly paid. During his testimony, Mr. Yee offered no credible explanation why he thought Mr. Matloff had received a $1 million bonus in 2016 or 2017, except based upon an alleged financial record he did not produce at trial.[394] Although Mr. Yee claimed that the existence of the alleged $1 million bonus was something discovered after the original 2016 Loan Agreement was funded,[395] when specifically asked at trial whether he had any documents or records that he could offer into evidence that would attest to the source of the alleged $1 million bonus, he replied "I do not. No, I do not think so."[396]

Third, TGL failed to establish that it relied on the alleged representation. Based on the evidence at trial, TGL cannot be said to have justifiably relied on the alleged promise contained in the bonus provision of the Side Letters, as this would require proof that TGL "actually relied" on the alleged promise and that such reliance "was justified in the circumstances." The credible evidence suggests that even a minimal investigation by TGL in 2017 would have revealed that Mr. Matloff had not, in fact, actually received an alleged $1 million bonus in 2016 or 2017. Further, there is no credible evidence in the record sufficient to establish that TGL conducted any investigation into the "bonus" issue contemporaneously with the negotiation and execution of the Side Letters that would establish justifiable reliance on the alleged promise that was contained in the Side Letters.

---

[394] Adv. ECF No. 156 at 174:20 thru 182:21.

[395] Adv. ECF No. 156 at 176:21 thru 177:8.

[396] Adv. ECF No. 156 at 179:9–18; *see also* ECF No. 156 at 182:14–21.

Finally, as noted above, in further support of TGL's allegation that Mr. Matloff was paid a bonus of just over $1 million in 2016, TGL offered a "Director's Remuneration" certificate describing $1,085,260 as "total remuneration paid to, *or receivable by* [Mr. Matloff] in respect of [his] services."[397] While the Director's Remuneration corroborates the sum of $1,085,260 that was adjusted in the 2016 Audited Financials from "due to" to "due from," the document does not specify whether the stated amount was actually paid to Mr. Matloff or was merely due and owing to Mr. Matloff. Therefore, the Director's Remuneration certificate fails to constitute sufficient credible evidence that Mr. Matloff was paid a bonus of just over $1 million in 2016.

Based on the Court's review and analysis of the evidence, the Court finds and concludes that TGL failed to offer adequate credible evidence to satisfy its burden to establish that Mr. Matloff falsely represented that he would repay the $1 million "bonus" he received.[398] As a result, TGL failed to satisfy the required elements necessary for a finding that Mr. Matloff made either a false pretense, a false representation, or actual fraud as required under 11 U.S.C. § 523(a)(2)(A).

e. *Mr. Matloff falsely represented that in 2018 he had additional funding arranged for Rooftop Singapore causing TGL to withhold exercising its full remedies at law*

In support of TGL's § 523(a)(2)(A) count, TGL next contends that Mr. Matloff made a false representation in 2018 that he had additional funding arranged for Rooftop Singapore causing TGL to withhold exercising its full remedies at law.[399] During the trial, however, TGL provided no evidence of any specific representations made by Mr. Matloff concerning potential

---

[397] TGL Ex. 24 (emphasis added).

[398] Adv. ECF No. 165 at 69–70; *see also* Adv. ECF No. 4 at 10, ¶ 41.

[399] Adv. ECF No. 4 at 6, ¶ 22 and 7, ¶ 26.

additional funding that was false. To the contrary, the only evidence presented on any contemplated "additional funding" for Rooftop Singapore related to TGL's participation in discussions with Star Funding in March 2018 for such potential new funding.[400] TGL presented no evidence, however, to support a finding of any false representation allegedly made by Mr. Matloff in connection with the Star Funding discussions. To the contrary, the uncontroverted evidence at trial suggests that TGL's own insistence on receiving a portion of the equity in Rooftop Singapore as a condition to allowing take-out financing by Star Funding likely impeded the possible funding.[401]

Based on the Court's review and analysis of the evidence, the Court finds and concludes that TGL failed to offer adequate credible evidence to satisfy its burden to establish that Mr. Matloff made a false representation in 2018 that he had additional funding arranged for Rooftop Singapore causing TGL to withhold exercising its full remedies at law.[402] As a result, TGL failed to satisfy the required elements necessary for a finding that Mr. Matloff made either a false pretense, a false representation, or actual fraud as required under 11 U.S.C. § 523(a)(2)(A).

Therefore, for all the reasons detailed above, **COUNT ONE** of the Complaint based on *§ 523(a)(2)(A)* is **DENIED** and **DISMISSED**.

### 2. *§ 523(a)(2)(B)—Use of a Statement in Writing*

A debt may be declared nondischargeable under § 523(a)(2)(B) if it is a debt "for money . . . or an extension, renewal, or refinancing of credit, to the extent obtained by— . . . (B) use of a statement in writing—(i) that is materially false, (ii) respecting the debtor's or an insider's

---

[400] TGL Ex. 90; Adv. ECF No. 157 at 169:9 thru 174:2

[401] Adv. ECF No. 154 at 198:14 thru 199:9.

[402] Adv. ECF No. 165 at 69–70; *see also* Adv. ECF No. 4 at 10, ¶ 41.

financial condition, (iii) on which the creditor to whom the debtor is liable for such money . . . or credit reasonably relied, and (iv) that the debtor caused to be made or published with intent to deceive."[403]

The Supreme Court held that a statement is "respecting" a debtor's financial condition "if it has a direct relation to or impact on the debtor's overall financial status."[404] By its plain terms, therefore, § 523(a)(2)(B) applies only to those written statements that have a direct relation to or impact on the debtor's or the insider's overall financial status. Consequently, "if the debt is obtained by a false oral statement respecting financial condition, then it is dischargeable."[405]

Further, general references to categories of financial documents, such as "investor presentations" and "management financial statements" are inherently inadequate under § 523(a)(2)(B).[406] Therefore, to satisfy its burden, the plaintiff must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements are fraudulent."[407]

To satisfy the "intent to deceive" requirement, TGL must establish that Mr. Matloff subjectively intended to defraud TGL.[408] A debtor does not subjectively intend to defraud a creditor simply because the debtor should know that he or she lacks the ability to repay a debt

---

[403] 11 U.S.C. § 523(a)(2)(B).

[404] *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1761 (2018).

[405] *Haler v. Boyington Capital Grp., LLC (In re Haler)*, 708 Fed. Appx. 836, 840 (5th Cir. 2017).

[406] *Dorsey v. Portfolio Equities, Inc*, 540 F.3d 333, 339 (5th Cir. 2008) (affirming the necessity of specifics to support fraud allegations); *see also Nibbl v. Kilroy (In re Kilroy)*, 357 B.R. 411, 424 (Bankr. S.D. Tex. 2006) (the absence of one of the "who, what, when, where, and how" allegations is fatal to a § 523(a) claim).

[407] *Gomez v. Saenz (In re Saenz)*, Adv. No. 13- 07029, 2014 BL 403464, at *5 (Bankr. S.D. Tex. Aug. 08, 2014) (citing *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 551 (5th Cir. 2010)).

[408] *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998) (citing *Field*, 516 at 59) (intent to defraud a is measured by a subjective standard").

when it is incurred. While the debtor's inability to repay a debt when it is incurred may be a factor in proving subjective intent, "the hopeless state of a debtor's financial condition should never become a substitute for an actual finding of bad faith."[409] Further, it must have been Mr. Matloff himself—and not some other person—who made or "published" the allegedly materially false statement.

Finally, TGL must also satisfy the "reliance" requirement. Section 523(a)(2)(B) requires "reasonable" reliance, which the Supreme Court has described as requiring the creditor opposing discharge to "explain why it viewed the debtor's false representation as relevant to the decision to extend money, property, services, or credit."[410]

Therefore, to prevail under § 523(a)(2)(B), TGL has the burden to establish (i) the existence of a materially false written statement concerning the financial condition of Mr. Matloff or an insider, (ii) that TGL reasonably relied on such written statement, and (iii) that Mr. Matloff caused such statement to be made with the intent to deceive TGL.

In the Complaint, TGL makes general allegations for the existence of false written statements concerning the financial condition of Rooftop Singapore and its subsidiaries. For example, TGL contends:

> [i]n yet another instance of misrepresentations or false statements, in or around January 2018, Matloff provided TGL with management financial statements for Rooftop Singapore. These financial statements falsely omitted significant supplier debt largely owed to creditors in mainland China. At the same time, these financial statements represented Rooftop

---

[409] *Lind Waldock & Co. v. Morehead*, 1 F. App'x 104, 107 (4th Cir. 2001) (quoting *Anastas v. American Sav. Bank (In re Anastas)*, 94 F.3d 1280, 1286 (9th Cir. 1996)).

[410] *Appling*, 138 S.Ct. at 1761.

Singapore as having accounts receivable and sales, for year-end 2017, well into the 9 digits of dollars.[411]

At trial, however, TGL failed to identify any specific written statements that Mr. Matloff caused to be made or published that were materially false. Generalized references to categories of financial documents, such as "investor presentations" and "management financial statements" are inherently inadequate under § 523(a)(2)(B).[412]

In the Complaint, TGL further alleges that:

> Matloff made additional misrepresentations (on which TGL relied) in order to induce TGL to enter into the Side Letters, including, but not limited to, ... the written representation that Rooftop Singapore was owed more than $15 million in accounts receivable as of the January 2018 Side Letter. These statements were false; Rooftop Singapore was in reality due less than two million dollars of these receivables and no new money was infused into Rooftop Singapore. Matloff dramatically changed his investor presentation between January, when the Side Letter signed, and March; the March receivables report dropped to $334,471 from the $13,403,201 he represented to TGL as of January 3, 2018.[413]

This allegation also fails because TGL provided no credible evidence at trial of any written document that misrepresented the outstanding receivables in January 2018. In support of its contention, TGL referenced two unrelated sources that were addressing two different periods of time. The January 2018 Investor Presentation identifies $13,403,201 in *gross* receivables not pledged to Star Funding that were outstanding as of January 3, 2018.[414] Whereas, three months later, in the Spring of 2018, the Investor Presentation shows total *net* receivables of $334,471

---

[411] Adv. ECF No. 4 at 5, ¶ 18.

[412] *Dorsey*, 540 F.3d at 339 (affirming the necessity of specifics to support fraud allegations); *see also Nibbl*, 357 B.R. at 424 (the absence of one of the "who, what, when, where, and how" allegations is fatal to a § 523(a) claim).

[413] Adv. ECF No. 4 at 6, ¶ 22.

[414] Mat. Ex. 71 at 16.

after various adjustments and deductions, as of March 31, 2018.[415] While the gross receivables shown in the March Investor Presentation were also significantly lower than what was shown in the January Investor Presentation, the Accounts Receivable Collections Report shows that millions in outstanding receivables were collected between January 3, 2018 and March 31, 2018.[416] TGL's contention that a decrease in the outstanding receivables balance over this time period is indicative of a misrepresentation is not persuasive when offered in conjunction with no other evidence that the January 3, 2018, receivables number was a misrepresentation by Mr. Matloff.

In the Complaint, TGL further contends that:

> TGL also relied on the 2017 year-end balance sheet of Rooftop Singapore, which reflected Rooftop Singapore's beneficial ownership of over $32 million in accounts receivable. These statements were false because Rooftop Singapore either did not have beneficial ownership of these accounts receivable or had no meaningful method of using these assets, in certain instances titled in the names of other entities, for payment of its own liabilities. Matloff sent these year-end financials to TGL in or around January 2018 with intent to deceive it and induce it to enter into the January 2018 Side Letter. TGL reasonably relied on these false representations in entering into the Side Letters.[417]

This contention also fails because TGL provided no credible evidence at trial to suggest that the 2017 year-end consolidated balance sheet misrepresented the beneficial ownership of receivables.[418] When questioned about the profit and loss statement for the same period ending

---

[415] Mat. Ex. 72 at 8.

[416] Mat. Ex. 53A.

[417] Adv. ECF No. 4 at 7, ¶ 23.

[418] Mat. Ex. 65.

December 31, 2017,[419] Mr. Yee confirmed that he understood the year-end balance sheet was prepared on a consolidated basis.[420]

Generally, to the extent TGL contends that Mr. Matloff made or caused to be published false written statements with intent to deceive, TGL failed to establish at trial that Mr. Matloff— as opposed to Mr. Chew or any other employee or representative within the finance and accounting department of Rooftop Singapore or any of its subsidiaries—"caused to be made or published" any of the enumerated financial statements "with intent to deceive."  As Mr. Yee acknowledged throughout his testimony, these written financial statements and presentations would have been prepared collectively by "a litany of staffing" that included Mr. Chew and his financial team, Mr. Nelson, Mr. Tuli, and Mr. Jeremy Underwood (the head of sales), among others.[421]

As a result, neither TGL or Mr. Yee could produce any credible evidence pointing to which part, if any, of any given written statement or presentation was prepared by or at the direction of Mr. Matloff.  Further, TGL failed to offer credible evidence to establish that any such written statements or presentations contained false information.  Absent any clear or credible evidence that Mr. Matloff himself "caused to be made or published" a false written statement upon which TGL detrimentally relied, TGL's claim fails.

Finally, each of TGL's contentions describes a written statement concerning financial condition that was prepared well after the 2017 Loan Agreement was executed and funded. Accordingly, any such writings—even if proven in some way to be false—could not have been

---

[419] Mat. Ex. 64

[420] Adv. ECF No. 156 at 246:17–21.

[421] Adv. ECF No. 156 at 242:17 thru 243:3.

relied upon by TGL in making the decision to fund the loans, as all the loans were funded several months earlier.

Based on the Court's review and analysis of the evidence, the Court finds and concludes that TGL failed to offer adequate credible evidence to satisfy its burden to establish (i) the existence of a materially false written statement concerning the financial condition of Mr. Matloff or an insider, (ii) that TGL reasonably relied on the materially false written statement, and (iii) that Mr. Matloff caused such statement to be made or published with the intent to deceive TGL. As a result, TGL failed to satisfy the required elements necessary under 11 U.S.C. § 523(a)(2)(B).

Therefore, for all the reasons detailed above, **COUNT ONE** of the Complaint based on *§ 523(a)(2)(B)* is **DENIED** and **DISMISSED**.

### 3.        *§ 523(a)(4)—Fraud or Defalcation While Acting in a Fiduciary Capacity*

A debt may be declared nondischargeable under § 523(a)(4) "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."[422]    The Court previously dismissed TGL's claims of embezzlement or larceny under § 523(a)(4).[423]    Therefore, TGL's remaining claims under § 523(a)(4) are for Mr. Matloff's alleged fraud or defalcation while acting in a fiduciary capacity.

Regarding fraud or defalcation claims under § 523(a)(4), courts typically focus on two elements: (i) whether the debtor was acting in a fiduciary capacity, and (ii) whether the debtor's actions consciously disregarded "a substantial and unjustifiable risk" that would violate a fiduciary duty.[424]

---

[422] 11 U.S.C. § 523(a)(4).

[423] Adv. ECF No. 120.

[424] *See Chaney v. Grigg* (*In re Grigg*), 619 F. App'x 195, 197–98 (3d Cir. 2015).

Fraud in this context requires positive fraud involving moral turpitude or intentional wrong.[425] Conversely, a finding of defalcation requires a culpable state of mind "involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior."[426]

When interpreting the fiduciary-capacity element, "the concept of a fiduciary [under § 523(a)(4)] is narrowly defined, applying only to technical or express trusts, and not those which the law implies from the contract."[427] The alleged trust relationship must have existed prior to the act creating the debt and without reference to that act.[428]

To prevail, therefore, TGL must establish (i) that Matloff acted as a fiduciary to TGL at the time the debt was created and (ii) the debt was caused by fraud or defalcation arising in that fiduciary relationship.[429]

Although TGL asserts a claim under § 523(a)(4) in the Complaint, there are no factual allegations contained in the Complaint to support such a claim. During trial and in its post-trial brief, however, TGL contends that:

- "Matloff admitted that TGL is a Rooftop [Singapore] shareholder, and Matloff acknowledged that he owed TGL a fiduciary duty. Yet, the evidence demonstrated that Matloff breached his fiduciary obligations by maliciously breaching Rooftop [Singapore]'s agreements with TGL, wasting Rooftop

---

[425] *Lester v. Dean*, Adv. No. 16-4147, 2018 BL 356899, *24 (Bankr. N.D. Tex. Sep. 29, 2018) (citing *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273 (2013)).

[426] *Bullock*, 569 U.S. at 269.

[427] *See LSP Inv. P'ship v. Bennett* (*In re Bennett*), 989 F.2d 779, 784 (5th Cir. 1993) (citing *Angelle v. Reed*, 610 F.2d 1335, 1338 (5th Cir. 1980)).

[428] *Id.* (the alleged trust relationship must have existed prior to the act creating the debt); *see also Lester*, 2018 BL 356899 at *10 ("To bar discharge, the debtor must have been acting in a fiduciary capacity at the time of the defalcation.").

[429] *Estate of Cora v. Jahrling (In re Jahrling)*, 816 F.3d 921, 925 (7th Cir. 2016); *see also Lester*, 2018 BL 356899, at *25 (finding no debt to except from discharge under § 523(a)(4) where plaintiff failed to prove any damages arising from alleged misconduct).

87

[Singapore]'s cash on his personal Yeon investment, and taking control of the Rooftop enterprise when even Matloff admits he was unqualified to do so."[430]

- "Under the January 16, 2018 Side Letter, Rooftop [Singapore] agreed to make TGL a shareholder within 3 days of execution of the Side Letter."[431]

In response, Mr. Matloff first argues that TGL's § 523(a)(4) fails because the Complaint fails to allege any facts to support the claim. The Court agrees—the Complaint fails to allege any facts to support this claim. Mr. Matloff next argues and reasserts his pre-trial objection that he does not consent to a constructive amendment of any matter not raised in the Complaint, including this § 523(a)(4) claim. The Court agrees—Mr. Matloff's objection was timely raised, preserved, and has merit. But even if the Court were to overrule Mr. Matloff's objection and permit a constructive amendment to the Complaint pursuant to Fed. R. Civ. P. 15(b), for all the reasons detailed below, the Court finds and concludes that TGL failed to satisfy the required elements to establish its claims under Count One as it relates to § 523(a)(4).

a.    *If Mr. Matloff owed TGL a fiduciary duty, that duty did not arise until May 10, 2018*

From 2016 until May 10, 2018—the date TGL became a one percent shareholder of Rooftop Singapore[432]—only a creditor-debtor relationship existed between TGL and Rooftop Singapore (or Matloff as guarantor). And their creditor-debtor relationship during that time was an ordinary commercial relationship that is insufficient to come within the provisions of § 523(a)(4).[433] To the extent Mr. Matloff owed a fiduciary duty to TGL, it did not arise, if at all,

---

[430] Adv. ECF 165 at 4.

[431] Adv. ECF 165 at 61; Mat. Ex. 22 at 2.

[432] TGL Ex. 104; Adv. ECF No. 157 at 8:22 thru 9:1.

[433] *Borg-Warner Acceptance Corp. v. Miles (In re Miles)*, 5 B.R. 458, 460 (Bankr. E.D. Va. 1980) ("The courts have attempted to avoid making the exception so broad that it reaches such ordinary commercial relationships as debtor-creditor and principal-agent").

until May 10, 2018, and only to the extent that TGL was a one percent shareholder of Rooftop Singapore.

b.    *The alleged debt arose before any of Mr. Matloff's fiduciary duties arose*

The Complaint itself does not identify the debt sought to be excepted from discharge under § 523(a)(4).  At trial, Mr. Yee testified that Mr. Matloff's debt to TGL arising under the Matloff Guaranty and Matloff Judgment (detailed in TGL's Proof of Claim) constitutes the debt that TGL contends is nondischargeable under § 523(a)(4).[434]  This debt arose as a matter of contract long before (and independent of) any shareholder status that TGL acquired in Rooftop Singapore on May 10, 2018.  On this basis alone, TGL's § 523(a)(4) claim fails.

Finally, in support of TGL's § 523(a)(4) claim, Mr. Yee testified that Mr. Matloff allegedly misappropriated funds and engaged in other nonspecific "activities" relating to purchase orders involving Rooftop Group USA and Asian Express—not Rooftop Singapore.[435]

Based on the Court's review and analysis of the evidence, the Court finds and concludes that TGL failed to offer any, let alone adequate, credible evidence to satisfy its burden to establish that that (i) Mr. Matloff acted as a fiduciary to TGL at the time the debt was created and (ii) the debt was caused by fraud or defalcation arising in that fiduciary relationship.  As a result, TGL failed to satisfy the required elements necessary to establish its claims under Count One as it relates to § 523(a)(4).

Therefore, for all the reasons detailed above, **COUNT ONE** of the Complaint based on *§ 523(a)(4)* is **DENIED** and **DISMISSED**.

4.    *§ 523(a)(6)—Willful and Malicious Injury*

---

[434] Adv. ECF No. 156 at 166:15–23; Adv. ECF No. 157 at 8:14–21.

[435] Adv. ECF No. 157 at 9:24 thru 10:15.

A debt may be declared nondischargeable under § 523(a)(6) "for willful and malicious injury by the debtor to another entity or to the property of another entity."[436]  Section 523(a)(6) requires "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury."[437]  In the Fifth Circuit, "an injury is 'willful and malicious' where there is either (1) an objective substantial certainty of harm arising from a deliberate or intentional action or (2) a subjective motive to cause harm by a party taking a deliberate or intentional action."[438]  In addition, "the debtor must have intended the actual injury that resulted."[439]

Whether a contractual debt may be discharged under § 523(a)(6) "depends upon the knowledge and intent of the debtor at the time of the breach, rather than whether conduct is classified as a tort or falls within another statutory exception to discharge."[440]  Courts "may infer that a debtor acted with malice, for purposes of § 523(a)(6), if the debtor acts in a manner which one knows will place the lender at risk."[441]

In the Complaint, TGL does not allege any particular injury to itself or to its property, nor did it present evidence at trial of any such injury.  While certain of the Rooftop-related entities pledged certain purchase orders and receivables to TGL as collateral to secure the 2016 Loan Agreement and then the 2017 Loan Agreement, those purchase orders and receivables (and the resulting cash proceeds) at all times remained the property of the corresponding Rooftop entity.

---

[436] 11 U.S.C. § 523(a)(6).

[437] *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis omitted).

[438] *Ward Family Found. v. Arnette* (*In re Arnette*), 454 B.R. 663, 700 (Bankr. N.D. Tex. 2011) (citing *In re Miller*, 156 F.3d at 604–06).

[439] *Texas v. Walker*, 142 F.3d 813, 823 (5th Cir. 1998).

[440] *Williams v. Int'l Bhd. of Elec. Workers Local 520* (*In re Williams*), 337 F.3d 504, 510 (5th Cir. 2003).

[441] *SE Prop. Holdings, L.L.C. v. Green* (*In re Green*), 968 F.3d 516, 524–25 (5th Cir. 2020).

Rather, the Complaint appears to contend that Mr. Matloff willfully caused Rooftop Group USA and Asian Express to breach the terms of the 2017 Loan Agreement and Side Letters. The mere existence of such a breach is not enough for a § 523(a)(6) claim although the Fifth Circuit has suggested that "a knowing breach of a clear contractual obligation that is certain to cause injury may prevent discharge under § 523(a)(6)."[442] Such a breach, however, must be supported with "explicit evidence that a debtor's breach was intended or substantially certain to cause the injury to the creditor."[443]

Moreover, the Fifth Circuit has held, "the dischargeability of contractual debts under Section 523(a)(6) depends upon the knowledge and intent of the debtor at the time of the breach."[444] Thus, the injury must give rise to the debt, not vice versa.[445]

To prevail under § 523(a)(2)(6) TGL must establish that (i) Mr. Matloff (as opposed to some other person or entity) knowingly breached a clear contractual obligation; (ii) at the time of such breach, there was either (a) an objective substantial certainty of harm arising from a deliberate or intentional action or (b) a subjective motive to cause harm by a party taking a deliberate or intentional action; (iii) the injury was not sufficiently justified under the circumstances to render it not willful and malicious; and (iv) that the debt to be excepted from discharge arose from such willful and malicious injury.

---

[442] *Williams*, 337 F.3d at 511.

[443] *Id.*

[444] *Id.* at 510; *see also GSY Corp. v. Hazan (In re Hazan)*, No. 1-15-41018-nhl, 2018 BL 354596, at *10 (Bankr. E.D.N.Y. Sept. 27, 2018) ("Section 523(a)(6) operates similarly to § 523(a)(2)(A) when applied to conduct occurring after an initial debt is incurred.").

[445] *Jou v. Adalian (In re Adalian)*, 481 B.R. 290, 298 (Bankr. M.D. Pa. 2012) (debt was not rendered nondischargeable where it was incurred before the alleged injurious actions); *see also Steier v. Best (In re Best)*, 109 Fed. Appx. 1, 6 (6th Cir. 2004); *Cordeiro v. Kirwan (In re Kirwan)*, 558 B.R. 9, 14 (Bankr. D. Mass. 2016).

### a. The Debt does not arise from any injury

The Complaint itself does not identify the debt sought to be excepted from discharge under § 523(a)(6). At trial, Mr. Yee testified that Mr. Matloff's debt to TGL arising under the Matloff Guaranty and Matloff Judgment (detailed in TGL's Proof of Claim) constitutes the debt that TGL contends is nondischargeable under § 523(a)(6).[446] Because that is the debt, TGL's claim under § 523(a)(6) fails.[447]

In further support of TGL's § 523(a)(6) claim, TGL identifies four discrete collections of funds transfers that it alleges were made "willfully and maliciously" and "in express violation of TGL's rights."[448] Neither the Complaint nor TGL's Proof of Claim, however, alleges any damages sustained by TGL because of these four alleged transfers. Thus, these four alleged injuries neither gave rise to the debt identified in the Proof of Claim nor are alleged to be the cause of any other debt or damages sustained by TGL. Although TGL's § 523(a)(6) claim based on the four alleged transfers fails for this reason, the Court will consider and address each of the four alleged transfers asserted by TGL.

### b. The $846,919.92 Transfers

TGL alleges that "[o]n or about March 1, 2018, Matloff willfully and maliciously transferred $846,919.82 from charged accounts in the names of Asian Express and Rooftop Singapore to Rooftop [Group] USA's bank account without TGL's consent and in express violation of TGL's rights."[449] The transactions comprising the $846,919.82 in alleged transfers

---

[446] Adv. ECF No. 156 at 167:8–12; Adv. ECF No. 157 at 12:5–11.

[447] *Jou*, 481 B.R. at 298; *see also Steier*, 109 Fed. Appx. at 6.

[448] Adv. ECF No. 4 at 9–10, ¶¶ 35, 37, 38, and 39.

[449] Adv. ECF No. 4 at 9, ¶ 35.

into Rooftop Group USA on March 1, 2018, originated from (i) Asian Express in the total amount of $620,818.00, and (ii) Rooftop Singapore in the total amount of $226,101.82.[450]

TGL contends that these transfers to Rooftop Group USA's Chase Bank account from the Charged Accounts of Asian Express and Rooftop Singapore violated ¶ 7(a)(i) of the January 16, 2018 Side Letter, which purports to "govern the implementation of the receipt of payments for purchase orders assigned or to be assigned to TGL and Polar as security for its financing to Rooftop" and prohibit disbursements of such funds "except pursuant to joint instruction of Rooftop (or its designee) and TGL."[451]  TGL did not allege either in the Complaint or at trial, however, that any portion of the $846,919.82 was subsequently disbursed by Rooftop Group USA without the requisite prior consent of TGL.  Nor did TGL allege that any portion of the $846,919.82 subsequently disbursed by Rooftop Group USA exceeded the 40/40/20 "Allocation" described in ¶ 9A of the January 16, 2018 Side Letter.  Accordingly, the only "injury" alleged by TGL relates to the mere transfer of funds from the Charged Accounts to Rooftop Group USA's Chase Bank account.  It should also be noted that although Rooftop Group USA's Chase Bank account was not a Charged Account, TGL was granted "real-time read-only" access to that account.[452]

TGL offered no credible evidence at trial of the existence of any debt arising from any injury TGL claims to have sustained because of the transfers from the Charged Accounts to Rooftop Group USA's Chase Bank account.  There was no evidence at trial to suggest the existence of any injury sustained by TGL other than Rooftop Singapore's failure to pay those

---

[450] Mat. Ex. 44 at 3.

[451] Mat. Ex. 22 at 7.

[452] Mat. Ex. 21 at 6, ¶ 7A.

funds to TGL to reduce the remaining principal balance and other amounts due under the 2017 Loan Agreement. Nor was there any credible evidence to suggest that the funds would have ultimately been disbursed differently from the Charged Accounts than they were ultimately disbursed by Rooftop Group USA.

Further, the credible evidence at trial cast significant doubt on whether TGL even had a contractual right in the funds, as a significant portion of the $846,919.82 was almost certainly *not* generated from "payments for purchase orders assigned or to be assigned to TGL and Polar as security for its financing to Rooftop." At trial, the credible evidence suggested that the funds included proceeds representing the "frozen balances" of four distinct secured creditors: TGL, Polar Overseas Ventures, Mr. Brian Dlugash, and Mr. Andre Hoffman.[453] At trial Mr. Yee acknowledged that the funds denominated as "frozen balances" of creditors Dlugash and Hoffman were in fact "recognized as being the collateral of other creditors" whose use would be "a function of the [credit] relationships between Rooftop and those other creditors."[454] Mr. Yee also admitted that TGL had "no contractual right" to interfere with the Rooftop entities use of the funds allocated to Dlugash and Hoffman.[455] Additionally, the credible evidence at trial further suggests that as much as $664,944 of these funds actually represented the collateral of Mr. Dlugash and Mr. Hoffman.[456]

---

[453] Mat. Ex. 135 at 2. TGL was not the only secured lender to Rooftop Singapore. TGL claimed no interest in the collateral of the lender creditors Polar Overseas Ventures, Mr. Brian Dlugash, or Mr. Andrew Hoffman. Adv. ECF No. 157 at 17:6 thru 20:23.

[454] Adv. ECF No. 157 at 20:5–23.

[455] Adv. ECF No. 157 at 22:7–11.

[456] Mat. Ex. 135 at 2.

Based on the credible evidence noted above and because TGL failed to offer credible controverting evidence, TGL failed to establish the portion of the $846,919.82, if any, that it had an enforceable interest such that the transfers could be construed to violate the terms of the 2017 Loan Agreement or any of the Side Letters.

Finally, the credible evidence at trial established that the purpose for transferring the $846,919.82 into Rooftop Group USA's Chase Bank account was to "insure that the emergency bills get paid first and foremost as our ability to continue operating is absolutely necessary if we are to meet our fiduciary obligations to all of our creditors."[457]  Mr. Matloff testified credibly that he did not believe he was harming TGL's interests by executing the funds transfers, but wanted only to "[p]rotect the company, pay the emergency bills, make sure the shipments keep flowing. And I was praying every night that I can make a deal with [TGL]."[458]  TGL offered no credible evidence at trial to rebut Matloff's extensive testimony regarding his desire to preserve the Rooftop business.  When asked if he considered his actions to harm TGL or TGL's interests, Mr. Matloff testified credibly that "[m]ore than anything, I wanted to pay these people back."[459]

Therefore, based on the Court's review and analysis of the evidence, the Court finds and concludes that TGL failed to offer adequate credible evidence to satisfy its burden to establish that Mr. Matloff willfully and maliciously transferred $846,919.82 from the Charged Accounts with the objective substantial certainty to harm TGL or the subjective motive to cause harm to TGL.  Therefore, TGL failed to satisfy the required elements necessary for a finding that its debt

---

[457] Mat. Ex. 134.

[458] Adv. ECF No. 154 at 192:13–15.

[459] Adv. ECF No. 154 at 192:17.

should not be discharged based on a willful and malicious injury by Mr. Matloff to TGL as required under 11 U.S.C. § 523(a)(6).

        c.     *The $176,000 Transfers*

TGL alleges that on March 28, 2018, "Matloff directed the transfer of an additional $176,000 of payments to other creditors or insiders from Rooftop Singapore's charged account without TGL's consent, in violation of TGL's rights."[460]  The Complaint fails to specify what rights TGL claims were violated, and TGL proffered no direct testimony on the contractual right it believes to have been breached nor the precise injury it claims to have sustained by these transfers.  According to the credible evidence, however, the transactions comprising this $176,000 are payroll related.[461]  Mr. Yee testified that TGL did not object to the payment of the payroll items *per se*, but merely "a breach of practice" insofar as the funds were used without TGL's consent.[462]

There is no credible evidence in the record of any debt arising from any alleged injury TGL claims to have sustained because of these payroll-related disbursements.  Again, as explained above, TGL's only debt against Mr. Matloff arose long before and independent of these transfers.  Further, no credible evidence was offered at trial to suggest the existence or amount of any injury sustained by TGL other than from Rooftop Singapore's failure to pay the remaining principal and other amounts due under the 2017 Loan Agreement.

Based on the credible evidence noted above, and because TGL failed to offer any credible controverting evidence, TGL has failed to establish that it had an enforceable interest in any

---

[460] Adv. ECF No. 4 at 9, ¶ 37.

[461] Mat. Ex. 141 at 1; Adv. ECF No. 157 at 32:12–25.

[462] Adv. ECF No. 157 at 33:2–18.

portion of the $176,000 such that this transfer could be construed to violate the terms of the 2017 Loan Agreement or any of the Side Letters.

Additionally, the credible evidence at trial established that the purpose for the $176,000 transfer was the same as the purpose for the $846,919.82 transfer discussed above—to protect the company and to make sure the shipments kept flowing.[463] TGL offered no credible evidence at trial to rebut Mr. Matloff's credible testimony regarding his desire to preserve the Rooftop business.

Therefore, based on the Court's review and analysis of the evidence, the Court finds and concludes that TGL failed to offer adequate credible evidence to satisfy its burden to establish that Mr. Matloff willfully and maliciously transferred $176,000 from the Charged Accounts with the objective substantial certainty to harm TGL or the subjective motive to cause harm to TGL. Therefore, TGL failed to satisfy the required elements necessary for a finding that its debt should not be discharged based on a willful and malicious injury by Mr. Matloff to TGL as required under 11 U.S.C. § 523(a)(6).

>           d.      *The $2,074,083.17 and $405,529.62 Transfers*

TGL alleges that "[b]etween March 1, 2018, and August 25, 2019, Matloff willfully and maliciously transferred proceeds of purchase orders and receivables not pledged to Star Funding totaling an amount of not less than $2,074,083.17 from Rooftop Group USA's Chase Bank account without TGL's consent, in violation of TGL's rights"[464] and "$405,529.62 from Rooftop Services' Wells Fargo Bank account in violation of TGL's rights."[465]

---

[463] Adv. ECF No. 154 at 192:13–15.

[464] Adv. ECF No. 4 at 9, ¶ 38; *see also* Mat. Ex. 44; Adv. ECF No. 157 at 38:10 thru 40:20.

[465] Adv. ECF No. 4 at 10, ¶ 39; *see also* Mat. Ex. 45; Adv. ECF No. 157 at 41:1 thru 42:6.

TGL further contends in its post-trial brief that "by breaching his agreement and removing TGL's collateral from its control [the Charged Accounts], Matloff intended to keep TGL's debt unpaid."[466]  TGL argues that "on December 5, 2018, TGL's injury resulting from Matloff's admitted, intentional breaches of the January 16, 2018 Side Letter Agreement was reduced to Judgement on Matloff's personal guarantee of the amounts owed under the agreement" and that "Matloff continued his attempts to evade repaying TGL by initiating an Arbitration, alleging that Rooftop's loan agreements with TGL were null and void because they were signed under duress."[467]  TGL concludes that "Matloff intended that the remaining balance of the 2017 Loan Agreement following February 20, 2018, go unpaid."[468]

At trial, TGL failed to offer sufficient credible evidence to suggest the existence of any debt arising from any injury TGL claims to have sustained because of these transfers.  Rather, the credible evidence established the existence of only a single debt owing to TGL that arose prior to—and independent of—the alleged breach of contract that may have occurred in connection with disbursements made by Rooftop Group USA or Rooftop Singapore in and after March 2018. Further, the only evidence TGL offered at trial to suggest any injury it sustained from and after February 28, 2018, was Rooftop Singapore's failure to pay to TGL the remaining principal balance and other amounts due under the 2017 Loan Agreement.

TGL offered no credible evidence to support its contention that Mr. Matloff "willfully and maliciously" caused Rooftop Group USA to disburse funds from and after March 1, 2018, when

---

[466] Adv. ECF No. 165 at 40.

[467] Adv. ECF No. 165 at 40–41.

[468] Adv. ECF No. 165 at 41.

it had disbursed such funds to pay employees, vendors, and other actual operating expenses of the Rooftop business as it had previously been doing in the ordinary course of business.[469]

Based on the Court's review and analysis of the evidence, the Court finds and concludes that TGL failed to offer adequate credible evidence to satisfy its burden to establish that its debt may be declared nondischargeable under § 523(a)(6) due to a willful and malicious injury by Mr. Matloff. As a result, TGL failed to satisfy the required elements necessary to establish its claims under Count One as it relates to § 523(a)(6).

Therefore, **COUNT ONE** of the Complaint based on *§ 523(a)(6)* is **DENIED** and **DISMISSED**.

**B.    COUNT TWO: 11 U.S.C. § 727(a)—Mr. Matloff**

Count Two of the Complaint, as construed by the Court, contains *two* distinct statutory bases for relief under § 727. The Court will address each in turn.

### *1.    § 727(a)(2)—Fraudulent Transfers—Mr. Matloff's Property*

A debtor's discharge may be denied under § 727(a)(2) if "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition."[470] A claim under § 727(a)(2) has four elements: "(1) a transfer of property, (2) belonging to the debtor; (3) within one year of the filing of the petition; (4) with intent to hinder, delay, or defraud a creditor."[471]

---

[469] Mat. Exs. 44, 45, 54, 55, 56, 57, 59, 60, 61, and 62.

[470] 11 U.S.C. § 727(a)(2).

[471] *Robertson v. Dennis* (*In re Dennis*), 330 F.3d 696, 701 (5th Cir. 2003).

TGL has the burden of proof for each of the four elements. "Evidence of actual intent to defraud creditors is required to support a finding sufficient to deny a discharge."[472] Constructive intent is insufficient.[473] Actual intent may be inferred through "badges of fraud" circumstantial evidence.[474] Although § 727 (a)(2) does not contain a materiality component *per se*, a small value of affected property strongly suggests a lack of requisite intent.[475]

Finally, although courts may consider circumstantial evidence to infer the existence of actual fraudulent intent, "[a] debtor is entitled to take reasonable steps in an attempt to keep his business alive before resorting to bankruptcy protection."[476] In the Fifth Circuit, courts look at several factors to determine whether the transfer was for a legitimate business purpose, including: (i) whether the transfer was pursuant to a standard business practice; (ii) whether the transfer was an arm's length transaction; (iii) whether the debtor transferred the funds fully voluntarily, or whether the situation effectively forced the transfer upon the debtor; and (iv) whether the debtor received proper consideration for the transfer.[477]

In the Complaint, TGL alleges, without elaboration, that Mr. Matloff, "with intent to hinder, delay, or defraud a creditor, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed, property of the Debtor, within one year before the Petition Date."[478] To prevail, therefore, TGL must establish

[472] *Pavy v. Chastant* (*In re Chastant*), 873 F.2d 89, 91 (5th Cir. 1989) (citing *First Texas Sav. Ass'n v. Reed* (*In re Reed*), 700 F.2d 986, 991 (5th Cir. 1983)).

[473] *Id.*

[474] *See Dennis*, 330 F.3d at 701–02; *see also Chastant*, 873 F.2d at 91.

[475] *Id.* at 702.

[476] *Wash. Mut. Bank, F.A. v. Condit (In re Condit)*, 2014 BL 186470, at *12 (Bankr. N.D. Tex. Feb. 6, 2014).

[477] *Id.* (quoting *Womble v. Pher Partners (In re Womble)*, 289 B.R. 836, 855 (Bankr. N.D. Tex. 2003) (citing *Moreno v. Ashworth (In re Moreno)*, 892 F.2d 417, 420 (5th Cir. 1990)).

[478] Adv. ECF No. 4 at 15, ¶ 69.

(i) a transfer of property, (ii) belonging to Mr. Matloff, (iii) within one year of June 19, 2019, (iv) with intent to hinder, delay, or defraud a creditor.

The Complaint does not, however, identify any specific transfers that were allegedly made by Mr. Matloff of his property within one year of his bankruptcy filing. In TGL's post-trial briefing, however, TGL contends that Mr. Matloff transferred his interest in (i) a company called Powerstores, and (ii) the Yeon Fashion business to the Matloff Family Trust.[479]

Regarding Powerstores, TGL asserts that Mr. Matloff "personally invested in a company called Powerstores" and then transferred "that interest" in Powerstores to his Trust.[480] But the uncontroverted evidence at trial established that Gandiva, not Mr. Matloff, owned the stock in Powerstores, and Gandiva eventually transferred the stock in Powerstores to the Matloff Family Trust.[481] Therefore, TGL's fraudulent transfer claim concerning the Powerstore interest fails.

TGL's contention concerning the Yeon Fashion business likewise fails because Mr. Matloff, individually, never owned the Yeon Fashion business. The uncontroverted evidence at trial established that Rooftop Group USA owned Yeon Fashion and then transferred the business to Asian Express as part of the 2015 corporate restructuring. At some point thereafter, Asian Express transferred its interest in the Yeon Fashion business to the Matloff Family Trust. Therefore, TGL's fraudulent transfer claim concerning the Yeon Fashion business fails.

Based on the Court's review and analysis of the evidence, the Court finds and concludes that TGL failed to offer adequate credible evidence to satisfy its burden to establish the existence of (i) a transfer of property, (ii) belonging to Mr. Matloff; (iii) within one year of June 19, 2019—

---

[479] Adv. ECF No. 165 at 58.

[480] Adv. ECF No. 165 at 58.

[481] Mat. Ex. 26; Adv. ECF No. 154 at 248:11 thru 249:17.

the Petition Date of Mr. Matloff's bankruptcy case; (iv) made with intent to hinder, delay, or defraud a creditor.

Therefore, **COUNT TWO** of the Complaint based on *§ 727(a)(2)* is **DENIED** and **DISMISSED**.

### 2.      *§ 727(a)(3)—Failed to Keep Records—Mr. Matloff's Personal Records*

A debtor's discharge may also be denied under § 727(a)(3) if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case."[482]   The statutory purpose of § 727(a)(3) is to assist the trustee in finding and administrating the estate's assets, evaluating and litigating claims against the estate, and  "to allow creditors and/or the trustee to examine the debtor's financial condition and determine what has passed through a debtor's hands."[483]

Although the Fifth Circuit has not delineated a precise threshold beyond which a debtor becomes accountable for lack of recordkeeping, at least some "written evidence" of the debtor's financial condition is required as opposed to "full detail" of the debtor's financial records.[484]   Nor must the debtor's records "necessarily provide specific financial information or be organized in a certain manner."[485]   Additionally, in personal bankruptcy cases, "debtors must only keep and

---

[482] 11 U.S.C. § 727(a)(3).

[483] *Cadle Co. v. Preston-Guenther (In re Guenther)*, 333 B.R. 759, 765 (Bankr. N.D. Tex. 2005).

[484] *Womble*, 108 F. App'x at 995; *Dennis*, 330 F.3d at 703; *Goff v. Russell Co.* (*In re Goff*), 495 F.2d 199, 201 (5th Cir. 1974).

[485] *Gebhardt v. Gartner* (*In re Gartner*), 326 B.R. 357, 375 (Bankr. S.D. Tex. 2005).

preserve records which are appropriate to their situation."[486]  As to what records constitute "appropriate" records in an individual debtor's case, the Fifth Circuit has noted that "income tax returns are the 'quintessential documents' in a personal bankruptcy."[487]

Additionally, an individual debtor is not required to keep corporate records for an affiliated entity provided he or she disclosed his or her ownership interest in the business affiliate in his or her bankruptcy schedules.[488]  Mr. Matloff disclosed his ownership interests in Rooftop Group USA and Eastern Design Group, LLC, in both his original and his amended schedules.[489] Mr. Matloff also disclosed his potential interest as a beneficiary of the Matloff Family Trust, which is the indirect owner of Rooftop Singapore and its subsidiaries.[490]

Under § 727(a)(3), the plaintiff bears the initial burden "to prove that the debtor failed to keep and preserve his financial records and that this failure prevented the party from ascertaining the debtor's financial condition."[491]  To sustain its burden, the creditor must be able to "specif[y] which records are missing or why their absence prevented [the creditor] from understanding [the debtor]'s financial condition."[492]

If the creditor satisfies its threshold burden, then the burden shifts to the debtor to prove that the inadequacy is justified under all the circumstances of the case, including what a reasonable person would do in similar circumstances.[493]  In the Fifth Circuit, this inquiry should

---

[486] *Chemoil, Inc. v. Pfeifle* (*In re Pfeifle*), 154 F. App'x 432, 435 (5th Cir. 2005).

[487] *Id.*

[488] *Judgment Factors, L.L.C. v. Packer (In re Packer)*, 816 F.3d 87, 94 (5th Cir. 2016).

[489] Mat. Ex. 8 at 7; Mat Ex. 9 at 5.

[490] Mat. Ex. 8 at 10; Mat. Ex. 9 at 8.

[491] *Womble*, 108 F. App'x at 995 (citing *Dennis*, 330 F.3d at 703).

[492] *Dennis*, 330 F.3d at 703.

[493] *Womble*, 108 Fed. Appx. at 995; *see also Gartner*, 326 B.R. at 375.

include "the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to the debtor in his business; and any other circumstances that should be considered in the interest of justice."[494]

In the Complaint, TGL alleges that Mr. Matloff "has concealed, destroyed, mutilated, falsified, or failed to keep or preserve recorded information, including books, documents, records, and papers, from which the Debtor's financial condition or business transactions might be ascertained."[495] Specifically, TGL contends that Mr. Matloff:

- "failed to keep any accounting of his personal obligations or assets;"[496]

- "failed to document or account for his personal assets or liabilities;"[497]

- "invested via equity or debt in [Yeon Fashion] and failed to document or maintain a record of his investment . . . and . . . failed to keep any record of the form of his interest or the terms of repayment;"[498]

- "made and received numerous loans from Matloff's friends and family . . . Matloff did not document these loans or track indebtedness or repayment via any book or record;"[499]

- "personally invested in [PowerStores] . . . but failed to keep a record of the amount, form of his investment, or terms of repayment before or after transferring his interest to the . . . Matloff Family Trust;"[500]

---

[494] *Womble*, 108 Fed. Appx. at 996 (citing *Meridian Bank v. Alten*, 958 F.2d 1226, 1231 (3d Cir.1992)); *see also Hughes v. Neary*, 386 B.R. 624 (N.D. Tex. 2008), *aff'd sub nom. Hughes v. Cadle Co. (In re Hughes)*, 309 F. App'x 841 (5th Cir. 2009) (characterizing as a sophisticated businessperson "a well-educated man, holding a degree in finance from a well-respected university").

[495] Adv. ECF No. 4 at 15, ¶ 70.

[496] Adv. ECF No. 4 at 11, ¶ 47; *see also* Adv. ECF No. 165 at 3 and 43.

[497] Adv. ECF No. 4 at 11, ¶ 48; *see also* Adv. ECF No. 165 at 3 and 43.

[498] Adv. ECF No. 4 at 11, ¶ 49; *see also* Adv. ECF No. 165 at 44–45.

[499] Adv. ECF No. 4 at 12, ¶ 50.

[500] Adv. ECF No. 4 at 12, ¶ 51.

104

- "personally invested in [Rhodium Productions], but failed to keep a record of the amount, form of his investment, or terms of repayment;"[501] and

- "did not write down the terms of his compensation from Rooftop [Group] USA."[502]

First, there is no evidence in the record to suggest that Mr. Matloff caused any of his personal records to be "concealed, destroyed, mutilated, or falsified."

Second, TGL failed to establish by credible evidence that Mr. Matloff "failed to keep any accounting of his personal obligations or assets" and that he "failed to document or account for his personal assets or liabilities."[503] To the contrary, the credible evidence at trial reflects that Mr. Matloff's personal records included: (i) personal federal income tax returns for each year from 2013 to 2019;[504] (ii) hundreds of pages of bank statements and credit card statements from 2015 to 2019;[505] and (ii) bank statements for the "WeChat" account maintained through Agricultural Bank of China.[506]

Third, TGL contends that Mr. Matloff failed to document or maintain a record of his alleged investment in Yeon Fashion. But the credible evidence at trial established that, aside from the personal loans made by Mr. Matloff to Ms. Yeon or Yeon Fashion, detailed, *supra*, Mr. Matloff had never personally invested in the equity of Yeon Fashion.[507] Therefore, TGL's contention that Mr. Matloff "failed to document or maintain a record of his investment . . . and .

---

[501] Adv. ECF No. 4 at 12, ¶ 52.

[502] Adv. ECF No. 4 at 12, ¶ 53.

[503] Adv. ECF No. 4 at 11, ¶¶ 47 and 48 respectively; *see also* Adv. ECF No. 165 at 3 and 43.

[504] Mat. Exs. 30–36.

[505] Mat. Exs. 47 and 49.

[506] Mat. Ex. 48.

[507] The issues regarding Ms. Yeon and Yeon Fashion are more fully detailed, *supra*, in Section II. Q.

105

. . failed to keep any record of the form of his interest" regarding Yeon Fashion fails because it is based on a false premise.

Fourth, TGL contends that Mr. Matloff failed to keep a record of his alleged investment in PowerStores.[508] But the uncontroverted evidence at trial established that Mr. Matloff had never personally owned stock in PowerStores. Rather, the credible evidence established that Gandiva, not Mr. Matloff, owned stock in Powerstores, and Gandiva eventually transferred the stock in PowerStores to the Matloff Family Trust.[509] Therefore, TGL's contention that Mr. Matloff personally invested in PowerStores but failed to keep records of his investment, fails because it is based on a false premise.

Fifth, TGL contends that Mr. Matloff failed to keep a record of his alleged investment in Rhodium Productions. But the uncontroverted evidence at trial established that Mr. Precheur, and not Mr. Matloff, owned Rhodium Production.[510] Mr. Matloff further confirmed that Mr. Precheur and Rhodium Production were paid in 2018 and 2019 as 1099 independent contractors of Rooftop Group USA.[511] Therefore, TGL's contention that Mr. Matloff personally invested in Rhodium Production but failed to keep records of his investment fails because it is based on a false premise.

Sixth, TGL's final contention that Mr. Matloff "did not write down the terms of his compensation from Rooftop [Group] USA," lacks merit. To the contrary, Mr. Matloff's

---

[508] Mr. Matloff initially testified that he, individually, may have invested in PowerStores (Adv. ECF No. 154 at 11:7–16.), but in his subsequent testimony, the evidence established that Gandiva, as opposed to Mr. Matloff, had initially owned the PowerStores stock. *See* Mat. Ex. 26; Adv. ECF No. 154 at 248:11 thru 249:17.

[509] Mat. Ex. 26; Adv. ECF No. 154 at 248:11 thru 249:17.

[510] Adv. ECF No. 154 at 240:13–23.

[511] Adv. ECF No. 154 at 241:16–19; *see also* Mat. Ex. 80.

compensation from Rooftop Group USA is reflected in the federal income tax returns filed by Mr. Matloff[512] and in the books and records of Rooftop Group USA.

Finally, neither TGL nor Mr. Vaclavek established through credible testimony or other evidence that Mr. Matloff failed to keep and preserve sufficient personal records.

Based on the Court's review, analysis, and consideration of the personal financial documents offered into evidence by Mr. Matloff, the evidence offered by TGL, and the testimony of TGL's expert witness, Mr. Vaclavek, the Court finds and concludes that TGL failed to offer adequate credible evidence to satisfy its burden to establish that Mr. Matloff concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which his financial condition or business transactions might be ascertained.  Further to the extent Mr. Matloff failed to keep or preserve any particular records that might be deemed material, his alleged failure was justified under all the circumstances of the case.

Therefore, **COUNT TWO** of the Complaint based on *§ 727(a)(3)* is **DENIED** and **DISMISSED**.

## C.      **COUNT THREE: 11 U.S.C. § 727(a)(7)—Rooftop Group USA**

Count Three of the Complaint, as construed by the Court, contains *three* distinct statutory bases for relief under § 727(a)(7).  The Court will address each in turn.

### 1.      *§ 727(a)(7) [incorporating § 727(a)(2)]—Fraudulent Transfers—Rooftop Group USA Property*

In Count Three of the Complaint TGL alleges, without elaboration, that Mr. Matloff, as an insider of Rooftop Group USA "with intent to hinder, delay, or defraud a creditor or an officer

---

[512] Mat. Exs. 30–36.

of the estate charged with custody of property under this title, has caused Rooftop [Group] USA to transfer, remove, destroy, mutilate, or conceal, or has permitted to be transferred, removed, destroyed, mutilated, or concealed, property of Rooftop [Group] USA, within one year before the date of the filing of the petition or during the pendency of this case."[513]

A claim under § 727(a)(2) has four elements: "(1) a transfer of property, (2) belonging to the debtor; (3) within one year of the filing of the petition; (4) with intent to hinder, delay, or defraud a creditor."[514] TGL has the burden of proof for each of the four elements. "Evidence of actual intent to defraud creditors is required to support a finding sufficient to deny a discharge."[515] Constructive intent is insufficient.[516] Actual intent may be inferred through "badges of fraud" circumstantial evidence.[517] Although § 727 (a)(2) does not contain a materiality component *per se*, a small value of affected property strongly suggests a lack of requisite intent.[518]

Finally, although courts may consider circumstantial evidence to infer the existence of actual fraudulent intent, "[a] debtor is entitled to take reasonable steps in an attempt to keep his business alive before resorting to bankruptcy protection."[519] In the Fifth Circuit, courts look at several factors to determine whether the transfer was for a legitimate business purpose, including: (i) whether the transfer was pursuant to a standard business practice; (ii) whether the transfer was an arm's length transaction; (iii) whether the debtor transferred the funds fully voluntarily or

---

[513] Adv. ECF No. 4 at 16, ¶ 76; *see also* 11 U.S.C. § 727(a)(2).

[514] *Dennis*, 330 F.3d at 701.

[515] *Chastant*, 873 F.2d at 91 (citing *First Texas Sav. Ass'n v. Reed* (*In re Reed*), 700 F.2d 986, 991 (5th Cir. 1983)).

[516] *Id.*

[517] *See Dennis*, 330 F.3d at 701–02; *see also Chastant*, 873 F.2d at 91.

[518] *Dennis*, 330 F.3d at 702.

[519] *Condit*, 2014 BL 186470, at *12.

108

whether the situation effectively forced the transfer upon the debtor; and (iv) whether the debtor received proper consideration for the transfer.[520]

The Complaint does not identify specific transfers that were allegedly made by Mr. Matloff, as an insider of Rooftop Group USA, within one year of Rooftop Group USA's bankruptcy filing. In its post-trial briefing, however, TGL identifies specific transfers that it contends Mr. Matloff caused Rooftop Group USA to make that were intended to hinder, delay, and defraud TGL.[521]

In response, Mr. Matloff first contends that substantially all the alleged transfers identified by TGL and addressed in this section were not properly raised in the Complaint or any formal or informal amendment to the Complaint.[522] Consequently, Mr. Matloff argues that the Court should disregard these "new" allegations and deny TGL's claims and causes of action to the extent they rely on these alleged transfers. Although Mr. Matloff's objection may have merit, the Court need not rule on his objection because it has been rendered moot by the rulings detailed in this Memorandum Opinion—which concludes that TGL has failed to satisfy its burden of proof to establish that any of the disputed transfers were made with intent to hinder, delay, or defraud TGL or any creditor of Rooftop Group USA.

Next, the Court will address the transfers identified by TGL as transfers that Mr. Matloff caused Rooftop Group USA to make with the intent to hinder, delay, and defraud TGL.

---

[520] *Id.* (quoting *Womble v. Pher Partners (In re Womble)*, 289 B.R. 836, 855 (Bankr. N.D. Tex. 2003) (citing *Moreno*, 892 F.2d at 420).

[521] Adv. ECF No. 165 at 47–55.

[522] Adv. ECF Nos. 96, 134, and 144; Adv. ECF No. 156 at 15:7 thru 40:25; Adv. ECF No. 166 at 2, ¶¶ 6–8.

a.      *Transfers to Amax*

To put the transfers to Amax into full context, the Court incorporates herein by reference the section summarizing Rooftop Group USA's relationship with Amax discussed, *supra*, in Section II. N.

Historically, going back to 2008, customers would issue purchase orders directly with Rooftop Group USA who would then place product orders with Asian Express.[523]  Asian Express would then manage the manufacturing of the Propel-branded products, usually through manufacturers located in China.  Rooftop Group USA would then collect the sale proceeds for the sold product and would periodically send payments (in large, round sums) from these proceeds to Asian Express so that Asian Express could pay for its manufacturing costs incurred in fulfilling the purchase orders.[524]

The 2017 Loan Agreement and the January 16, 2018 Side Letter specifically addressed the receipt of payments for purchase orders that were assigned to TGL.  The January 16, 2018 Side Letter provides, in pertinent part:

> [t]he following further provisions shall govern the implementation of the receipt of payments for purchase orders assigned or to be assigned to TGL and Polar as security for its financing to Rooftop [Singapore]:
>
> (a) All . . . payments under purchase orders:
>
> i.  All payments shall be made into the accounts at HSBC or Fubon Bank charged in favour of TGL . . . and shall be held in such accounts and (in the case of any disbursement exceeding USD 50,000 (with detailed arrangements to be agreed among Sunny Tuli, Anita York and Tomo Kinouchi or other representative of TGL and Polar) singly or when

---

[523] Adv. ECF No. 154 at 30:13–16; 48:13–21; 95:14 thru 97:14; and 115:17–21; *see also* Adv. ECF No. 156 at 60:19–23.

[524] Adv. ECF No. Adv. ECF No. 154 at 29:25 thru 30:16; 48:13–21; 95:14 thru 97:14; and 101:7–15; *see also* 155 at 60:14–25 and 102:3 thru 104:22; Adv. ECF No. 156 at 214:7–22.

> aggregated with all other disbursements to the same or related
> payees within the prior 10 calendar days) not disbursed
> except pursuant to joint instruction of Rooftop [Singapore]
> (or its designee) and TGL.

TGL contends that in May 2018, without first having obtained approval from TGL, Mr. Matloff directed Rooftop Group USA to transfer proceeds it received from purchase orders assigned to TGL from the Charged Accounts at HSBC or Fubon Bank to Rooftop Group USA's Chase Bank account held at Amax.[525] The Chase Bank account was not a Charged Account subject to TGL's oversight and conditions contained in the January 16, 2018 Side Letter, but it was an account over which TGL was granted "real-time read-only" access. TGL asserts that by directing such proceeds to the Chase Bank account in default of the January 16, 2018 Side Letter, Mr. Matloff purposely avoid his contractual obligations to TGL.[526]

TGL then identified twenty-one transfers from May 1, 2018, through March 20, 2019, totaling $686,250 that Rooftop Group USA made from the Chase Bank account to Amax.[527] TGL then contends that given that "the Amax transfers have several badges of fraud, the Court should find them fraudulent."[528]

Although TGL identified twenty-one transfers from Rooftop Group USA to Amax, TGL failed to establish, through tracing or other credible evidence, that the funds identified as transfers from Rooftop Group USA to Amax were, in fact, proceeds of accounts that had been pledged to TGL—as opposed to other lenders that also had accounts pledged to secure their secured claims.

---

[525] Adv. ECF No. 4 at 9, ¶¶ 34–36; Adv. ECF No. 165 at 49; *see also* Adv. ECF No. 154 at 49:22 thru 50:5; Adv. ECF No. 155 at 103:5 thru 104:22; Adv. ECF No. 156 at 197:9–12; TGL Ex. 116.

[526] Adv. ECF No. 165 at 49.

[527] Adv. ECF No. 165 at 49; *see also* TGL Ex. 116 (includes nineteen of the alleged twenty-one transfers).

[528] Adv. ECF No. 165 at 51.

Second, TGL failed to offer any credible evidence to establish that such transfers to Amax were "fraudulent." Rather, the uncontroverted credible evidence established that the transfers made to Amax were to enable the payment of the actual manufacturing costs and other business expenses incurred by Rooftop Group USA to fulfill purchase orders.[529]

Mr. Matloff admitted that he directed Rooftop Group USA to transfer the funds to the Chase Bank account because he was concerned that TGL "would have swept all the money"[530] and that "I felt I had no choice but to breach my agreement, I transferred the money back to the U.S. account to protect it, because I was afraid they would somehow freeze the accounts in Asia."[531] Mr. Matloff testified further the he believed he "had no other alternative to try to – in order to preserve the company, which I believe still had life in it, for the benefit of the creditors, employees, and everyone involved. I had no other choice."[532]

Mr. Matloff testified further that he believed his actions would benefit TGL "[b]ecause if they swept the last couple of bucks, that would have been game over for them, too. The company would have fallen"[533] and he was hoping to "[p]rotect the company, pay the emergency bills, make sure the shipments [kept] flowing. And [] was praying every night that [he could] make a deal with [TGL]. . . . More than anything, [he] wanted to pay [TGL] back."[534] Finally, Mr.

---

[529] Adv. ECF No. 154 at 49:22 thru 50:5 and 188:22 thru 190:9; Adv. ECF No. 155 at 103:5 thru 104:22; Adv. ECF No. 156 at 197:9–12.

[530] Adv. ECF No. 154 at 188:3–6.

[531] Adv. ECF No. 154 at 188:15–18 and *see also* 188:22.

[532] Adv. ECF No. 154 at 190:6–9.

[533] Adv. ECF No. 154 at 192:6–10.

[534] Adv. ECF No. 154 at 192:13–17.

Matloff testified credibly that Amax used the funds transferred to it by Rooftop Group USA to pay actual expenses incurred in connection with the Rooftop Group USA business.[535]

The Court finds and concludes that TGL failed to establish that any of the twenty-one transfers from Rooftop Group USA to Amax constitute fraudulent transfers within the meaning of 11 U.S.C. § 727(a)(2). In conclusion, the Court finds and concludes that TGL failed to establish that Mr. Matloff caused Rooftop Group USA to make any of the twenty-one transfers to Amax or that any of the transfers were made with the intent to hinder, delay, and defraud TGL or any creditors of Rooftop Group USA within the meaning of 11 U.S.C. § 727(a)(2). Therefore, TGL failed to satisfy its burden to establish that any of the transfers it identified with Amax constitute fraudulent transfers within the meaning of 11 U.S.C. § 727(a)(2).

### b. Transfers to Mr. McEnaney and Q4 Brands

TGL contends that "Matloff made several transfers to Q4 Brands, which was operated by his long-time friend and close associate, Adam McEnaney."[536] TGL then identified nine transfers from September 21, 2018, through June 19, 2019, totaling $152,000 from Rooftop Group USA to Q4 Brands that TGL contends were fraudulent.[537]

For all the reasons discussed, *supra*, in Section II. R, the Court finds and concludes that TGL failed to offer any credible evidence to support its contentions that the payments by Rooftop Group USA to Mr. McEnaney or Q4 Brands were fraudulent, improper, or not properly documented in Rooftop Group USA's books and records. Although Mr. Matloff admitted that

---

[535] Adv. ECF No. 154 at 229:25 thru 234:14; Mat Ex. 62.

[536] Adv. ECF No. 165 at 51.

[537] Adv. ECF No. 165 at 51–53.

Mr. McEnaney made personal loans to Mr. Matloff in December 2017 and January 2018,[538] TGL failed to offer any credible evidence that the loans from Mr. McEnaney to Mr. Matloff were fraudulent or were intended to hinder, delay, or defraud TGL or any other creditor of Rooftop Group USA.

Finally, TGL failed to offer any credible evidence that Mr. Matloff "directed" Rooftop Group USA to make the payments to Mr. McEnaney or Q4 Brands. Rather, the credible evidence established that the payments made by Rooftop Group USA to Mr. McEnaney and Q4 Brands were for earned compensation as determined and authorized by Ms. York in the ordinary course of Rooftop Group USA's business.

The Court finds and concludes that TGL failed to establish that Mr. Matloff caused Rooftop Group USA to make any of the nine transfers to Mr. McEnaney or Q4 Brands or that any of the nine transfers were made with the intent to hinder, delay, and defraud TGL or any creditors of Rooftop Group USA within the meaning of 11 U.S.C. § 727(a)(2). Therefore, TGL failed to satisfy its burden to establish that any of the transfers it identified concerning Mr. McEnaney and Q4 Brands constitute fraudulent transfers within the meaning of 11 U.S.C. § 727(a)(2).

c.    *Loans with Mr. Ricky Pamani or his entities Fortune 8 or Hind International*

In TGL's Complaint, it contends that "Matloff and Rooftop [Group] USA also made and received numerous loans from Matloff's friends . . . including . . . Ricky Pamani" and that "Matloff did not document these loans or track indebtedness or repayment via any book or record."[539] The credible evidence at trial established that Mr. Matloff had a professional

---

[538] Adv. ECF No. 154 at 90:5 thru 92:15.

[539] Adv. ECF No. 4 at 12, ¶ 50.

relationship with Mr. Pamani.[540]  Both Mr. Matloff and Ms. York testified credibly that Mr. Pamani—or one of his entities either Fortune 8 or Hind International—would make short term loans to Rooftop Group USA to cover expenses when it needed temporary liquidity and then Rooftop Group USA would usually repay such loans within a few days when it had sufficient cash.[541]

Although these temporary loans made to Rooftop Group USA were not documented with formal loan agreements, each of the short-term loan transactions were recorded in Rooftop Group USA's general ledger.[542]

Further, TGL failed to identify or offer credible evidence of any specific transfers from Rooftop Group USA to Mr. Pamani, Fortune 8, or Hind International that constitute fraudulent transfers.

The Court finds and concludes that TGL failed to establish that Mr. Matloff caused Rooftop Group USA to make transfers to Mr. Pamani, Fortune 8, or Hind International with the intent to hinder, delay, and defraud TGL or any creditors of Rooftop Group USA within the meaning of 11 U.S.C. § 727(a)(2).  Therefore, TGL failed to satisfy its burden to establish that any of the transfers it identified with Mr. Pamani, Fortune 8, or Hind International constitute fraudulent transfers within the meaning of 11 U.S.C. § 727(a)(2).

> d.    *Transfers to Incredible International*

In TGL's post-trial brief, TGL contends that "Rooftop [Group] USA's general ledger shows a $100,000 transfer to Incredible International, an entity associated with Mr. Pamani, that

---

[540] Adv. ECF No. 154 at 234:21 thru 235:8.

[541] Adv. ECF No. 154 at 235:18 thru 240:12; Adv. ECF No. 155 at 72:24 thru 74:1 and 97:10 thru 98:25; *see also* Mat. Ex. 149.

[542] TGL Ex. 198; Adv. ECF No. 157 at 214:1; 215:16; and 247:6 thru 248:1; *See also supra* Section II.S.4, e.

is booked as 'Due From Rooftop International'"[543] and that "[t]he Rooftop [Group] USA general ledger also identifies a $60,420.00 transfer to Incredible International on May 22, 2018 as 'Due From Rooftop International.'"[544] TGL concludes that "[t]here is no evidence of any consideration for these transfers."[545]

TGL failed to offer credible evidence to support its contention that the two transfers from Rooftop Group USA to Incredible International constitute fraudulent transfers.

The Court finds and concludes that TGL failed to establish that Mr. Matloff caused Rooftop Group USA to make transfers to Incredible International with the intent to hinder, delay, and defraud TGL or any creditors of Rooftop Group USA within the meaning of 11 U.S.C. § 727(a)(2). Therefore, TGL failed to satisfy its burden to establish that any of the transfers it identified with Incredible International constitute fraudulent transfers within the meaning of 11 U.S.C. § 727(a)(2).

e.    *Transfers to Ms. Nathalie Naude*

In TGL's Complaint, TGL contends that "Matloff and Rooftop [Group] USA also made and received numerous loans from Matloff's friends . . . including . . . Nathalie Naude" and that "Matloff did not document these loans or track indebtedness or repayment via any book or record."[546] TGL further contends in its post-trial brief that from May 11, 2018, through June 21, 2019, Mr. Matloff made twenty-five transfers to Ms. Nathalie Naude totaling $37,757.48.[547]

---

[543] Adv. ECF No. 165 at 53; Mat. Ex. 55, tab 3, 759.

[544] Adv. ECF No. 165 at 53; Mat. Ex. 55, tab 3, 825.

[545] Adv. ECF No. 165 at 53.

[546] Adv. ECF No. 4 at 12, ¶ 50.

[547] Adv. ECF No. 165 at 53–54.

116

Mr. Matloff testified that Ms. Naude was his personal assistant and that they were "extremely close friends. We've known each other for 25 years."[548] Mr. Matloff testified further that Ms. Naude has been employed by Rooftop Group USA since 2009 as his personal assistant and that "[s]he's been my personal assistant for probably entire career life. She's my right hand. I don't know how I'd be able to function without her."[549] Mr. Matloff confirmed that the payments disputed by TGL represent Ms. Naude's by weekly payroll.[550]

TGL offered no credible evidence to support its contention that "there is virtually no evidence that Ms. Naude did any work for Rooftop [Group] USA,"[551] and that "Matloff made the transfers to Nathalie Naude . . . with the intent to hinder, delay, and defraud Rooftop [Group] USA's creditors."[552] Further, TGL offered no credible evidence to controvert the credible testimony of Mr. Matloff concerning the validity of the payroll transfers to Ms. Naude.

The Court finds and concludes that TGL failed to establish that Mr. Matloff caused Rooftop Group USA to make transfers to Ms. Naude with the intent to hinder, delay, and defraud TGL or any creditors of Rooftop Group USA within the meaning of 11 U.S.C. § 727(a)(2). Therefore, TGL failed to satisfy its burden to establish that any of the transfers it identified with Ms. Naude constitute fraudulent transfers within the meaning of 11 U.S.C. § 727(a)(2).

---

[548] Adv. ECF No. 154 at 241:20 thru 242:9.

[549] Adv. ECF No. 154 at 242:10–17.

[550] Adv. ECF No. 154 at 242:21 thru 244:1; *see also* Mat. Ex. 81.

[551] Adv. ECF No. 165 at 54. In TGL's post-trial brief, TGL cited to the deposition testimony of Mr. Dixon as evidence that Ms. Naude did not do any work for Rooftop Group USA, but in context, it is clear the Mr. Dixon's answer to the question was that he simply did not know what Ms. Naude's job responsibilities were for Rooftop Group USA. *See* Adv. ECF No. 171 at 48:12–19.

[552] Adv. ECF No. 165 at 55.

f.    *Transfers to Mr. Michael Matloff*

TGL contends that from October 26, 2018, through May 23, 2019, Mr. Matloff made thirteen transfers to Mr. Michael Matloff totaling $26,830.79.[553]   Mr. Matloff and Ms. York testified credibly that Mr. Michael Matloff is Ms. Matloff's brother and that he performed IT functions for Rooftop Group USA.[554]

Other than TGL's contention that Mr. Michael Matloff is Mr. Matloff's brother and that "the close relationship badge is easily established,"[555] TGL offered no credible evidence to support its contention that "Matloff made the transfers to . . . Michael Matloff with the intent to hinder, delay, and defraud Rooftop [Group] USA's creditors."[556]   Further, TGL offered no credible evidence to controvert the credible testimony of Mr. Matloff and Ms. York concerning the validity of the payroll transfers to Mr. Michael Matloff.

The Court finds and concludes that TGL failed to establish that Mr. Matloff caused Rooftop Group USA to make transfers to Mr. Michael Matloff with the intent to hinder, delay, and defraud TGL or any creditors of Rooftop Group USA within the meaning of 11 U.S.C. § 727(a)(2).   Therefore, TGL failed to satisfy its burden to establish that any of the transfers it identified with Mr. Michael Matloff constitute fraudulent transfers within the meaning of 11 U.S.C. § 727(a)(2).

---

[553] Adv. ECF No. 165 at 54–55.

[554] Adv. ECF No. 154 at 244:22 thru 247:18; Adv. ECF No. 155 at 79:17–24; *see also* Mat. Exs. 75 and 82.

[555] Adv. ECF No. 165 at 54.

[556] Adv. ECF No. 165 at 55.

g.      *Transfers to Mr. David Precheur and Rhodium Production*

In its Complaint, TGL contends that "Matloff and Rooftop [Group] USA also made and received numerous loans from Matloff's friends . . . including David Precheur" and that "Matloff did not document these loans or track indebtedness or repayment via any book or record."[557] TGL further contends that "Matloff personally invested in a company called Rhodium Productions, LLC, whose principal is David Precheur, but failed to keep a record of the amount, form of his investment, or terms of repayment."[558]  TGL failed, however, to offer any credible evidence in support of these contentions regarding Mr. Precheur or Rhodium Productions during trial.

Mr. Matloff, on the other hand, testified credibly that Mr. Precheur owned Rhodium Productions and that his background was in the entertainment business "and we [would] use him from time to time for various things.  He did a lot of work on the Star Wars project back in 2016 and 2017.  And primarily he does a lot of things with sound, voices, soundtracks that wind up in our toys and our products."[559]  Mr. Matloff further confirmed that Mr. Precheur and Rhodium Production were paid in 2018 and 2019 as 1099 independent contractors of Rooftop Group USA.[560]

The Court finds and concludes that TGL failed to establish that Mr. Matloff caused Rooftop Group USA to make transfers to Mr. Precheur or Rhodium Production with the intent to hinder, delay, and defraud TGL or any creditors of Rooftop Group USA within the meaning of

---

[557] Adv. ECF No. 4 at 12, ¶ 50.

[558] Adv. ECF No. 4 at 12, ¶ 52.

[559] Adv. ECF No. 154 at 240:13–23.

[560] Adv. ECF No. 154 at 241:16–19; *see also* Mat. Ex. 80.

11 U.S.C. § 727(a)(2). Therefore, TGL failed to satisfy its burden to establish that any of the transfers it identified with Mr. Precheur and Rhodium Production constitute fraudulent transfers within the meaning of 11 U.S.C. § 727(a)(2).

h.      *Transfers to Ms. Ocampo*

In TGL's Compliant, TGL contends that "Matloff and Rooftop [Group] USA also made and received numerous loans from Matloff's friends and family, including . . . Susan Ocampo" and that "Matloff did not document these loans or track indebtedness or repayment via any book or record."[561]  TGL failed, however, to offer any credible evidence in support of these contentions regarding Ms. Ocampo during trial. Further, TGL did not address or attempt to support these contentions regarding Ms. Ocampo in its post-trial brief.[562]

The Court finds and concludes that TGL failed to establish that Mr. Matloff caused Rooftop Group USA to make transfers to Ms. Ocampo with the intent to hinder, delay, and defraud TGL or any creditors of Rooftop Group USA within the meaning of 11 U.S.C. § 727(a)(2). Therefore, TGL failed to satisfy its burden to establish that any of the transfers it identified with Ms. Ocampo constitute fraudulent transfers within the meaning of 11 U.S.C. § 727(a)(2).

i.      *Conclusion concerning 11 U.S.C. § 727(a)(7) [incorporating 11 U.S.C. § 727(a)(2)*

Based on the Court's review and analysis of the evidence, the Court finds and concludes that TGL failed to establish that Mr. Matloff caused Rooftop Group USA to make transfers with

---

[561] Adv. ECF No. 4 at 12, ¶ 50.

[562] TGL did not assert that any transfers that may have been made to Ms. Ocampo were fraudulent, rather only that Mr. Matloff allegedly failed to make required disclosures of transfers made to insiders of Rooftop Group USA. *See* Adv ECF No. 165 at 56–57.

the intent to hinder, delay, and defraud TGL or any creditors of Rooftop Group USA within the meaning of 11 U.S.C. § 727(a)(2).

Therefore, because TGL failed to satisfy its burden to establish that any of the transfers it identified constitute fraudulent transfers within the meaning of 11 U.S.C. § 727(a)(2), **COUNT THREE** of the Complaint based on *§ 727(a)(7) (incorporating § 707(a)(2))* is **DENIED** and **DISMISSED**.

### 2. *§ 727(a)(7) [incorporating § 727)(a)(3)]—Failed to Keep Records—Rooftop Group USA Records*

Like the second distinct statutory bases for relief detailed in Count Two, *supra*, Count Three asserts that Mr. Matloff, as an insider of Rooftop Group USA, concealed, destroyed, mutilated, falsified, or failed to keep or preserve sufficient recorded information, including books, documents, records, and papers, from which Rooftop Group USA's financial condition or business transactions might be ascertained.

Specifically, TGL contends in its Complaint, without specificity or elaboration, that:

- Mr. Matloff "did not maintain the records of Rooftop Services or Rooftop [Group] USA sufficient to allow a creditor or the . . . trustee to ascertain whether transfers of their assets had a legitimate purpose;"[563]

- Mr. Matloff "did not keep records of salary, fringe benefits, commissions, or expenses due either to him or by Rooftop Services or Rooftop [Group] USA;"[564]

- "There are no recorded terms for payment or compensation due to any employee (or employee equivalent) or insider;"[565]

- "Rooftop [Group] USA did not have a general ledger, a QuickBooks file, or any records other than bank statements and a box containing what appear to be mostly

---

[563] Adv. ECF No. 4 at 12, ¶ 54.

[564] Adv. ECF No. 4 at 12, ¶ 54.

[565] Adv. ECF No. 4 at 12, ¶ 54.

unopened demand letters, utility bills, and unanswered correspondence from taxing authorities."[566]

- "Rooftop [Group] USA [did not keep] invoices or a ledger showing what "business expenses" those payments were for, who the obligor on the bills was, what indebtedness was accruing to Rooftop [Group] USA, or whether those payments were for a proper business purpose at all."[567]

- "For all personal expenses charged to Rooftop [Group] USA (which add up to material amounts), [Mr. Matloff] did not record the business purpose for any of his transportation, meals, lodging, or entertainment expenses."[568]

TGL contends further in its post-trial brief that:

- "The books and records of Rooftop [Group] USA were a 'mess';"[569]

- There is an "absence of any competent records supporting the Yeon transactions;"[570]

- Rooftop Group USA's financial records "are unreliable."[571]

First, there is no evidence in the record to suggest that Mr. Matloff, or anyone, caused records of Rooftop Group USA to be "concealed, destroyed, mutilated, or falsified." To the contrary, the credible testimony from Ms. Ocampo and Ms. York, and corroborated by the deposition testimony of Mr. Schafman and Ms. Newbrand, established that Rooftop Group USA maintained sufficient books and records from which its financial condition and business transactions could be ascertained. And there was no testimony or evidence to suggest that any of Rooftop Group USA's records were concealed, destroyed, mutilated, or falsified.

---

[566] Adv. ECF No. 4 at 12, ¶ 58.

[567] Adv. ECF No. 4 at 12, ¶ 59.

[568] Adv. ECF No. 4 at 12, ¶ 60.

[569] Adv. ECF No. 165 at 3.

[570] Adv. ECF No. 165 at 3 and 43.

[571] Adv. ECF No. 165 at 27.

Second, the Court incorporates the discussion of what the law requires under 11 U.S.C. § 727(a)(3) as detailed in the Court's analysis of the second distinct statutory bases for relief detailed in Count Two, *supra*.  In addition, the Court incorporates by reference Section II. S., *supra*, in which the Court detailed and analyzed the record keeping functions for the Rooftop entities.  For all the reasons detailed in that Section, the Court finds and concludes that the credible evidence at trial established that Rooftop Group USA maintained quality accounting and finance staff that were responsible for maintaining the books and records for the Rooftop entities from 2008 through 2019.  Further, the Court finds and concludes that, during that entire time, the credible evidence established that Rooftop Group USA kept and preserved sufficient recorded information, including books, documents, records, and papers, from which Rooftop Group USA's financial condition or business transactions might be ascertained.  Finally, the Court finds and concludes that the overwhelming credible evidence established that Mr. Matloff had limited involvement with the Rooftop entities' QuickBooks files, bookkeeping and accounting functions, or record maintenance and retention issues.[572]

Therefore, based on the Court's review and analysis of the evidence, the Court finds and concludes that TGL failed to offer adequate credible evidence to satisfy its burden to establish that Mr. Matloff, as an insider of Rooftop Group USA, concealed, destroyed, mutilated, falsified, or caused Rooftop Group USA to fail to keep or preserve sufficient recorded information, including books, documents, records, and papers, from which Rooftop Group USA's financial condition or business transactions might be ascertained as required by § 727(a)(3) and (7).  Further

---

[572] Adv. ECF No. 155 at 55:17 thru 56:20.

to the extent Rooftop Group USA may have failed to keep or preserve any such material records, such failure was justified under all the circumstances of the case.

Therefore, **COUNT THREE** of the Complaint based on *§ 727(a)(7) (incorporating § 707(a)(3))* is **DENIED** and **DISMISSED**.

### 3.    *§ 727(a)(7) [incorporating § 727(a)(4)]—False Oaths or Account—Rooftop Group USA Bankruptcy Case*

A debtor's discharge may be denied under § 727(a)(7) (incorporating § 727(a)(4)) if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."[573]   TGL alleges that Mr. Matloff, as an insider of Rooftop Group USA, committed false oaths in connection with the Rooftop Group USA bankruptcy case.

Under § 727(a)(4), TGL has the burden to establish that (i) Matloff made a statement under oath, (ii) the statement was false, (iii) Matloff knew the statement was false, (iv) Matloff made the statement with fraudulent intent, and (v) the statement related materially to the Rooftop Group USA bankruptcy case.[574]   The required element of fraudulent intent under § 727(a)(4) is actual fraud, which may be established "by showing either actual intent to deceive or a reckless indifference for the truth."[575]   In addition, the false oath must be material and bear "a relationship to the [debtor]'s business transactions or estate, or [concern] the discovery of assets, business dealings, or the existence and disposition of his property."[576]

Specifically, TGL contends that:

---

[573] 11 U.S.C. § 727(a)(4)(A).

[574] *Beaubouef v. Beaubouef* (*In re Beaubouef*), 966 F.2d 174, 178 (5th Cir. 1992); *Sholdra v. Chilmark Fin. LLP* (*In re Sholdra*), 249 F.3d 380, 382 (5th Cir. 2001).

[575] *Cadle Company v. Mitchell* (*In re Mitchell*), 102 F. App'x 860, 862 (5th Cir. 2004).

[576] *Beaubouef*, 966 F.2d at 178.

- Mr. Matloff "made a false statement on the statement of financial affairs of Rooftop [Group] USA when he failed to disclose" a March 4, 2019, $25,000 transfer from Rooftop Group USA to Silver State Family Office.[577]

- Mr. Matloff failed to disclose several transfers made to insiders of Rooftop Group USA.[578]

    a.    *Failure to disclose an alleged $25,000 transfer from Rooftop Group USA to Silver State Family Office*

The credible evidence at trial established that the Rooftop Group USA general ledger reveled that Rooftop Group USA transferred $25,000 to Silver State Family Office on March 4, 2019, classifying the transaction as an "owner draw."[579]   TGL, however, offered no evidence concerning this alleged transfer or why it should have been disclosed in the Rooftop Group USA statement of financial affairs.   In the absence of any evidence in support of TGL's contention, TGL failed to satisfy its burden to establish that Mr. Matloff, with the intent to deceive others, intended to make a false oath by the alleged failure to disclose the alleged transfer in the Rooftop Group USA statement of financial affairs.

Additionally, the alleged false oath must be material[580] and "a discharge cannot be denied when items are omitted from schedules by honest mistake."[581]   Here, because of the relatively small size of the transfer when compared to the facts of the Rooftop Group USA case, the denial of Mr. Matloff's discharge due to the alleged omission of disclosing this transfer in the Rooftop Group USA case would be unduly harsh.[582]

---

[577] Adv. ECF No. 4 at 10, ¶¶ 40 and 42; at 16, ¶ 77.

[578] Adv. ECF No. 4 at 10, ¶ 44; at 16, ¶ 77; Adv. ECF No. 165 at 56.

[579] Mat. Ex. 55 at line 337.

[580] *Beaubouef*, 966 F.2d at 178.

[581] *Id.*

[582] *Guenther*, 333 B.R. at 767–68.

Therefore, based on the Court's review and analysis of the evidence, the Court finds and concludes that TGL failed to offer adequate credible evidence to satisfy its burden to establish that Mr. Matloff knowingly and fraudulently, in or in connection with the Rooftop Group USA case made a false oath or account as required by §§ 727(a)(3) and (7).

### b.    *Failure to disclose transfers made to insiders of Rooftop Group USA*

In its Complaint, TGL contends that:

> Matloff further failed to disclose the following preference period payments that he directed from Rooftop [Group] USA: $10,000 to his sister, Susan Ocampo, on June 5, 2019; $30,000 to insider Anita York on June 5, 2019; $58,231 on June 5, 2019 to an unknown party in China for "business expenses"; $24,000 to Matloff personally on June 5, 2019; $5,000 on June 7, 2019 to Q4 Brands; $3,846.15 on June 7, 2019 to Anita York; $2,500 on June 7, 2019 to his sister; $80,000 on June 13, 2019 to an unknown party in China for "emergency bills"; $10,000 on June 19, 2019 to Q4 Brands; and $2,500 to his sister on June 21, 2019.[583]

First, Mr. Matloff concedes that each of these transactions cited by TGL can be found in the general ledger of Rooftop Group USA. The credible evidence at trial, however, revealed that most of these transfers identified by TGL involve compensation to non-insiders that is outside the scope of the disclosure requirements for the statement of financial affairs.[584] The Court will address each transfer in turn.

### i.    Transfers to Ms. Ocampo

TGL alleges that the Rooftop Group USA statement of financial affairs omits disclosure of payments to Ms. Ocampo in the amounts of (a) $10,000 on June 5, 2019, (b) $2,500 on June

---

[583] Adv. ECF No. 4 at 10, ¶ 44.

[584] Section 2 of the official form for the statement of financial affairs requires the debtor to "[l]ist payments or transfers—including expense reimbursements—to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $6,825." *See* Mat. Ex. 10 at 1.

7, 2019; and (c) $2,500 on June 21, 2019. Ms. Ocampo is an insider, as that term is defined in §

101(31)(B)(vi), by virtue of her familial relationship to Mr. Matloff. But TGL offered no

evidence to suggest that omission was willful or made with fraudulent intent. To the contrary and

in light of this familial relationship, the credible evidence at trial established that the each of the

payments to Ms. Ocampo were compensation for bookkeeping services performed by Ms.

Ocampo for Rooftop group USA and that the omission was an honest mistake.[585] Further, the

small amount of the transactions further suggest the lack of actual intent to deceive creditors for

having failed to list such transfers in the Rooftop Group USA statement of financial affairs.[586]

ii.      Transfers to Ms. York

TGL next alleges that that the Rooftop Group USA statement of financial affairs omits

disclosure of payments to Ms. York in the amounts of (a) $30,000 on June 5, 2019, and (b)

$3,846.15 on June 7, 2019. Although TGL alleges that Ms. York was an insider, too, TGL

presented no evidence at trial to suggest that she was an officer, director, or person in control of

Rooftop Group USA nor that she has any familial relationship to Matloff. The credible evidence,

however, established that Ms. York was employed by Rooftop Group USA and the payments

identified by TGL represent payments for her employee compensation.[587] Compensation to non-

insiders is outside the scope of the disclosure requirements of for statements of financial affairs.[588]

---

[585] Adv. ECF No. 155 at 11:11–18; *see also Isaacson v. Isaacson*, 478 B.R. 763, 783 (Bankr. E.D. Va. 2012) (holding that § 727(a)(4) is not meant to penalize a debtor who has made an honest mistake with respect to his schedules).

[586] *See Guenther*, 333 B.R. at 767–68.

[587] Adv. ECF No. 155 at 45:6-37.

[588] Section 2 of the official form for the statement of financial affairs requires the debtor to "[l]ist payments or transfers—including expense reimbursements—to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $6,825." *See* Mat. 10 Ex. at 1.

Consequently, it was not an omission—and certainly not a willfully false omission—for Mr. Matloff not to have included the transfers to Ms. York in the Rooftop Group USA statement of financial affairs.

iii.       Transfers to Mr. McEnaney and Q4 Brands

TGL next alleges that that the Rooftop Group USA statement of financial affairs omits disclosure of payments to Q4 Brands in the amounts of (a) $5,000 on June 7, 2019, and (b) $10,000 on June 19, 2019. Again, there is no evidence that Q4 Brands or its principal, Mr. McEnaney, was an insider of Rooftop Group USA. To the contrary, Mr. McEnaney testified in his deposition that he is not even an employee of Rooftop Group USA, but merely an independent contractor.[589] Mr. Matloff and Mr. McEnaney both testified that the transfers identified by TGL were compensation owing to Mr. McEnaney.[590]

iv.       Transfers to "an unknown part in China"

TGL next alleges that that the Rooftop Group USA statement of financial affairs omits disclosure of payments to "an unknown party in China" in the amounts of (a) $58,231 on June 5, 2019, and (b) $80,000 on June 13, 2019. The general ledger of Rooftop Group USA reflects that these two transactions as having been made to Qy Trading Limited.[591] The credible evidence in the record suggests that these transactions also related to employee compensation.[592] Qy Trading was used by Rooftop Group USA to facilitate wire transfers from Rooftop Group USA to Amax

---

[589] Adv. ECF No. 171-1 at 9:8–11.

[590] Adv. ECF No. 171-1 at 79:5-8; 82:12 thru 84:14; Adv. ECF No. 154 at 210:9-13; ECF No. 155 at 72:1-19; Mat. Ex. 76.

[591] Mat. Ex. 55 at lines 967 and 1007.

[592] Mat. Exs. 62 and 62A.

128

for the purpose of paying certain Rooftop related expenses in China, and the majority of these disbursements were used to pay "employee salary / compensation / reimbursement."[593]

v.  Transfers to Mr. Matloff

TGL next contends that the Rooftop Group USA statement of financial affairs omits disclosure of transfers to Mr. Matloff personally in the amount of $24,000.  But the Rooftop Group USA statement of financial affairs does disclose a total of (a) $86,542.16 in transfers to Mr. Matloff for "YTD 2019" and (b) $116,441.51 in transfers for "2018."[594]  TGL offered no evidence at trial to establish that the alleged $24,000 transfer was not included in the figures that were disclosed.

Based on the Court's review and analysis of the evidence, the Court finds and concludes that—with the exception of a small portion of the identified transfers made to Qy Trading—*all* of the transfers identified by TGL were in the nature of compensation for work performed for Rooftop Group USA.  Further, the relatively small dollar amount of transfers that were identified by TGL contradicts a finding that Mr. Matloff intended to make a false statement under oath that related materially to the Rooftop Group USA bankruptcy case.[595]  Nor did TGL establish by credible evidence that Mr. Matloff knew that any omissions of any of these transfers from the Rooftop Group USA's statement of financial affairs was made with the necessary "actual intent to deceive or a reckless indifference for the truth."[596]

---

[593] Mat. Ex. 62A at lines 241, 244, 252, and 259.

[594] Mat. Ex. 10 at 2.

[595] *Beaubouef*, 966 F.2d at 178; *Sholdra*, 249 F.3d 3 at 382.

[596] *Mitchell*, 102 Fed. Appx. at 862.

Consequently, TGL failed to offer adequate credible evidence to satisfy its burden to establish (i) Mr. Matloff made a statement under oath, (ii) the statement was false, (iii) Mr. Matloff knew the statement was false, (iv) Mr. Matloff made the statement with fraudulent intent, and (v) the statement related materially to the Rooftop Group USA bankruptcy case.

Therefore, **COUNT THREE** of the Complaint based on *§ 727(a)(7) (incorporating § 707(a)(4))* is **DENIED** and **DISMISSED**.

D.      **COUNT FOUR: 11 U.S.C. § 727(a)(7)** *[incorporating § 727(a)(3)]*—**Failed to Keep Records—Rooftop Services Records**

Count Four of the Complaint, as construed by the Court, contains ***one*** distinct statutory basis for relief under § 727(a)(7) (incorporating § 727(a)(3)).

Like the second distinct statutory bases for relief detailed in Count Two and in Count Three, *supra*, Count Four asserts that Matloff, as an insider of Rooftop Services, concealed, destroyed, mutilated, falsified, or failed to keep or preserve sufficient recorded information, including books, documents, records, and papers, from which Rooftop Services' financial condition or business transactions might be ascertained.

First, there is no evidence in the record to suggest that Mr. Matloff, or anyone, caused records of Rooftop Services to be "concealed, destroyed, mutilated, or falsified." To the contrary, the credible testimony from Ms. Ocampo and Ms. York, and corroborated by the deposition testimony of Mr. Schafman and Ms. Newbrand, established that Rooftop Services maintained sufficient books and records from which its financial condition and business transactions could be ascertained. And there was no testimony or evidence to suggest that any of Rooftop Services' records were concealed, destroyed, mutilated, or falsified.

Second, the Court incorporates the discussion of what the law requires under 11 U.S.C. § 727(a)(3) as detailed in the Court's analysis of the second distinct statutory bases for relief detailed in Count Two, *supra*. In addition, the Court incorporates by reference Section II. S., *supra*, in which the Court detailed and analyzed the record keeping functions for the Rooftop entities. For all the reasons detailed in that Section, the Court finds and concludes that the credible evidence at trial established that Rooftop Services maintained quality accounting and finance staff that were responsible for maintaining the books and records for the Rooftop entities, including Rooftop Services, from 2008 through 2019. Further, the Court finds and concludes that during that entire time, the credible evidence established that Rooftop Services kept and preserved sufficient recorded information, including books, documents, records, and papers, from which Rooftop Services' financial condition or business transactions might be ascertained. Finally, the Court finds and concludes that the overwhelming credible evidence established that Mr. Matloff had limited involvement with the Rooftop entities' QuickBooks files, bookkeeping and accounting functions, or record maintenance and retention issues.[597]

Therefore, based on the Court's review and analysis of the evidence, the Court finds and concludes that TGL failed to offer adequate credible evidence to satisfy its burden to establish that Mr. Matloff, as an insider of Rooftop Services, concealed, destroyed, mutilated, falsified, or caused Rooftop Services to fail to keep or preserve sufficient recorded information, including books, documents, records, and papers, from which Rooftop Services' financial condition or business transactions might be ascertained as required by § 727(a)(3) and (7). Further, to the

---

[597] Adv. ECF No. 155 at 55:17 thru 56:20.

extent Rooftop Services may have failed to keep or preserve any such material records, such failure was justified under all the circumstances of the case.

Therefore, **COUNT FOUR** of the Complaint based on *§ 727(a)(7) (incorporating § 707(a)(3))* is **DENIED** and **DISMISSED**.

E.     **COUNT FIVE: 11 U.S.C. § 727(a)(7) *[incorporating § 727(a)(4)]*—False Oath or Account—Rooftop Singapore Bankruptcy Case**

Count Five of the Complaint, as construed by the Court, contains *one* distinct statutory basis for relief under § 727(a)(7) (incorporating § 727(a)(4)).

Like the third distinct statutory bases for relief detailed in Count Three, *supra*, Count Five asserts that that Mr. Matloff, "has knowingly and fraudulently, in or in connection with Rooftop Singapore's bankruptcy case, made a false oath or account."[598] TGL makes two allegations of false oaths that it contends Matloff caused to be made in the case of Rooftop Singapore. First, Mr. Matloff "failed to disclose on either his schedules or those of Rooftop Singapore a $1 million loan from Rooftop Singapore to him personally originally classified as a bonus, or account for his disposition of $1 million in cash."[599] And second, Mr. Matloff "failed to disclose Rooftop Singapore's interest in a Fubon account ending in 7931 in Rooftop Singapor's schedules.[600]

*1.     The alleged $1 million "bonus" or "loan" Mr. Matloff allegedly received*

TGL contends that Mr. Matloff was required to repay to Rooftop Singapore a $1 million "bonus" he received.[601]   In support of this contention, TGL states that "[o]n six separate

---

[598] Adv. ECF No. 4 at 18, ¶ 92.

[599] Adv. ECF No. 4 at 10, ¶ 41.

[600] Adv. ECF No. 4 at 11, ¶ 46. The evidence suggested that TGL incorrectly identified the last four digits of this account in the Complaint as 9731.

[601] Adv. ECF No. 165 at 69–70; *see also* Adv. ECF No. 4 at 10, ¶ 41.

occasions, Matloff promised that he would repay a bonus he received from Rooftop."[602]   TGL contends that Mr. Matloff  made such representations in (i) the Term Sheet, (ii) the July 5, 2017 Side Letter, (iii) the July 20, 2017 Side Letter, (iv) the August 8, 2017 Side Letter, (v) the September 22, 2017 Side Letter, and (vi) the January 18, 2018 Side Letter.[603]

Specifically, each of the Side Letters upon which TGL relies state "the bonus paid to DSM in 2017 for 2016 shall be reclassified and treated as a loan from Rooftop to DSM, and DSM shall repay such loan as and when reasonably practicable."[604]  In addition to the other factors that TGL must establish, because the "bonus provision" is an alleged promise relating to a future action, TGL must also establish that "when the representation [was] made, the debtor had no intention of performing as promised."[605]

Mr. Matloff did not execute any of the six documents referenced by TGL in his personal capacity, so it is debatable to what extent he personally made "representations" in these documents. But because Mr. Matloff did execute the documents in his various corporate representative capacities, even if the Court assumes the "representations" contained in the six documents constitute Mr. Matloff's representations, TGL's contention still fails to establish that Mr. Matloff is obligated to Rooftop Singapore for an alleged loan.

First, the "bonus provision" upon which TGL relies requires the repayment of "the bonus paid to DSM in 2017 for 2016," but the "bonus provision" does not provide any other specificity, such as the date(s) the alleged bonus was paid, or the amount(s) paid. Mr. Matloff testified

---

[602] Adv. ECF No. 165 at 69.

[603] Adv. ECF No. 165 at 69.

[604] Mat. Exs. 18, 19, 20, 21, and 22 each at 1, ¶ 2.

[605] *See Allison*, 960 F.2d at 484.

credibly that he never actually received any "bonus" payments in 2017 for bonuses earned in 2016.[606] Mr. Matloff's testimony was corroborated by his 2016, 2017, and 2018 Federal Income Tax Returns.[607] All three tax returns were prepared by Mr. Dixon, and none of the tax returns reflect any bonuses having been paid to Mr. Matloff.[608] Therefore, because the credible evidence established that Mr. Matloff was not paid a bonus in 2016, 2017, or 2018, any corresponding obligation to repay such a bonus must necessarily not have arisen.

Second, other than a Director's Remuneration certificate, TGL was not able to establish why it reasonably believed Mr. Matloff had received a $1 million bonus in either 2016 or 2017, or from what entity such a bonus was allegedly paid. During his testimony, Mr. Yee offered no credible explanation why he thought Mr. Matloff had received a $1 million bonus in 2016 or 2017, except based upon an alleged financial record he did not produce at trial.[609] Although Mr. Yee claimed that the existence of the alleged $1 million bonus was something discovered after the original 2016 Loan Agreement was funded,[610] when specifically asked at trial whether he had any documents or records that he could offer into evidence that would attest to the source of the alleged $1 million bonus, he replied "I do not. No, I do not think so."[611]

Further, as noted above, in further support of its allegation that Mr. Matloff was paid a bonus of just over $1 million in 2016, TGL offered a "Director's Remuneration" certificate describing $1,085,260 as "total remuneration paid to, *or receivable by* [Mr. Matloff] in respect of

---

[606] Adv. ECF No. 154 at 146:12–18.

[607] Mat. Exs. 33, 34, and 35.

[608] Adv. ECF No. 154 at 146:22 thru 148:24.

[609] Adv. ECF No. 156 at 174:20 thru 182:21.

[610] Adv. ECF No. 156 at 176:21 thru 177:8.

[611] Adv. ECF No. 156 at 179:9–18; *see also* ECF No. 156 at 182:14–21.

[his] services."[612]  While the Director's Remuneration corroborates the sum of $1,085,260 that was adjusted in the 2016 Audited Financials from "due to" to "due from," the document does not specify whether the stated amount was actually paid to Mr. Matloff or was merely due and owing to Mr. Matloff.  Therefore, the Director's Remuneration certificate fails to constitute sufficient credible evidence that Mr. Matloff was paid a bonus of just over $1 million in 2016.

Finally, no note or loan agreement was offered into evidence memorializing an alleged $1 million loan owing by Mr. Matloff to Rooftop Singapore.  Moreover, there is no evidence to either establish the existence of the obligation such that its omission represented a false statement or that Mr. Matloff knew such an omission to be false and made such omission with the intent to deceive creditors.  To the contrary, the credible evidence at trial suggests that Mr. Matloff received no such bonus from Rooftop Singapore, and Rooftop Singapore has no loan or note receivable due from Mr. Matloff as an asset that was omitted from its schedules.

## 2.    *The alleged interest in a Fubon account ending in 7931*

TGL next contends that Mr. Matloff failed to disclose Rooftop Singapore's interest in a Fubon account ending in 7931 in Rooftop Singapore's schedules of assets and liabilities.[613]  Mr. Nelson testified that the last transaction through that account was on or about July 4, 2018, following which the account had a balance of just $842.59.[614]  Mr. Nelson also confirmed that the account was rarely used in the course of Rooftop Singapore's business compared to accounts held by Rooftop Group USA or Asian Express.[615]

---

[612] TGL Ex. 24 (emphasis added).

[613] Adv. ECF No. 4 at 11, ¶ 46; Mat. Ex. 50.

[614] Adv. ECF No. 158 at 83:4–18.

[615] Adv. ECF No. 158 at 83:20 thru 84:4.

The credible evidence established that the Fubon account contained a de minimus balance with limited use in the Rooftop Singapore business. Finally, Mr. Matloff stated that its omission in the Rooftop Singapore's schedules "was entirely an oversight as there has been no meaningful activity in the account since August 2018, at which time the account held less than $850 in cash."[616] TGL failed to offer credible controverting evidence concerning the omission of the Fubon account from the Rooftop Singapore schedules.

Based on the Court's review and analysis of the evidence, the Court finds and concludes that TGL failed to offer adequate credible evidence to satisfy its burden to establish that (i) Mr. Matloff made a statement under oath, (ii) the statement was false, (iii) Mr. Matloff knew the statement was false, (iv) Mr. Matloff made the statement with fraudulent intent, and (v) the statement related materially to the Rooftop Singapore's bankruptcy case.

Therefore, **COUNT FIVE** of the Complaint based on *§ 727(a)(7) (incorporating § 707(a)(4))* is **DENIED** and **DISMISSED**.

## F.       COUNT SIX: Objection to Claim of Exemptions Pursuant to 11 U.S.C. § 522(l)

Count six of the Complaint alleges that Mr. Matloff's claim of exemptions in (i) the stock of Rooftop Group USA, (ii) commissions receivable from Rooftop Group USA, and (iii) interests in the Matloff Family Trust should be limited to the combined cash amount set forth in 11 U.S.C. § 522(d)(5).[617]

The Bankruptcy Code permits a debtor to exempt property from the bankruptcy estate under either the federal exemption or, if available, state exemption provisions.[618] Subsection (l)

---

[616] TGL Ex. 157 at 7, ¶ 27.

[617] Adv. ECF No. 4 at 18, ¶¶ 97 and 98.

[618] 11 U.S.C. § 522(b).

of § 522 goes on to direct the debtor to file a list of property that the debtor claims as exempt under § 522(b). "Unless a party in interest objects, the property claimed as exempt on such list is exempt."[619]

TGL objected to Mr. Matloff's exemptions in "the stock of Rooftop [Group] USA, commissions receivable from Rooftop [Group] USA, and interests in the Matloff Family Trust over the combined cash amount set forth in 11 U.S.C. § 522(d)(5)."[620] TGL further argues that "Matloff is only entitled to an exemption in the cash amount specified in 11 U.S.C. § 522(d)(5), not to any specific property interest in the stock of Rooftop [Group] USA, commissions receivable from Rooftop [Group] USA, and interests in the Matloff Family Trust over the combined cash amount set forth in 11 U.S.C. § 522(d)(5)."[621]

Fed. R. Bankr. P. 4003(c) clearly and unequivocally places the ultimate burden of persuasion in any contested matter over the validity of a debtor's exemption claims upon the party objecting to a debtor's claimed exemptions.[622] At trial, TGL presented no evidence on the question of exemption claims. Consequently, TGL failed to satisfy its burden. Therefore, the objection must be overruled.

But, even assuming TGL's objection itself was deemed sufficient, the objection should still be overruled on the merits.

---

[619] 11 U.S.C. § 522(l).

[620] Adv. ECF No. 4 at 18, ¶ 97.

[621] Adv. ECF No. 4 at 18, ¶ 98.

[622] *In re Harrington*, 306 B.R. 172, 181 (Bankr. E.D. Tex. 2003).

### 1.     Rooftop Group USA stock

TGL's objections to Mr. Matloff's exemptions in the stock of Rooftop Group USA is moot and overruled.  Rooftop Group USA was substantively consolidated with Rooftop Services and Rooftop Singapore as part of the confirmation of the plan of reorganization filed in those cases.[623] As part of the plan, equity holders of the Rooftop entities were extinguished, therefore Mr. Matloff (or his bankruptcy estate) no longer owns the stock of Rooftop Group USA.

### 2.     Unpaid Commissions from Rooftop Group USA

Mr. Matloff did not file a claim for unpaid commissions in the Rooftop Group USA bankruptcy case, and the claims bar date has long since run. Rooftop Group USA did schedule Mr. Matloff's claim as a priority claim, but it is not known whether the plan contemplates the existence or payment of priority claims.  Mr. Matloff did not object to the plan treatment of his priority claim, thus he believes his claim would only receive treatment as a general unsecured creditor.   At this time, however, it is not known if Reorganized Rooftop will make any distributions to unsecured creditors, including Mr. Matloff.

### 3.     Interest in the Matloff Family Trust

With respect to Mr. Matloff's interest in the Matloff Family Trust, the amount claimed was "unknown" because Mr. Matloff is a beneficiary, but not the trustee, of the Matloff Family Trust, and no evidence was presented at trial to suggest that he has any power to request or compel a distribution.  TGL offered no evidence at trial as to the value of Matloff's interest in the trust. No evidence was presented at trial to suggest that two of the three assets of the Trust (Rooftop Singapore and Yeon) had any value.  The remaining asset is the subject of a pending settlement

---

[623] In re Rooftop Group International PTE Ltd., Case No. 19-4340, ECF No. 259.

in the *Seidel v. Barnett* proceeding.[624]   Absent any evidence to suggest that Mr. Matloff's beneficial interest in the Trust exceeds the statutory allowance set forth in 11 U.S.C. §522(d)(5), TGL's objection is overruled as TGL failed to carry its burden.

Furthermore, § 541(c)(2), excludes from the scope of property of the estate trusts with restrictions on the transfer of a beneficial interest of a debtor to the extent that such restriction is enforceable under applicable nonbankruptcy law.[625]   Mr. Matloff contends that the Matloff Family Trust is a spendthrift trust under Nevada Law, and TGL offered no evidence at trial to suggest that the trust should be considered property of Mr. Matloff's bankruptcy estate or to controvert Mr. Matloff's position.

Therefore, **COUNT SIX** of the Complaint objecting to claims of exemptions pursuant to **11 U.S.C. § 522(l)** is **DENIED** and **DISMISSED**.

## G.     OTHER CONTENTIONS BY TGL

In the Complaint and in its post-trial briefing, TGL alleges three "false oaths" made by Mr. Matloff in connection with the schedules filed in his personal Chapter 7 case.[626]   However, in the Complaint TGL has not sought denial of Mr. Matloff's discharge under ¶ 727(a)(4) based upon a false oath in his Chapter 7 case (as opposed to the cases of Rooftop Group USA and Rooftop Singapore in Counts Three and Five).   Accordingly, such allegations are not relevant to the claims at issue.   But even if they were relevant, TGL failed to satisfy its burden to establish that Mr. Matloff's discharge should be denied under 11 U.S.C. § 727(a)(4) for alleged "false oaths' made in connection with the schedules filed in his personal Chapter 7 case.

[624] *Seidel v. Barnett*, Adv. Proc. No. 19-04114-mxm.

[625] *In re Blount*, 438 B.R. 98, 99 (Bankr. E.D. Tex. 2010).

[626] Adv. ECF No. 4 at 10-11, ¶¶ 41, 43, and 45.

139

## IV.    CONCLUSION

For the forgoing reasons, the Court finds and concludes that TGL failed to satisfy its burden to establish that Mr. Matloff's debt to TGL should be declared nondischargeable under § 523 or that Mr. Matloff should be denied a discharge under § 727.  Therefore, each of the claims and causes of action contained in Counts One, Two, Three, Four, and Five of the Complaint are denied.  Additionally, the Court also finds and concludes that each of TGL's objections to Mr. Matloff's exemptions in Count Six are overruled and denied.

The Court will enter a separate final judgment consistent with this Memorandum Opinion.


### ### END OF MEMORANDUM OPINION ###